U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2024 MAR 19  PM 3: 37

CLERK

BY_____
DEPUTY CLERK

DEVEN BARRETTE,                              )
                                             )
        Plaintiff,                           )
                                             )
        v.                                   )        Case No. 2:22-cv-00129
                                             )
VILLAGE OF SWANTON,                          )
HOWARD CENTER, INC., d/b/a/                  )
HOWARD CENTER, KYLE GAGNE,                   )
ROBERT RECORE, LEONARD STELL,               )
JORDAN MICHAEL MOSHER, and                   )
JOHN AND JANE DOES I-X,                       )
                                             )
        Defendants.                          )

**OPINION AND ORDER GRANTING DEFENDANT THE HOWARD
CENTER'S MOTION TO DISMISS THE AMENDED COMPLAINT**
(Doc. 86)

Plaintiff Deven Barrette ("Plaintiff") brings this action against Defendants the

Village of Swanton; Howard Center, Inc., doing business as Howard Center (the

"Howard Center"); Kyle Gagne ("Defendant Gagne"); Jordan M. Mosher ("Defendant

Mosher"); Robert Recore ("Defendant Recore"); and Leonard Stell ("Defendant Stell");

as well as John and Jane Does I-X (the "Doe Defendants").

Plaintiff's claims arise from his detention by Swanton Village Police Department

("SVPD") officers on the night of April 1, 2020, and subsequent treatment by those

officers and Northwest State Correctional Facility ("NSCF") employees. The Amended

Complaint ("AC") asserts eight claims: violation of his Fourth and Fourteenth

Amendment rights against excessive force under 42 U.S.C. § 1983 against Defendants

Recore, Gagne, and Mosher (Count I); violation of his Fourth and Fourteenth

Amendment rights against unlawful detention or seizure under 42 U.S.C. § 1983 against

Defendants Recore, Gagne, and Mosher (Count II); violation of his Fourth and

Fourteenth Amendment rights against unlawful imprisonment under 42 U.S.C. § 1983 against Defendants Recore, Gagne, and Mosher (Count III); unconstitutional policies, customs, and practices under 42 U.S.C. § 1983 against the Village of Swanton (Count IV); assault and battery against Defendants Recore, Gagne, and Mosher (Count V); violation of the Vermont Constitution, Chapter 1, Article 11, against the Village of Swanton (Count VI); intentional infliction of emotional distress ("IIED") against Defendants Recore, Gagne, and Mosher (Count VII); and negligence against the Howard Center and Doe Defendants (Count VIII).

Plaintiff is represented by Colin R. Hagan, Esq., David J. Shlansky, Esq., and Frances F. Workman, Esq. The Village of Swanton and Defendants Gagne and Stell are represented by James F. Carroll, Esq. The Howard Center is represented by Richard J. Windish, Esq. Defendant Recore is represented by Brian P. Monaghan, Esq. Defendant Mosher is represented by Andrew C. Boxer, Esq., and Oliver A. Abbott, Esq.

I.      **Pertinent Procedural Background.**

On June 9, 2022, Plaintiff filed the original Complaint in this action. (Doc. 1.) On June 6, 2023, the court issued an Opinion and Order granting in part and denying in part Defendants' motions to dismiss and granting in part Plaintiff's request for leave to amend (the "Opinion and Order"). (Doc. 65.) In its Opinion and Order, the court granted the Howard Center's motion to dismiss Plaintiff's claims against it. Plaintiff filed an AC on July 6, 2023. (Doc. 74.)

On July 20, 2023, the Howard Center filed the instant motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). (Doc. 86.) Plaintiff responded on August 18, 2023, (Doc. 95), and the Howard Center replied on August 31, 2023. (Doc. 97.) On December 26, 2023, the court held oral argument, at which time it took the pending motion under advisement.

II.     **Allegations in the Amended Complaint.**

Plaintiff resides in Vermont and asserts claims arising out of his arrest and detention. At the time of the alleged events, Defendants Recore and Gagne were SVPD officers, and Defendant Stell was the SVPD Police Chief. Defendant Mosher is a Correctional Facility Shift Supervisor at NSCF in Swanton, Vermont.

The Howard Center is a non-profit corporation registered in Vermont with its principal place of business in Burlington, Vermont. The Doe Defendants are "natural persons who have been involved in the wrongful actions alleged in th[e] [AC], including unknown Howard Center and Vermont Department of Corrections ('[V]DOC') agents." (Doc. 74 at 3, ¶ 14.) Plaintiff alleges that some of the Doe Defendants are employed by the Howard Center.

### A.    Defendants Recore and Gagne Take Plaintiff into Custody.

On April 1, 2020, Plaintiff had ankle surgery for a "serious injury." *Id.* at 4, ¶ 19. "While recovering," Plaintiff played cards, ate snacks, and drank alcohol with his girlfriend and a friend at his girlfriend's friend's house in Swanton, Vermont. *Id.* ¶ 20. During the game, Plaintiff became upset by the pain caused by his surgical wound and "general stress[]" and began yelling, prompting his girlfriend to call the SVPD at approximately 9:35 p.m. *Id.* ¶ 21.

Plaintiff called his roommate to ask for a ride home before his girlfriend called the police. He alleges that despite being under the influence of alcohol and wearing a knee-high cast boot on one leg, he was able to talk and walk. Plaintiff left the house and began walking to a gas station across the street to wait for his roommate to pick him up. He contends that he was "responsibly awaiting his ride[]" and was neither armed nor belligerent. *Id.* at 5, ¶ 23.

At approximately 9:52 p.m., Plaintiff was pursued on foot and then stopped by Defendant Gagne, with whom he went to high school. Defendant Gagne made statements such as, "We can't let you walk[,]" "We're going to make sure you're safe[,]" and "I'm just trying to get you home here." *Id.* ¶ 26 (internal quotation marks omitted). Plaintiff alleges that Defendant Gagne made these statements in bad faith because he knew Plaintiff's home address, knew that he had a friend coming to give him a ride home, and had no probable cause to believe that Plaintiff was committing any crime or posing a danger to anyone else. Audio and video evidence allegedly "shows that they did not perceive any serious risk and knew [Plaintiff] was harmless." (Doc. 74 at 5, ¶ 27.)

Plaintiff was handcuffed and claims that the officers were aware that he was

limping and "had a noticeable surgical boot on[]" before Defendant Gagne "coordinated [Defendant] Recore tackling" Plaintiff to the ground. *Id.* at 6, ¶ 30.

Plaintiff alleges that the officers were aware that he had a surgical wound but nevertheless placed him into the back seat of a police cruiser that could not accommodate his knee-high cast boot. Plaintiff's roommate arrived at the gas station during Plaintiff's interaction with Defendants Recore and Gagne and saw Plaintiff in the police cruiser as it drove away.

Defendant Gagne's official report of the incident states:

> I arrived on scene and observed a male who I know from previous[] professional encounters as [Plaintiff]. After briefly speaking with [him] I observed indicators of intoxication. [Plaintiff] then walked away from me and I followed him. . . . [Defendant] Recore and I grabbed [Plaintiff] to take him into protective custody. [Plaintiff] briefly resisted and was taken into custody. [He] was transported to Detox where he was denied and ultimately brought to [NSCF]. Nothing Further.

*Id.* ¶ 31 (fifth alteration in original).

Defendant Gagne's police report indicates that Plaintiff was "intoxicated[]" under Vermont law so Defendant Gagne could only allegedly "assist[]" Plaintiff with his "consent." *Id.* at 6-7, ¶¶ 36, 38 (internal quotation marks omitted) (citing 18 V.S.A. § 4810(a)). Plaintiff asserts that because he was not "incapacitated" under 18 V.S.A. § 4802, he was not subject to law enforcement intervention pursuant to 18 V.S.A. § 4810, which allows officers to take incapacitated individuals into protective custody. *Id.* at 7-8, ¶¶ 40-42 (internal quotation marks omitted). He contends that Vermont law would only allow law enforcement to take him to a correctional facility if a qualified evaluator determined that he was "indeed incapacitated." *Id.* at 8, ¶¶ 42-43 (internal quotation marks omitted).

### B. The Howard Center.

Rather than allow him to go home, at approximately 10:30 p.m., Plaintiff alleges Defendants Recore and Gagne drove him to the Howard Center's substance abuse treatment and recovery facility in St. Albans, Vermont, known as the "Public Inebriate Center." (Doc. 74 at 6, ¶ 34) (internal quotation marks omitted). Howard Center staff

allegedly did not screen Plaintiff, engage with him, offer him a blood alcohol content ("BAC") or breathalyzer test, nor provide him with any "alcohol-incapacitated" ("incap") services. *Id.* at 9, ¶ 46 (internal quotation marks omitted). Instead, the Howard Center staff interacted with only one police officer whose body camera was off. Video surveillance footage allegedly shows "that no one at the Howard Center paid any attention to [Plaintiff] – he was 'refused,' with no inquiry." *Id.* at 12, ¶ 66.

According to the AC, Defendant Recore testified, "I don't recollect anybody actually assessing [Plaintiff] as far as like the Howard Center staff goes[,]" *id.* ¶ 65 (internal quotation marks omitted), although he understood that the Howard Center's job was to "sit, assess and make sure that the person becomes sober before leaving." *Id.* ¶ 64 (internal quotation marks omitted). He further testified that "out of the approximately [twenty] individuals brought to the Howard Center by [him] alone, . . . he only brought one individual inside the Howard Center." *Id.* at 13, ¶ 71.

The Howard Center's report of the incident indicates that Plaintiff was under the influence of alcohol but was "discharged[]" instead of being "referred to treatment[.]" (Doc. 74 at 12, ¶ 67) (alteration adopted) (internal quotation marks omitted). Plaintiff alleges that the report falsely states "that there was an evidence-based determination of [Plaintiff's] 'incapacitation[]'" and that he was not admitted because of "Violence Concerns, Uncooperative, Refused[,]" when in fact the Howard Center did not evaluate him. *Id.* ¶¶ 67-68 (internal quotation marks omitted). Plaintiff claims the Howard Center had actual knowledge of this false report, which includes a false statement that Plaintiff refused to have his blood drawn. He alleges that the Howard Center "had actual or implied knowledge that [Plaintiff], upon its refusal to provide him services and failure to screen him, would be brought to [NSCF,]" *id.* at 37-38, ¶ 180, "detained, or seized by [V]DOC agents[,]" *id.* at 38, ¶ 181, and "that such seizure and detention would be unlawful[.]" *Id.* ¶ 182. He claims the "Howard Center knew or should have known that its failure to screen [him] or failure to provide him with services (including a safe shelter) could result in harm." *Id.* at 37, ¶ 176.

Plaintiff contends the Howard Center had an existing care provider-patient

relationship with him since 2018, and "knew or should have known that it had a duty to him as a vulnerable person." (Doc. 74 at 9, ¶ 48.) It "expressly selected" NSCF on its refusal form to "knowingly sen[d]" him to a correctional facility. *Id.* at 13, ¶ 69. The Howard Center is "paid and licensed by the State of Vermont to provide services in these situations, in order to prevent just this type of harm[,]" *id.* at 9, ¶ 48, and its services include screening and placement for "the protection of individuals who are referred to the Howard Center as 'intoxicated' or 'incapacitated.'" *Id.* at 36, ¶ 173.

Although a non-profit organization, the Howard Center receives federal and state funding through a "Master Agreement" and annual "Final Grant Agreements" it has with the State of Vermont. *Id.* at 9, ¶ 49. Plaintiff alleges the Howard Center may also receive funding from the federal government. He contends that this funding is to "prevent people who are intoxicated, but have caused no harm, from being jailed and subjected to the danger of being injured." *Id.* ¶ 47.

In 2018, the Howard Center allegedly received more than five million dollars to provide "developmental disabilities, mental health and substance use disorder services." (Doc. 74 at 9, ¶ 50) (internal quotation marks omitted). The 2018 award funded a "Public Inebriate Program" ("PIP")[1] and provided:

> The process of screening and determining appropriate placement for individuals meeting criteria for Incapacitation, due to either the intoxication or withdrawal from alcohol or other drugs, as defined in 18 V.S.A. Chapter 94. Results of the screening process may include individuals being referred for further medical assessment, alternative placements to incarceration, or placement within restrictive facilities.

*Id.* at 9-10, ¶ 50 (internal quotation marks omitted). The State of Vermont Department of Health Grants Nos. 03420-08140 and DA-2018-003 required the Howard Center to comply with 18 V.S.A. Chapter 94's requirements. *Id.* at 10, ¶ 51.[2] The Master

---

[1] Plaintiff alleges that "ACT 1 and PIP are two names for the service of sheltering individuals to prevent injury to those who are incapacitated, and are regaining sobriety." (Doc. 74 at 10, ¶ 53.)

[2] In its Opinion and Order, the court took judicial notice of Vermont Rule CVR 13-100-003, which Plaintiff argued was cited by the Health Grants, and its repeal on May 2, 2018. It was therefore not in effect when Plaintiff was injured.

Agreement also states that "[a]ll public inebriates must be screened." *Id.* ¶ 52 (alteration in original) (emphasis and internal quotation marks omitted).

According to the Howard Center's website, PIP "provide[s] a safe and supervised environment for individuals who are incapacitated by the use of alcohol or other drugs." *Id.* ¶ 54 (internal quotation marks omitted). Plaintiff alleges that the website also states that the PIP program to which Plaintiff was brought "provides a supervised environment for individuals who are incapacitated due to alcohol or other drugs until they can regain sobriety." *Id.* ¶ 55 (internal quotation marks omitted). ACT 1, per the Howard Center's November 2020 Outcomes Report, allegedly offers "shelter" until an inebriated individual regains sobriety. (Doc. 74 at 10, ¶ 56) (internal quotation marks omitted).[3]

Plaintiff claims that his "type of injury has occurred at [NSCF] about [twenty] times in the past according to one [V]DOC agent, and Howard Center has actual or implied knowledge of similar incidents of violence against individuals refused from its programs and general violence of law enforcement officers in Vermont." *Id.* at 13, ¶ 70. Plaintiff cites a 2016 Vermont Mental Health Crisis Response Commission's report that allegedly faulted the Howard Center for police officers' shooting "a mentally unstable man" because the Howard Center failed to intervene when the man stopped taking medication it had prescribed to him. *Id.* at 11, ¶ 62. Plaintiff also cites a 2020 event in which "a homeless man" allegedly denied access to Burlington's ACT 1 program was assaulted by a firefighter. *Id.* at 12, ¶ 63. Plaintiff alleges that "numerous people" have been taken to Howard Center facilities for "incap" services and refused "without any proper effort or basis," and thereafter became incarcerated or suffered "accidental injuries." *Id.* at 13, ¶ 71 (internal quotation marks omitted).

---

[3] The Public Inebriate and Sober Bed Programming 2023 Report to the Vermont Legislature, submitted by the Commissioner of the Vermont Department of Health, allegedly stated that "PIP beds have been great to keep people out of jail when intoxicated on alcohol. The need has changed over the years. We need stabilization locations or a safety net to provide respite for those in various transitions." (Doc. 74 at 11, ¶ 60) (internal quotation marks omitted). Plaintiff alleges that "[t]he PIP program is acknowledged to be designed to prevent individuals from being jailed." *Id.*

### C.    Plaintiff's Injuries at NSCF.

After leaving the Howard Center with Plaintiff in handcuffs, Defendants Recore and Gagne took Plaintiff to NSCF, arriving at approximately 10:37 p.m. Plaintiff alleges that he remained in handcuffs while at NSCF and was in "protective custody[.]" *Id.* at 38, ¶ 181 (internal quotation marks omitted). In anticipation of his arrival, Plaintiff contends that NSCF staff were preparing a "welcoming party" for which "reservations had been made." (Doc. 74 at 14, ¶ 77) (internal quotation marks omitted). He claims that they did so because they expected a "violent and non-responsive" individual. *Id.* at 39, ¶ 188.

Defendants Recore, Gagne, Mosher, and others were involved in "the accident[,]" *id.* at 18, ¶ 83, and Plaintiff's "investigation, and the investigation by the Vermont State Police of his assault and battery, suggest that [Defendant] Mosher planned the assault and battery. But [Plaintiff] is not sure as the State [allegedly] has the evidence and has shown it only once and has withheld to date all further access." *Id.* at 2, ¶ 3.

According to the AC, Richard Rowden, II, a former defendant who worked at NSCF at the time, described Plaintiff's arrival as follows:

> After completing the Covid-19 screening we tried to help the Detox [Barrette] out of the Cruiser and he started pull away from CFSS Mosher. CFSS Mosher then removed the detox from the cruiser, and took him to a controlling surface (the Floor). At this time the Detox began to bleed from the nose and he appeared to have a large cut on his nose at that time. The Detox then began to comply and he was stood up against the wall. I then got some medical cloths to hold on the bridge of the detox nose to control the bleeding. Am care was then called and the detox was brought to the hospital by Am care and staff accompanied the detox to the hospital. During this incident COI Tuttle passed out as he was running the camera and he fell to the floor hitting his head on the cruiser. The nurse and I (CFSS Rowden) checked on COI Tuttle. After letting COI Tuttle regain himself I and the LNA helped him to his feet and out of the booking Garage to booking. There he was looked at by Nurse Cindy and she was not concerned about the small bump on his head. He was given some ice and had his vitals checked. He was sent home for the night as a precaution. His wife came and picked him up[], as it was best he didn't drive. Superintendent Beyor Notified.

*Id.* at 14-15, ¶ 78 (first alteration in original).

Plaintiff alleges that Mr. Rowden's account is contradicted by video evidence and that an unknown Vermont Department of Corrections ("VDOC")-affiliated individual "now thought to be [Defendant] Mosher[]" approached Plaintiff and "suddenly and forcibly slam[med]" his face and skull into the concrete floor, causing a "serious concussion[,]" cuts, bleeding, and other injuries, *id.* at 18, ¶ 87, as well as "severe trauma with lasting neurological, psychological, and emotional effects[]" and resulting "economic consequences." (Doc. 74 at 14, ¶ 75.) "[B]ody camera footage taken after the assault and battery" allegedly "shows that [Defendant] Mosher was physically in charge." *Id.* at 2, ¶ 3.

Plaintiff asserts that the "[V]DOC-affiliated parties" have claimed that their alleged assault and battery of Plaintiff was in self-defense because he was moving toward them in a threatening manner ("getting closer . . . getting louder and had a history of fighting with the police[]") and they were concerned about the protection of staff, *id.* at 15, ¶ 81 (first alteration in original) (internal quotation marks omitted). Plaintiff characterizes this story as "a fabrication[,]" *id.*, and claims VDOC "affiliates" allegedly falsely described Plaintiff as having tripped or having had a "slip and fall." *Id.* ¶ 79 (internal quotations marks omitted).

Although Plaintiff remembers the events leading up to the alleged assault, he does not remember the events thereafter due to the injuries he sustained. His allegations are, in part, based on his memory of a onetime viewing of a VDOC video that depicts him in a NSCF sally port. VDOC did not allow him to keep or copy the video.

According to Plaintiff, Defendant Gagne claimed to have turned his body camera off during "all key events" after Plaintiff's initial arrest, allegedly in violation of SVPD policy. *Id.* at 18, ¶ 84. Defendant Recore allegedly turned his body camera off after he arrived with Plaintiff at NSCF, then turned the camera back on "just after the 'accident,' when there was blood all over." (Doc. 74 at 18, ¶ 85.) Plaintiff includes four still photos from Defendant Recore's body camera in the AC, depicting Plaintiff being held by two correctional officers next to a wall that appears to have blood on it.

Defendant Stell allegedly claimed there are no text messages relating to Plaintiff's

injuries; however, Plaintiff contends: "There is good reason to believe that there were extensive text messages about the events in question, and that they disappeared in the days after the event. During those several days, the official-record reports were changed several times to try to conform with observable data to which became apparent." *Id.* at 21, ¶ 89.

### D.     Plaintiff Receives Care at the Hospital.

After Plaintiff was injured, an ambulance took him to a hospital where he received medical attention. The hospital then released him, and he went home with his mother. According to the AC, Plaintiff's mother allegedly stated:

> I picked him up at the hospital and could hardly recognize him due to the trauma that was done to his face. I brought him home and stayed by his side for 14 days. I lost hours and pay at work cause he couldn't be left alone for the first nights. I was awake all night because he kept choking on his own blood due to the nose injury. He was off balance for a good week. His thought process and ability to comprehend was off. He woke up several times at night with night terrors. To the point where I had to lay across him to keep him under control. I couldn't look at my son without crying. I just couldn't believe anybody could do this to a person let alone a person who just had surgery and could hardly walk. Still today the headaches and blurry vision is an issue. But for me the worst was having to lie to his daughter because you don't want kids to be afraid of police.

*Id.* ¶ 92. Plaintiff alleges that law enforcement's release of him to his mother and his "home and caring friends and family" proves that any assertion that he was a hazard to himself or others due to his alcohol use was false. *Id.* ¶ 90. In his AC, he includes three photos of his facial injuries taken after his release from the hospital.

Plaintiff seeks compensatory damages; punitive damages; attorney's fees and costs; declaratory, injunctive, or other equitable relief; and any other relief the court deems proper, including additional and available fees and costs and prejudgment interest.

## III.    Conclusions of Law and Analysis.

### A.     Standard of Review.

To survive a motion to dismiss filed pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff must allege sufficient facts to "nudge[] their claims across the line from conceivable to plausible[.]" *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

The sufficiency of a plaintiff's complaint under Rule 12(b)(6) is evaluated using a "two-pronged approach[.]" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 679). First, the court discounts legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. The court is also "'not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Id.* (citation omitted). Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.* The court does not "weigh the evidence" or "evaluate the likelihood" that a plaintiff's claims will prevail. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017).

## B. Whether Plaintiff Plausibly Alleges the Howard Center Owed Plaintiff a Duty of Care.

Under Vermont law, "[c]ommon law negligence has four elements: a legal duty owed by defendant to plaintiff, a breach of that duty, actual injury to the plaintiff, and a causal link between the breach and the injury." *Demag v. Better Power Equip., Inc.*, 2014 VT 78, ¶ 6, 197 Vt. 176, 179, 102 A.3d 1101, 1105 (citation and internal quotation marks omitted). "In determining whether a duty exists, [Vermont courts] consider a variety of public policy considerations and relevant factors. It is a question of fairness that depends on, among other factors, the relationship of the parties, the nature of the risk, the public interest at stake, and the foreseeability of the harm." *Sutton v. Vt. Reg'l Ctr.*, 2019 VT

71A, ¶ 26, 212 Vt. 612, 238 A.3d 608, 620 (citation and internal quotation marks omitted).

Although Plaintiff alleges that he had been a patient of the Howard Center since 2018 and had a treatment relationship on the date of the incident, he does not assert a claim of medical malpractice. Instead, he claims that the Howard Center "knew or should have known that it had a duty to him as a vulnerable person." (Doc. 74 at 9, ¶ 48.) He grounds this duty in Vermont statutory and common law, including Vermont's adoption of § 324A of the Restatement (Second) of Torts.

### 1.    Whether the Howard Center Owed Plaintiff a Statutory Duty.

In the AC, Plaintiff asserts that the Howard Center's "aware[ness] and acknowledg[ment] that it is paid to provide safety and shelter to individuals like [Plaintiff], whom [it] is required to screen for the purpose of determining whether safety and shelter are necessary[,]" *id.* at 10-11, ¶ 57, "comports with" 18 V.S.A. § 4810. *Id.* at 11, ¶ 58. Section 4810 states:

> No person shall be lodged in a lockup or community correctional center under subsection (d) of this section without first being evaluated and found to be indeed incapacitated by a substance abuse crisis team, a designated substance abuse counselor, a clinical staff person of an approved substance abuse treatment program with detoxification capabilities, or a professional medical staff person at a licensed general hospital emergency room.

*Id.* at 38, ¶ 183; 18 V.S.A. § 4810(e) (emphasis omitted).

18 V.S.A. Chapter 94 imposes a duty on law enforcement, not the Howard Center.[4] This remains true even if Plaintiff is characterized as a "vulnerable person."

---

[4] As stated in the court's Opinion and Order, "18 V.S.A. § 4810 requires law enforcement to follow certain procedures when a substance abuse treatment program is at capacity or otherwise refuses to accept an individual in protective custody. There is no corresponding statute imposing this duty on the Howard Center." Doc. 65 at 27-28; *see* 18 V.S.A. § 4810(b) (providing officer "shall" take a person he or she judges to be incapacitated into protective custody, then "shall transport" that person to "an approved substance abuse treatment program with detoxification capabilities or to the emergency room of a licensed general hospital for treatment"); *id.* § 4810(c) ("If an incapacitated person is taken to an approved substance abuse treatment program with detoxification capabilities and the program is at capacity, the person shall be taken to the nearest licensed general hospital emergency room for treatment."); *id.* § 4810(d) (allowing an incapacitated individual to be "lodged in protective custody in a lockup or community

(Doc. 74 at 9, ¶ 48.) There is, moreover, no indication that the Vermont Legislature intended to create a private cause of action against PIP screeners. To the extent that Plaintiff's negligence claim rests on the Howard Center's statutory duty of care under 18 V.S.A. § 4810, the court GRANTS the Howard Center's motion to dismiss that claim for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6).

### 2.   Whether the Howard Center Owed Plaintiff a § 324A Duty.

The Vermont Supreme Court has adopted § 324A of the Restatement (Second) of Torts ("§ 324A"), which provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> > (a) his failure to exercise reasonable care increases the risk of such harm, or
> >
> > (b) he has undertaken to perform a duty owed by the other to the third person, or
> >
> > (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965); *see also Perry v. Green Mountain Mall*, 2004 VT 69, ¶ 10, 177 Vt. 109, 113, 857 A.2d 793, 797 (holding that plaintiff who was injured when her car skidded on ice in a mall parking lot alleged a duty under § 324A owed by defendant who had a contract with the mall owner to maintain the mall's parking lots and roads); *Derosia v. Liberty Mut. Ins. Co.*, 583 A.2d 881, 883-84 (Vt. 1990) (finding insurer who provided safety investigations for insured owed a duty under § 324A to plaintiff employee who was injured at insured's workplace).

Vermont courts "require[] a threshold showing that there existed an undertaking to render services for another for the protection of a third party[]" "[b]efore considering [the

---

correctional center" only if he or she refuses treatment or "no approved substance abuse treatment program with detoxification capabilities and no staff physician or other medical professional at the nearest licensed general hospital can be found who will accept the person for treatment").

§ 324A] subsections[.]" *Sheldon v. Ruggiero*, 2018 VT 125, ¶ 31, 209 Vt. 33, 45, 202 A.3d 241, 250 (first alteration in original) (citation and internal quotation marks omitted). "[F]or there to be an 'undertaking' at all, the defendant must have undertaken to do the specific task he or she is accused of performing negligently, and the extent of the undertaking defines the scope of the liability." *Id.* at ¶ 31, 209 Vt. at 46, 202 A.3d at 250 (citation omitted).

The Vermont Supreme Court has "closely scrutinized the actual task assumed by the defendant in determining whether there was the threshold 'undertaking.'" *Id.* at ¶¶ 29, 32, 209 Vt. at 45-46, 202 A.3d at 250 (finding "defendant is not liable for negligent undertaking because there is no evidence demonstrating that he specifically engaged in an undertaking of the scope asserted by plaintiffs[]" and, even if he had, "his subjective intent and unilateral, uncommunicated actions do not support a negligent-undertaking claim").

Typically, "[t]he existence of a duty is a question of law to be decided by the court." *Montague v. Hundred Acre Homestead, LLC*, 2019 VT 16, ¶ 14, 209 Vt. 514, 520, 208 A.3d 609, 614. However, "[i]n cases under section 324A, . . . the existence and scope of a defendant's duty depend on the nature and extent of its undertaking, and these, in turn, are questions of fact for the jury." *Pratt v. Liberty Mut. Ins. Co.*, 952 F.2d 667, 671 (2d Cir. 1992) (citing *Derosia*, 583 A.2d at 886).

In its Opinion and Order, the court found that Plaintiff had plausibly alleged the Howard Center owed him a duty under § 324A to exercise reasonable care in providing its services because it had contracted with the State of Vermont to "provide screening and placement services for the protection of individuals presented for screening[,]" and Plaintiff alleges he would have avoided physical injury if the Howard Center had conducted proper screening. (Doc. 65 at 29.) He claims that the Howard Center's funding agreement with Vermont requires that "[a]ll public inebriates must be screened[,]" (Doc. 74 at 10, ¶ 52) (first alteration in original) (emphasis and internal quotation marks omitted), and the Howard Center offers PIP/ACT 1 as a service that "provide[s] a safe and supervised environment" and "shelter" for incapacitated individuals to regain

14

sobriety. *Id.* ¶¶ 54, 56 (internal quotation marks omitted).

Accepting the AC's allegations as true, Plaintiff plausibly alleges at least a jury question as to whether the Howard Center had a duty to screen, place, and potentially shelter incapacitated individuals for the State of Vermont. He does not, however, plausibly allege an "undertaking." Rather than provide such services, Plaintiff contends the Howard Center provided no services to him and falsified its records to suggest it did. As a result, the AC fails to plausibly allege the "threshold 'undertaking.'" *Sheldon*, 2018 VT 125, ¶¶ 32, 34, 209 Vt. at 46-47, 202 A.3d at 250-51 ("The record lacks any evidence that when defendant spoke to the [Department for Children and Families ("DCF")] caseworker about [a child's stepfather,] he specifically undertook to broadly investigate the cause of [a child's] injuries rather than to fulfill his narrower contractual and statutory obligation as an administrative reviewer to decide whether to uphold DCF's substantiation of abuse against mother."). On this basis alone, Plaintiff fails to allege a threshold component of a § 324A claim.

The necessity of an undertaking is buttressed by the comparison § 324A(a) requires. "To impose liability under § 324A[a] . . . the defendant must have increased the risk of harm to the third person[.]" *Id.* at ¶ 35, 209 Vt. at 47, 202 A.3d at 251. "The standard of comparison for [§ 324A(a)] is not the risk of harm created if defendant [had] exercised reasonable care," but rather "the risk of harm that would be present if defendant *never undertook to render the services.*" *Newton v. Preseau*, 2020 VT 50, ¶ 10, 236 A.3d 1270, 1274 (second alteration in original) (internal quotation marks omitted) (emphasis supplied); *see also* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 43 cmt. d ("'Increased risk' means that the undertaking creates greater risk than the risk that existed in the absence of the undertaking."). "Neither mere failure to discover a danger nor 'failure to advise' that permits continuation of an existing risk will subject a defendant to liability." *Stocker v. State*, 2021 VT 71, ¶ 42, 215 Vt. 432, 456, 264 A.3d 435, 452 (citation omitted).

In summary, "[t]o establish increased risk of harm under § 324A(a), plaintiffs must identify 'sins of commission rather than omission,' or conduct that 'directly

increases risk of harm.'" *Id.* (citation omitted). Because the Howard Center allegedly did not perform any undertaking, its "omission[]" cannot be the basis for increasing the risk of harm to Plaintiff under § 324A(a). *Id.* (citation and internal quotation marks omitted). Similarly, because "[t]he standard of comparison for [§ 324A(a)]" is "the risk of harm that would be present if defendant never undertook to render the services," there was no increased risk of harm to Plaintiff because the Howard Center did not provide any services to him. *Newton*, 2020 VT 50, ¶ 10, 236 A.3d at 1274.

For the reasons stated above, the court GRANTS the Howard Center's motion to dismiss Plaintiff's § 324A claim for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6).

### 3. Whether the Howard Center Had a Common Law Duty that Extended to Plaintiff.

When a court finds a common law duty, the scope of that duty "is determined by the foreseeability of the consequences of an individual's acts or omissions." *Edson v. Barre Supervisory Union No. 61*, 2007 VT 62, ¶ 10, 182 Vt. 157, 161, 933 A.2d 200, 204 (citation omitted). The common law does not "hold[] individuals liable in negligence for consequences that a reasonably prudent person could not have foreseen or anticipated under the circumstances." *Id.*

"[I]n general, crimes committed by a third party fall within the realm of the unforeseeable, and therefore cannot form the basis for liability[,]" unless "the defendant had special knowledge or notice which would allow it to anticipate the wrongful act." *Stopford v. Milton Town Sch. Dist.*, 2018 VT 120, ¶ 17, 209 Vt. 171, 180, 202 A.3d 973, 981 (citations and internal quotation marks omitted); *see also Lexington Ins. Co. v. Rounds*, 349 F. Supp. 2d 861, 866 (D. Vt. 2004) ("Knowledge of danger on the part of the actor is vital to the creation of the duty to exercise care in any given situation where injury to the person or property of others is at stake.") (internal quotation marks omitted) (quoting *Thompson v. Green Mountain Power Corp.*, 144 A.2d 786, 789 (Vt. 1958)).

In its Opinion and Order, the court acknowledged that "[a]lthough certain exceptions exist, there is generally no duty to protect another from the actions of a third person." Doc. 65 at 27 (alteration adopted) (quoting *Montague*, 2019 VT 16, ¶ 15, 209

16

Vt. at 521, 208 A.3d at 614); *see also* Restatement (Second) of Torts § 315 ("There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless . . . a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or . . . gives to the other a right to protection."). Where the Vermont Supreme Court has not given its "imprimatur that a legal duty exists[,]" courts "should not recognize a new cause of action or enlarge an existing one without first determining whether there is a compelling public policy reason for the change." *Langle v. Kurkul*, 510 A.2d 1301, 1305-06 (Vt. 1986).

Plaintiff asserts, "[i]t was reasonably foreseeable that [he] would be unlawfully detained, confined, or imprisoned as a result of the Howard Center's failure to screen or otherwise provide services to [him.]" (Doc. 74 at 37, ¶ 179.) The Howard Center concedes it was foreseeable that Plaintiff would be taken to NSCF after the Howard Center refused him services.[5] Plaintiff does not, however, allege further facts that support a claim that the Howard Center had control over where the law enforcement officers took him, nor facts that plausibly allege the Howard Center had a duty or ability to control NSCF's conduct.

Arguing that he need only allege the general risk and nature of the physical harm to him was foreseeable, and that foreseeability may be implied by the circumstances, Plaintiff contends his common law claim is plausible. Foreseeability, however, is not synonymous with duty. Rather, "foreseeability of harm is *relevant* to whether there was a legally cognizable duty owed to the plaintiff[,]" *Lexington Ins. Co.*, 349 F. Supp. 2d at 866 (emphasis supplied), and is the linchpin of the *scope* of the duty found. *See Edson*, 2007 VT 62, ¶ 10, 182 Vt. at 161, 933 A.2d at 204. The Vermont Supreme Court has not recognized a PIP provider's duty to a person to whom it does not provide services to

---

[5] Plaintiff alleges that the Howard Center "had actual knowledge that [Plaintiff] was being sent to [NSCF], as it indicated he be sent to [NSCF] on its refusal form." (Doc. 74 at 39, ¶ 186.) The Howard Center states, "for the purposes of this motion it is accepted that [it] may have known that Plaintiff would be taken to [NSCF]." (Doc. 86 at 7.)

protect that party from harm from third parties over which it has no oversight or control. As this court must predict whether it would do so,[6] it predicts the Vermont Supreme Court would not recognize a duty in these circumstances. Such a duty, if imposed, would be virtually limitless and would extend not only to law enforcement but to the incapacitated person's family and friends as well as healthcare workers and anyone else who subsequently assumed a caregiving role toward the incapacitated person.

Because Plaintiff fails to plausibly allege that, under Vermont law, the Howard Center "had special knowledge or notice which would allow it to anticipate the wrongful act[s]" of third parties, *Stopford*, 2018 VT 120, ¶ 17, 209 Vt. at 180, 202 A.3d at 981, the court GRANTS the Howard Center's motion to dismiss Plaintiff's negligence claim against it for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

## CONCLUSION

For the foregoing reasons, the Howard Center's motion to dismiss is GRANTED. (Doc. 86.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 19th day of March, 2024.

Christina Reiss, District Judge
United States District Court

---

[6] *See Runner v. New York Stock Exch., Inc.*, 568 F.3d 383, 386 (2d Cir. 2009) (observing that a federal court's role "is not to adopt innovative theories that may distort established state law. Instead [it] must carefully predict how the state's highest court would resolve the uncertainties that [it has] identified") (quoting *The Travelers Ins. Co. v. Carpenter*, 411 F.3d 323, 329 (2d Cir. 2005)).