UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2025 MAY 22  PM 4: 55

CLERK

BY_____
DEPUTY CLERK

DEVEN BARRETTE,                        )
                                       )
        Plaintiff,                     )
                                       )
        v.                             )        Case No. 2:22-cv-00129
                                       )
VILLAGE OF SWANTON,                    )
KYLE GAGNE, ROBERT RECORE,             )
LEONARD STELL,                         )
JORDAN MICHAEL MOSHER, and             )
JOHN AND JANE DOES I-X,                )
                                       )
        Defendants.                    )

**OPINION AND ORDER DENYING IN PART AND GRANTING IN PART
DEFENDANT MICHAEL MOSHER'S MOTION FOR SUMMARY JUDGMENT**
(Doc. 170)

Plaintiff Deven Barrette ("Plaintiff") brings this action against Defendants the

Village of Swanton; Kyle Gagne ("Defendant Gagne"); Jordan M. Mosher ("Defendant

Mosher"); Robert Recore ("Defendant Recore"); and Leonard Stell ("Defendant Stell");

as well as John and Jane Does I-X (the "Doe Defendants").

Plaintiff's claims arise from his detention by Swanton Village Police Department

("SVPD") officers on the night of April 2, 2020, and subsequent treatment by those

officers and Northwest State Correctional Facility ("NWSCF") employees. The Amended

Complaint asserts eight claims: violation of his Fourth and Fourteenth Amendment rights

against excessive force under 42 U.S.C. § 1983 against Defendants Recore, Gagne, and

Mosher (Count I); violation of his Fourth and Fourteenth Amendment rights against

unlawful detention or seizure under 42 U.S.C. § 1983 against Defendants Recore, Gagne,

and Mosher (Count II); violation of his Fourth and Fourteenth Amendment rights against

unlawful imprisonment under 42 U.S.C. § 1983 against Defendants Recore, Gagne, and

Mosher (Count III); unconstitutional policies, customs, and practices under 42 U.S.C. §

1983 against the Village of Swanton (Count IV); assault and battery against Defendants Recore, Gagne, and Mosher (Count V); violation of the Vermont Constitution, Chapter 1, Article 11, against the Village of Swanton (Count VI); intentional infliction of emotional distress against Defendants Recore, Gagne, and Mosher (Count VII); and negligence against the Howard Center, Inc., doing business as Howard Center (the "Howard Center") and Doe Defendants (Count VIII). On March 7, 2024, the court granted Defendant Mosher's partial motion to dismiss Count III against him, (Doc. 147), and on March 19, 2024, the court granted Defendant Howard Center's motion to dismiss Count VIII against it. (Doc. 150.)

On August 30, 2024, Defendant Mosher moved for summary judgment, seeking dismissal of Plaintiff's claims against him. (Doc. 170.) Plaintiff responded on October 25, 2024, (Doc. 180), and Defendant Mosher replied on November 11, 2024. (Doc. 184.) Plaintiff filed a sur-reply on December 5, 2025, at which time the court took the pending motion under advisement.[1] (Doc. 200.)

Plaintiff is represented by Colin R. Hagan, Esq., David J. Shlansky, Esq., and Frances F. Workman, Esq. The Village of Swanton and Defendants Gagne and Stell are represented by James F. Carroll, Esq. Defendant Recore is represented by Brian P. Monaghan, Esq. Defendant Mosher is represented by Andrew C. Boxer, Esq., and Oliver A. Abbott, Esq.

## I.    The Factual Record on Summary Judgment.

"Only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment, and a district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence." *Picard v. JABA Assocs. LP*, 49 F.4th 170, 181 (2d Cir. 2022) (alteration adopted) (internal quotation marks and citation omitted); *see* Fed. R. Civ. P. 56(c)(2) ("A party may object that the

---

[1] Plaintiff filed a motion for leave to file a sur-reply on November 21, 2024. (Doc. 192). Defendant Mosher opposed Plaintiff's motion and filed a motion to strike Plaintiff's sur-reply on November 21, 2025 and November 22, 2024. (Docs. 194, 195.) The court denied Defendant Mosher's motion to strike and stated it "will consider only arguments that properly fall within the sur-reply." (Doc. 196.)

material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). "[T]he nonmoving party need not produce evidence in a form that would be admissible at trial in order to avoid summary judgment," but "any evidence considered on summary judgment must be reducible to admissible form[.]" *Grabin v. Marymount Manhattan Coll.*, 659 F. App'x 7, 9 (2d Cir. 2016) (summary order) (internal quotation marks and citations omitted) (alteration adopted).

In support of his motion for summary judgment, Defendant Mosher submits, among other things, evidence from Plaintiff's use-of-force expert, Shannon K. West; Defendant Mosher's use-of-force expert, Steve Ijames; and Defendant Mosher's human factors expert Michael J. Kuzel. The evidence submitted by Plaintiff in opposition includes internal documents and communications regarding Defendant Mosher's use of force; NWSCF guidelines for the use of force, intake of incapacitated individuals and transportation of inmates; Vermont Department of Corrections ("DOC") training materials; incident reports regarding the use of force on Plaintiff on April 2, 2020; intake videos of other individuals being brought by police to NWSCF; and deposition testimony from Plaintiff's acquaintance, Randy Cummings, regarding DOC intake practices and the meaning of the term "welcoming party," which Plaintiff claims was used by dispatch to refer to the officers assembled to receive him when he was transported to NWSCF.

Plaintiff contends that Defendant Mosher's expert reports are inadmissible hearsay to the extent they describe how Plaintiff's injury "supposedly occurred" and that the expert's conclusions "are unreliable or otherwise rely on inaccurate assumptions." (Doc. 180 at 19-20.) Plaintiff also argues that Mr. Kuzel was unqualified to opine regarding a correctional officer's use of force. In a similar vein, Defendant Mosher asserts that the "opinions and comments of [Defendant] Mosher's supervisors at the DOC, observations by Swanton [Police Department], as well as an internal review and internal policies" are inadmissible as irrelevant because "[t]here is no evidence that these supervisors were conducting a Fourth Amendment analysis or applying an objective-person standard" and therefore "their offhand remarks provide no basis for

3

judging whether [Defendant] Mosher acted reasonably or not." (Doc. 184 at 4.)
Defendant Mosher further argues that the videos submitted by Plaintiff of intakes other
than his own are inadmissible as irrelevant and unduly prejudicial and that Mr.
Cummings's testimony regarding the meaning of "welcoming party" is not credible
evidence.

## A.    Use-of-Force Expert Opinions.

Fed. R. Evid. R. 702 governs the admissibility of expert testimony at summary
judgment and at trial. Pursuant to that rule:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise if
> the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will
> help the trier of fact to understand the evidence or to determine a fact in
> issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and
> methods to the facts of the case.

Fed. R. Evid. 702.

"In considering whether to admit expert testimony under Rule 702, a district court
serves a 'gatekeeping role' by 'ensuring that an expert's testimony both rests on a reliable
foundation and is relevant to the task at hand.'" *United States v. Napout*, 963 F.3d 163,
187-88 (2d Cir. 2020) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597
(1993)). "In 'deciding whether . . . an expert's analysis is unreliable, the district court
should undertake a rigorous examination of the facts on which the expert relies, the
method by which the expert draws an opinion from those facts, and how the expert
applies the facts and methods to the case at hand.'" *Daniels-Feasel v. Forest Pharms.,
Inc.*, 2023 WL 4837521, at *2 (2d Cir. July 28, 2023) (alteration in original) (quoting *In
re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*, 982 F.3d 113, 123 (2d Cir.
2020)). "Any expert opinions or testimony on legal questions or conclusions should be
stricken." *Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting,*

4

*Inc.*, 743 F. Supp. 3d 530, 543 n.9 (S.D.N.Y. 2024).

Mr. Ijames, Defendant Mosher's use-of-force expert, has forty-six years of experience in policing and has acted as an instructor, presenter, and consultant on the use of force. In his report, Mr. Ijames opined that the injury suffered by Plaintiff "was not the result of force intentionally applied, but the accidental and unintended consequence of appropriate action taken while overcoming his resistance to control." (Doc. 170-9 at 32.) Mr. Ijames bases this opinion, in part, upon his reconstruction of the incident in which he met with Defendant Mosher, drove a Vermont State Police vehicle to a similar location where the vehicle transporting Plaintiff was parked, and allowed Defendant Mosher to extract him from the vehicle approximately twenty times in varying ways, including one in which a second officer grabbed him as he was being pulled out of the vehicle. According to Mr. Ijames, the second officer's action "presented [him] in a position more likely to have resulted in facial contact with the ground during a dynamic removal" because "the contact pressure applied to [his] body on the opposite side from [Defendant] Mosher prevented the natural rotation towards [his] left side and resulted in [him] going to the ground on [his] stomach each time." *Id.* at 33. Mr. Ijames claims he re-created these circumstances "approximately five" times. *Id.*

Mr. West, Plaintiff's use-of-force expert, was an active police officer for twenty years with the Kentucky State Police and as an instructor with the Kentucky Department of Criminal Justice police academy for eight years. Mr. West testified, among other things, that the injury to Plaintiff's face "was accidental[,]" although he characterized the use of force as "violently yanking [Plaintiff] from the cruiser." (Doc. 170-8 at 39.) Mr. West opined that certain actions of Plaintiff, such as leaning forward and screaming "Let me do it," could "reasonably be perceived as a pre-attack cue[,]" *id.* at 24, that it was "reasonable" for Defendant Mosher to perceive "that spitting might be a real concern for his health" because of the COVID-19 pandemic, *id.* at 20, and that it was also "reasonable" for Defendant Mosher to believe that Plaintiff "might present a risk of physical injury" to him based on the description of Plaintiff's behavior prior to Plaintiff's arrival at NWSCF. *Id.*

5

"'Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony,' as '[t]he question of intent is a classic jury question and not one for the experts.'" *Novartis Pharma AG v. Incyte Corp.*, 2024 WL 3608338, at *10 (S.D.N.Y. July 29, 2024) (alteration in original). The opinions of Mr. Ijames and Mr. West that Plaintiff's injuries were "accidental" are inadmissible because they are opinions regarding Defendant Mosher's intent. Correspondingly, expert opinions regarding whether Defendant Mosher acted "reasonably" under the circumstances are inadmissible because they not only usurp the role of the finder of fact,[2] but also "express[] a legal conclusion or instruct[] the jury what conclusion to reach[.]" *Outlaw v. City of Hartford*, 2015 WL 1538230, at *14 (D. Conn. Apr. 6, 2015); see also *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards.").

Plaintiff's challenge to opinions based on the attempts by Mr. Ijames to re-create the event are grounded in the absence of a need for expert witness testimony on this point. To allow an expert to assume the role of an actor in his or her own incident reconstruction which involves no special expertise lies far afield of an opinion based upon specialized knowledge grounded in the expert's education, experience, or training. It is unsurprising that Defendant Mosher cites no authority for the admission of this type of opinion under *Daubert*, and the court has found none.

## B.    Human Factors Expert Opinion.

Mr. Kuzel, a certified human factors professional with degrees in bioengineering, industrial engineering, and applied psychology, provided an "event reconstruction and

---

[2] *See Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992) (ruling that conclusory opinions that do little more than tell the jury what result to reach are not helpful and thus "should have been excluded"); *see also Oakley v. Dolan*, 980 F.3d 279, 284 (2d Cir. 2020) ("Because of its intensely factual nature, the question of whether the use of force was reasonable under the circumstances is generally best left for a jury to decide.") (internal quotation marks omitted) (quoting *Holland v. City of Poughkeepsie*, 90 A.D. 3d 841, 844, 935 N.Y.S.2d 583, 588 (2d Dep't 2011)).

human factors analysis" of Defendant Mosher's use of force. (Doc. 170-11 at 2.) Mr.
Kuzel represents that he has "investigated and evaluated" police use-of-force incidents
"as a reconstruction, injury biomechanics, and human factors expert." *Id.* at 3. Based on
his review of the video of Defendant Mosher's use of force and Defendant Mosher's
testimony about the incident, Mr. Kuzel opined that the action used by Defendant Mosher
to pull Plaintiff out of the vehicle "involved a ballistic muscle contraction." *Id.* at 12.
According to Mr. Kuzel, "there is an accurac[]y tradeoff associated with ballistic
contractions, leading to the actual force differ[]ing from the intended force[.]" *Id.* Mr.
Kuzel rendered the following conclusions about Defendant Mosher's use of force:

> 1. Ballistic movements are often necessary and appropriate in situations
> demanding the use of force.
>
> 2. [Defendant] Mosher's use of force necessarily involved a ballistic
> movement to extract [Plaintiff] from the vehicle.
>
> 3. Limiting the force applied to [Plaintiff] through a ballistic movement
> would require [Defendant] Mosher to be able to accurately predict
> [Plaintiff's] resistance to that movement, which is unrealistic and near
> impossible.
>
> 4. Therefore, criticism of the amount of force used by [Defendant] Mosher
> to extract [Plaintiff] from the vehicle does not account for human
> performance limitations in making a ballistic movement in the subject
> context and, therefore, is unreasonable.
>
> 5. The evidence does not demonstrate that [Defendant] Mosher intended to
> use excessive or unnecessary force to extract [Plaintiff] from the vehicle.
>
> 6. The evidence does not demonstrate that [Defendant] Mosher "*forcibly
> slam[med]*" or threw [Plaintiff] to the controlling surface.

*Id.* at 13 (emphasis and second-to-last alteration in original).

Plaintiff argues that Mr. Kuzel's engineering background does not qualify him to
opine on Defendant Mosher's use of force, and that his conclusions are "speculative and
conclusory[.]" (Doc. 180 at 20.) Defendant does not cite to any authority for admitting a
human factors expert's testimony regarding a police officer's use of force.

Because Mr. Kuzel provides no scientific basis for his conclusions that Defendant
Mosher's use of force on Plaintiff was a "ballistic muscle contraction[,]" (170-11 at 12),
or that it is "unrealistic and near impossible" to predict Plaintiff's resistance to such a

movement or for his opinions regarding Defendant Mosher's intent, *id.* at 13, and because his alleged scientific sources offer only broad generalizations about human behavior, such that "[t]hinking and decision-making are guided by two Systems[,]" one characterized by "instantaneous, automatic thinking" and another that "is analytical, deliberate, and rational," *id.* at 11, his opinions are inadmissible. *See Lewis v. Kern Cnty.*, 2025 WL 821895, at \*3 (E.D. Cal. Mar. 13, 2025) (excluding Mr. Kuzel's expert opinions about a police shooting because "[w]ithout any methodology or reasoning in the expert report, the [c]ourt cannot adequately assess the basis for [Mr.] Kuzel's opinions or conclusions as to any 'human factors' that may have influenced [the officer's] decision"); *see also Bonta v. Accor N. Am. Inc.*, 2010 WL 11549397, at \*5 (W.D.N.Y. Dec. 23, 2010), *report and recommendation adopted*, Text Order (Mar. 7, 2011) (recommending exclusion of human factors expert's testimony on "effects of momentum and gravity" in plaintiff's fall where the expert's report "contain[ed] no tests or scientific analysis relating to [plaintiff's] movements").

### C. Internal Review and Guidelines.

In opposing summary judgment, Plaintiff cites internal documents related to Defendant Mosher's use of force and the use of force generally, including an NWSCF's superintendent's comment that Defendant Mosher's use of force was "concerning" and a report by the Vermont Corrections Academy's Academy Director James Rice finding that Defendant Mosher's "use of force does not look to be consistent with V[ermont] DOC training[.]" (Doc. 180 at 11-12) (internal quotation marks and citations omitted). Defendant Mosher argues that these materials lack relevance because supervisors who commented on his use of force were not judging the matter using constitutional standards, nor do internal policies and guidelines necessarily reflect the constitutional standard for whether force is reasonable. Defendant Mosher asserts that admitting Mr. Rice's opinion would "prejudice [him], since the jury would be tempted to assume that if someone as senior as [Mr.] Rice found fault with the force, then [Defendant] Mosher must have violated the constitutional standard too — even if the analyses are different." (Doc. 184 at 4.)

8

The test for relevant evidence is whether "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed R. Evid. 403. "Fed. R. Evid. 403 'requires the trial court to make a conscientious assessment of whether the probative value of the evidence on a disputed issue in the case is substantially outweighed by the prejudicial tendency of the evidence to have some other adverse effect upon the defendant.'" *Sitts v. Dairy Farmers of Am., Inc.*, 2020 WL 5233027, at *5 (D. Vt. Sept. 2, 2020) (quoting *United States v. Quattrone*, 441 F.3d 153, 186 (2d Cir. 2006)).

The challenged evidence is clearly relevant as it reflects an analysis of Defendant Mosher's use of force by individuals whose job responsibilities include oversight over his actions. *See Brown v. City of New York*, 798 F.3d 94, 101 n.11 (2d Cir. 2015) (noting that other circuits have considered the "regulations of a single department" in making constitutional rulings on excessive force). Whether such evidence should be excluded at summary judgment or at trial because it is unduly prejudicial and because of the potential for juror confusion is a different question.

Although Defendant Mosher cites several cases in which courts have excluded evidence of police department policies or internal reviews at trial in excessive use-of-force claims, at the summary judgment phase, the court is not concerned with confusing the jury, and the evidence has some probative value "in deciding whether the use of force was appropriate in this case." *Outlaw*, 2015 WL 1538230, at *14 (allowing expert to "testify generally regarding accepted police procedures involving violent arrestees"); *see Crawford v. City of New London*, 2014 WL 186417, at *5 (D. Conn. Jan. 16, 2014) (admitting a witness' statement that the plaintiff "was not resisting or doing anything whatsoever to deserve that kind of treatment" at summary judgment) (internal quotation marks omitted).

Because at the summary judgment stage "[t]here is no jury to prejudice or

9

mislead," the court finds the probative value of this evidence is not substantially outweighed by the potential prejudice and will consider it for the purpose of deciding whether to grant summary judgment. *Cooper Crouse-Hinds, LLC v. City of Syracuse, New York*, 568 F. Supp. 3d 205, 222 (N.D.N.Y. 2021); *see Tang Cap. Partners, LP v. BRC Inc.*, 757 F. Supp. 3d 363, 374 (S.D.N.Y. 2024) (noting that "while it is not unheard of to exclude evidence under Rule 403 at the summary judgment stage, . . . the balancing process contemplated by that rule is best undertaken at the trial itself") (alteration in original) (internal quotation marks and citation omitted).

### D.    Evidence of Other Intakes.

Plaintiff submits videos of what appear to be six different intakes in which an individual is extracted from a police vehicle. (Docs. 180-9, 180-10, 180-11, 180-12, 180-13, 180-14). Plaintiff contends that five correctional officers and one nurse assembled to receive him upon his arrival to NWSCF, which was "generally more officers than typically assembled to receive an incapacitated individual" and cites these videos of other intakes as showing only "two or three corrections officers[] and a nurse" and "that detainees who were more combative or threatening than [Plaintiff] were treated more gently and with less force." (Doc. 180-1 at 2-3.) He also claims, based on the same videos, that "Vermont [DOC] corrections officers often permit 'incapacitated' individuals brought for intake to get out of the police cruiser on their own volition." *Id.* at 3. Defendant Mosher argues these videos are irrelevant and prejudicial because "[h]ow different officers handled removing a different individual from a different cruiser in a different garage at a different facility under different conditions has no relevancy . . . to whether reasonable force was used." (Doc. 184 at 3.) The court agrees.

Without knowing the context of each video, including the events leading up to the intakes; the condition of the detainee; the knowledge of the officers involved regarding the threat, if any, posed by the individual; and the individual's physical and mental condition both before and during the incident, the videos yield scant relevant information for determining whether Defendant Mosher's use of force against Plaintiff was excessive. Accordingly, at this juncture, the videos of other intakes not involving Plaintiff are

10

inadmissible.

    **E.**    **Testimony of Mr. Cummings.**

Plaintiff cites the testimony of his acquaintance Randy Cummings to support his assertion that "[a] 'welcoming party' is a euphemism for a group of officers assembling and preparing for a use of force" and "generally means that 'there's going to be ten [corrections officers] in the booking when you get there. And if you flinch or do anything crazy they're going to whip you into shape[.]'" (180-1 at 2) (second alteration in original) (quoting Doc. 180-8 at 4). Mr. Cummings testified that "the term 'welcoming party,' when I first started going to prison, if you gave [officers] any reason . . . you were getting your ass kicked, period." (Doc. 180-8 at 4.) Mr. Cummings also testified that he had not been to prison for eleven years and that "with the technology and the computers and the cameras and everything that there is now . . . I'm assuming things are different in there." *Id.* Defendant Mosher contends that the opinions and testimony of Mr. Cummings are "unsupported by credible evidence." (Doc. 184-3 at 2.)

Generally, a "witness *may not* testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." *United States v. Garcia*, 291 F.3d 127, 140 (2d Cir. 2002) (emphasis in original) (quoting Fed. R. Evid. 602). Mr. Cummings is competent to testify to his own experience, but he is not qualified to testify to general practices unless he has witnessed them and is competent to testify that they are representative of DOC's practices, which is unlikely. Moreover, because Mr. Cummings testified that his understanding of the term "welcoming party" was based on his personal experiences with Vermont correctional personnel eleven years ago, there is no evidence that he had relevant personal knowledge of what the term means in this case, and his testimony on this issue is inadmissible.

**II.**    **The Undisputed Facts.**

On April 2, 2020, Town of Swanton's dispatch received a call from a friend of Plaintiff's girlfriend at the time complaining that Plaintiff was intoxicated and would not leave her property. Defendant Gagne, an officer from the SVPD, responded to the call and found Plaintiff outside showing signs of intoxication. At the time, Plaintiff was

wearing a medical boot on his left leg after undergoing surgery on his ankle earlier that day. Defendant Gagne attempted to stop Plaintiff and help him find a ride home, but Plaintiff walked away. At one point, Plaintiff crossed the street after a car passed. As Plaintiff continued walking away from Defendant Gagne, Defendant Gagne approached him from behind and used an arm-bar takedown to bring him to the ground and take him into protective custody.

Officers first took Plaintiff to the Howard Center, which refused to admit him. The Howard Center "Incapacitation Screening and Disposition Report" checked the boxes for violence concerns, uncooperative, and refused under "NON-ADMIT REASON CODES[.]" Doc. 170-4 at 2. The blood alcohol content ("BAC") section is empty except for the word "Refused" written over it. Rita Dean, the Howard Center employee who filled out the report, did not speak to Plaintiff or personally evaluate him. *See* Doc. 180-4 at 44-45 (Defendant Gagne's testimony that when Plaintiff arrived at the Howard Center, he was in the car with the door closed, and Ms. Dean "didn't go to speak with him"); Doc. 184-8 at 13 (Ms. Dean's testimony that her writing "Refused" next to the BAC section meant that she "couldn't get close enough" to ask Plaintiff to take his BAC).

Thereafter, the officers took Plaintiff to NWSCF. Prior to Plaintiff's arrival, an officer briefed Defendant Mosher, who was acting as shift supervisor, that Plaintiff was being "uncooperative with law enforcement" and "was spitting." (Doc. 170-2 at 2.) Upon Plaintiff's arrival at NWSCF, Defendant Recore "twice warned the NWSCF personnel, including [Defendant] Mosher, that [Plaintiff] was spitting." (Doc. 180-2 at 3.) The parties agree "there is no evidence that [Plaintiff] spat" while in the NWSCF garage. (Doc. 184-2 at 4.) Plaintiff was received by five corrections officers and one nurse. In the handheld video of the incident, a voice can be heard saying "be aware that he is spitting" as the nurse approaches the side of the police cruiser where Plaintiff is seated. (Doc. 170-6 at 0:25.)

With the door shut to the police cruiser, a nurse conducted a COVID-19 screening by talking to Plaintiff through a partially opened window with a ventilated barrier. The video depicts this screening and the approximately thirty minutes of events that

12

followed.[3] Plaintiff appears agitated while answering the nurse's questions. He also appears to be having difficulty hearing, and he speaks in a loud voice. He mentions several times that he needs to use the restroom. He also states that he had undergone surgery that day. Plaintiff appears intoxicated, but he is intelligible, and his answers are responsive.

After the screening, which takes approximately one minute, Defendant Mosher opens the back door to the cruiser where Plaintiff is sitting and says, "come on out." *Id.* at 1:17. Defendant Mosher is wearing a mask and gloves, and Plaintiff is handcuffed behind his back. Defendant Mosher reaches for Plaintiff's shoulders and Plaintiff shouts loudly, "Hey, don't pull on me." *Id.* at 1:21. Plaintiff repeats "don't pull on me" and says "wait," "don't" and "let" as Defendant Mosher tries to move Plaintiff out of the cruiser. *Id.* at 1:22-28. Someone says, "we're helping you out, bud," and Defendant Mosher beckons Plaintiff with his hand and says, "come on." *Id.* at 1:28. Plaintiff shouts in Defendant Mosher's face, "let me do it!" *Id.* at 130-32. Defendant Mosher says, "we'll pull you out if you don't," and Plaintiff says "no you're not" at a normal volume. (Doc. 170-6 at 1:32-34.)

Defendant Mosher pulls Plaintiff out of the cruiser. While Plaintiff is being pulled, the camera's view is momentarily blocked by the open cruiser door. The camera then depicts Plaintiff lying face-down on the ground with four officers crouching or kneeling over him as a pool of blood spreads on the cement floor. The officers help Plaintiff stand up against the wall. Plaintiff's face is bloodied, and he is bleeding profusely from his nose. He indicates he cannot breathe. NWSCF staff is directed to call 911. Plaintiff was subsequently transported to a local hospital by ambulance. The total time period between

---

[3] The Statement of Undisputed Facts submitted by Defendant Mosher quotes and summarizes certain portions of this video. Plaintiff does not dispute "that the quoted words were said" but disputes that Defendant Mosher's description "reflects the totality or an accurate summary of the exchange." (Doc. 180-2 at 8.) The court summarizes the video based on its own review and treats these facts as undisputed to the extent they reflect what is depicted in the video. *See Scott v. Harris*, 550 U.S. 372, 381 (2007) (holding that where unaltered video footage contradicts a party's version of events on summary judgment, court should "view[] the facts in the light depicted by the videotape").

Defendant Mosher's opening of the cruiser door and Plaintiff's contact with the cement floor is approximately sixteen seconds.

When asked what kind of maneuver Defendant Mosher used on Plaintiff, Defendant Recore testified it was similar to "an arm bar takedown[,]" a technique that is taught to law enforcement and correctional officers, although he concedes that in a typical arm bar takedown, the subject of force would not be handcuffed. (Doc. 180-22 at 64.) The parties do not dispute that Plaintiff's face hit the floor when Defendant Mosher extracted him from the cruiser, resulting in facial injuries. Defendant Mosher testified that he did not intend for Plaintiff's head to hit the floor.

Various DOC personnel reviewed the video of Defendant Mosher's use of force on Plaintiff. An email sent to NWSCF's acting superintendent, in response to his request for review of a use-of-force incident that Plaintiff contends corresponds to Defendant Mosher's use of force on him, describes the incident as "very disturbing" and states it should be "sent up for review[.]" (Doc. 180-16 at 2.) In the same email chain, which discussed both the use of force on Plaintiff and an unrelated use-of-force incident, another NWSCF employee wrote the other incident "looks bad, like really bad" and "Mosher/Rowden is not much better[.]" *Id.* at 3.

A review by Mr. Rice, academy director of the Vermont Corrections Academy, stated that Defendant Mosher's use of force "does not look to be consistent with [Vermont] DOC training." (Doc. 180-18 at 2.) Defendant Recore testified that although he had his body camera turned off before the incident, he turned it back on after Plaintiff got injured because "as soon as it happened, I knew that it was wrong[.]" (Doc. 180-22 at 36.)

**III.    The Disputed Facts.**

On April 2, 2020, when he was taken into custody, Plaintiff contends that Defendant Gagne was not investigating Plaintiff for a suspected crime. Defendant Mosher disputes this based on Defendant Gagne's testimony that he saw the potential for a trespassing and property destruction charge when he encountered Plaintiff. Plaintiff contends that when Defendant Gagne began asking Plaintiff questions, Plaintiff "was reasonably able to understand and respond to [his] questions." (Doc. 180-1 at 2.)

14

Defendant Mosher disputes this statement to the extent it claims Plaintiff was acting "reasonably[.]" (Doc. 184-3 at 2) (internal quotation marks omitted).

Plaintiff disputes that he was "acting belligerently" toward Defendant Gagne. (180-2 at 2.) Body camera footage from the night of April 2, 2020, shows Defendant Gagne approaching Plaintiff and attempting to speak to him about getting him a ride home based on his intoxication. As Plaintiff begins to walk away, Defendant Gagne follows him and repeatedly asks Plaintiff to stop and talk. In response, Plaintiff continues walking and indicates that he does not want to stop and talk and wants to go home. As Defendant Gagne continues following him and asking to talk, Plaintiff raises his voice and repeatedly states not to touch him. At one point Plaintiff says, "Don't touch me. I'm telling you it's going to get bad." (Doc. 180-5 at 2:25-27). Defendant Gagne asks to see Plaintiff's hands. Plaintiff complies as he continues to walk away with his hands raised.

Later in the video, Defendant Recore arrives on the scene. He and Defendant Gagne apprehend Plaintiff and take him into protective custody. The body camera video depicts Plaintiff sitting on the ground, handcuffed behind the back, for several minutes before being helped into a police cruiser. An officer explains to him that they are putting him in protective custody to keep him safe because he is intoxicated. Plaintiff is at times verbally aggressive, raising his voice, swearing at the officers, and saying at one point, "You're lucky I'm cuffed." *Id.* at 6:13. At other times Plaintiff is calm, answers the officers' questions, and tells them he is not trying to be disrespectful.

Defendant Gagne testified that Plaintiff was not obligated to comply with his initial requests to ask him to stop. (Doc. 180-1 at 2.) Defendant Mosher responds that this is an inadmissible legal conclusion.

Defendant Mosher asserts that when Plaintiff was taken to the Howard Center for detox, he was turned away "due to violence concerns, a lack of cooperation from [Plaintiff], and because [Plaintiff] refused a BAC screening." (Doc. 180-2 at 2.) Defendant Mosher cites a screening intake form signed by Ms. Dean that checks boxes for violence concerns, uncooperative, and refused in a section titled "NON-ADMIT REASON CODES" as well as deposition testimony from Ms. Dean stating that she

15

would not have checked these boxes if Plaintiff were not being uncooperative or violent. (Doc. 170-4 at 2.) Plaintiff disputes this description because Ms. Dean "did not speak with or personally evaluate [Plaintiff,]" citing Defendant Recore's deposition testimony. (Doc. 180-2 at 2.) There is no evidence that the Howard Center screened Plaintiff or even interacted with him. *See* Doc. 180-22 at 59 (Defendant Recore's testimony that "I don't recollect anybody actually assessing [Plaintiff] as far as like the Howard Center staff goes"); *id.* at 61 (Defendant Recore noting that Ms. Dean was standing next to the cruiser and may have heard Plaintiff inside, although he did not recall if she dealt with Plaintiff directly); *see also Barrette v. Vill. of Swanton*, 2024 WL 1175078, at *10-11 (D. Vt. Mar. 19, 2024) (granting Howard Center's motion to dismiss).

Plaintiff asserts that after the Howard Center refused to admit him, Defendant Recore transported him to NWSCF and, en route, dispatch told Defendant Recore "reservations have been made at [NWSCF]" and "the welcoming party will be available." (Doc. 184-3 at 2.) (internal quotations marks and citations omitted). In a video of the car ride after Plaintiff was taken into custody, dispatch can be heard saying "welcoming party will be available" or a similar sounding phrase. (Doc. 180-5 at 46:22-27). Defendant Mosher disputes this statement as immaterial to the pending motion and asserts its origin is unconnected to NWSCF.

The parties disagree whether prior to his encounter with Plaintiff, Defendant Mosher received briefing that Plaintiff was "combative." (Doc. 180-2 at 5.) Plaintiff acknowledges that dispatch told the booking officer "that [Plaintiff] was 'an intoxicated male' who 'has been spitting' and 'in and out of being compliant/non-compliant' and was 'just refused [from] detox,' and 'he's been a little bit of a handful.'" *Id.* (citing Doc. 180-23). Defendant Mosher's incident report states that the "transporting officer advised over the phone to" the booking officer "that when taking custody of [Plaintiff] he was combative and spitting." (Doc. 180-27 at 4.) Plaintiff contends Defendant Recore's body camera footage and deposition testimony contradict Defendant Mosher's incident report because they reveal that Defendant Recore did not speak directly with the booking officer.

16

Defendant Mosher asserts that when he opened the door to the police cruiser, Plaintiff's feet were pointed straight, with his left leg "towards the interior of the car, behind his right leg and foot," and the medical boot was thus "unseen by Mosher." (Doc. 170-2 at 3.) According to Plaintiff, he "was positioned to face out of the cruiser as if positioning himself to exit" when Defendant Mosher opened the door and Plaintiff had just told the screening nurse that he had surgery that morning. (Doc. 180-2 at 6.) He thus claims his medical condition was known.

After Defendant Mosher opened the door to the cruiser, Plaintiff "was attempting to exit" and told Defendant Mosher to "let [him] do it." (Doc. 180-1 at 3) (internal quotation marks omitted). According to Plaintiff, he "was uncomfortable as he was handcuffed behind his back, with a surgical boot on, and had been asking to use [the] restroom since the time he was taken into protective custody, for approximately [forty] minutes." *Id.* When Defendant Mosher opened the door, Plaintiff asserts he was "positioned in the vehicle as if attempting to get out of the cruiser on his own volition." *Id.* Defendant Mosher agreed that Plaintiff stated "let me do it[,]" but otherwise disputes Plaintiff's account "as unsupported by any evidence." (184-3 at 3) (internal quotation marks omitted). At his deposition, Defendant Mosher testified that he "did not understand ['let me do it'] to mean compliance" with his directions for exiting the vehicle. (Doc. 170-5 at 28.)

Plaintiff claims that Defendant Mosher "did not give [Plaintiff] a reasonable opportunity to get out of the cruiser before pulling him out[,]" noting that approximately sixteen seconds elapsed between Defendant Mosher opening the cruiser door to when Plaintiff hit the floor. (Doc. 180-1 at 3.) According to Plaintiff, "[t]here was no immediate urgency" and "[Defendant] Mosher was attempting to seize the element of surprise by making a 'quick maneuver.'" *Id.* at 4 (quoting 170-5 at 52.) Defendant Mosher disputes that he did not give Plaintiff a reasonable amount of time to exit the cruiser and disputes Plaintiff's statement that there was no immediate urgency to the extent it "suggests that [Plaintiff] could remain in the [police] cruiser for an open-ended amount of time in NWSCF's only garage[.]" (Doc. 184-3 at 4.)

17

Defendant Mosher contends that, as he was in the process of pulling Plaintiff out of the police cruiser, "another corrections officer is standing to [his] right and appears to move with [Plaintiff] to the floor of the garage." (Doc. 180-2 at 9.) According to Plaintiff, the officer standing next to Defendant Mosher was Officer Rowden, who testified that he did not "have hands on" Plaintiff when Plaintiff was pulled from the cruiser. *Id.* (internal quotation marks omitted) (quoting Doc. 180-29 at 44).

Plaintiff asserts that Defendant Mosher's use of force was intentional based on Defendant Mosher testifying that he intended to take Plaintiff to the floor, did not slip or accidentally put him on the floor, and that his hands were on Plaintiff until Plaintiff reached the floor. (Doc. 180-1 at 3.) Defendant Mosher denies "that [he] intentionally hurt [Plaintiff] or that [he] intentionally slammed [Plaintiff] to the ground in any[ ]way or that [Defendant] Mosher used force beyond what he deemed necessary to overcome [Plaintiff's] initial resistance and pull him from the car." (Doc. 184-3 at 3.) At his deposition, Defendant Mosher testified that he "made a quick split decision" to use force on Plaintiff that may have caught Plaintiff off guard and, "with the momentum of him coming out of the vehicle, [that] may have been what caused his face to strike the floor." (Doc. 170-5 at 52.) Defendant Mosher claims the floor was the only available controlling surface when he used force on Plaintiff, while Plaintiff claims that a nearby wall in the garage could have served as a controlling surface.

Defendant Mosher testified that prior to pulling Plaintiff out of the cruiser, he feared for his personal safety because Plaintiff was "being uncompliant (phonetic) he's beginning to escalate and now, you know, some gross motor activity with his body. So, he's presenting some pre-attack views." *Id.* at 32. He claims that Plaintiff "suddenly flinched away from — and then back at — [Defendant] Mosher, at the same time shouting in [Defendant] Mosher's face." (Doc. 170 at 3.) When asked what specific risk or potential harm to his safety he perceived, Defendant Mosher answered, "[t]here is potential to take a head-butt, to be spit on, as [Plaintiff] had already been doing as reported by the officers who transported him." (Doc. 170-5 at 33.)

Plaintiff disputes that he aggressively flinched at Defendant Mosher. The video

shows Defendant Mosher grasping Plaintiff's right arm and Plaintiff pulling away and saying "don't." (Doc. 170-6 at 1:17.) Plaintiff then turns his head toward Defendant Mosher as he shouts, "let me do it." *Id.*

Mr. West, Plaintiff's use-of-force expert, testified that Plaintiff's "action when he sort of leans forward and screams Let me do it" could "reasonably be perceived as a pre-attack cue[.]" (Doc. 170-8 at 24.) Mr. West answered "no" in response to questions about whether he "take[s] issue" with Defendant Mosher perceiving a threat from Plaintiff and stated that he agreed with Defendant Mosher's testimony that there was a "possibility" of Plaintiff head-butting Defendant Mosher. *Id.* at 32. Mr. West also acknowledged that Plaintiff was in an elevated emotional state and did not present as emotionally stable in his encounter with Defendant Mosher. In response to the question "[b]y description to Mr. Mosher of the person not cooperative with law enforcement, spitting and combative, was [Plaintiff] a pre-assaultive subject just by radio communications?" he answered, "[t]hat could be considered that way; yes, absolutely." *Id.* at 33, 39.

> Plaintiff describes his injuries as follows:
>
> Due to [Defendant] Mosher's use of force, [Plaintiff] is suffering and will continue to suffer from a life-altering traumatic brain injury which has caused him daily headaches, somatic pains, poor sleep, anger, anxiety, mood swings, depression, memory issues, reduced libido, and irritability, among others. Randy Cummings testified that [Plaintiff] is a "different" person after the assault. After the assault [Plaintiff's girlfriend at the time of the incident] testified that [Plaintiff] had "two black eyes, his nose was crooked busted, his mouth was still bloody, busted. He had shown me that his teeth were very easily movable." She further testified he was in "excruciating" pain and "[h]e wasn't able to eat. Any time he moved his mouth he would wince. You know, he couldn't – anything that involved his face essentially. He couldn't sleep on his side because his nose was so sensitive to the touch of anything that it hurt him. He wasn't able to – like if he were to sit up or be sitting and stand up too fast, he couldn't do that. It hurt him. Like it gave him headaches, I guess."

(Doc. 180-1 at 5) (citations omitted) (quoting Doc. 180-21 at 4). Defendant Mosher disputes that Plaintiff suffered a traumatic brain injury, citing a report by a doctor that undertook a neuropsychological evaluation of Plaintiff which states that "there is no

evidence of any persisting or permanent neurocognitive impairment or dysfunction that can be causally attributed to [Plaintiff's] head injury involving a nasal fracture on [April 2, 2020]." (Doc. 184-3 at 6) (quoting 184-9 at 72).

## IV.    Conclusions of Law and Analysis.

### A.    Standard of Review.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that "'might affect the outcome of the suit under the governing law[,]'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)), while "[a] dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248). On a motion for summary judgment, the court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (internal quotation marks omitted) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011)).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). When the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. To avoid summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

In adjudicating a motion for summary judgment, the district court's role "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Clark v. Hanley*, 89 F.4th 78, 95 (2d Cir. 2023) (internal

quotation marks omitted) (quoting *Kee v. City of New York*, 12 F.4th 150, 166-67 (2d Cir. 2021)). If the evidence "presents a sufficient disagreement to require submission to a jury[,]" the court should deny summary judgment. *Anderson*, 477 U.S. at 251-52. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (citation and internal quotation marks omitted). Not all disputed issues of fact, however, preclude summary judgment. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## B.    Qualified Immunity.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). "When a defendant moves for summary judgment based on qualified immunity, courts consider whether the facts shown make out a violation of a constitutional right, and whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct." *McKinney*, 49 F.4th at 738 (internal quotation marks and citation omitted) (alteration in original). For excessive force claims, the court applies the "same" standard of "objective reasonableness" to the merits of a Fourth Amendment claim and to a qualified immunity claim. *Collado v. City of N.Y.*, 396 F. Supp. 3d 265, 274 n.11 (S.D.N.Y. 2019); *see also O'Bert ex rel. Est. of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) ("[I]n Fourth Amendment unreasonable force cases, unlike in other cases, the qualified immunity inquiry is the same as the inquiry made on the merits[.]") (internal quotation marks and citation omitted).

"Once the jury has resolved any disputed facts that are material to the qualified immunity issue, the ultimate determination of whether the officer's conduct was objectively reasonable is to be made by the court." *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007). However, where there are disputed issues of material fact, a determination of qualified immunity is often inappropriate at the summary judgment

stage. *See Husain v. Springer*, 494 F.3d 108, 133 (2d Cir. 2007) (noting that "[s]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness") (alteration in original) (quoting *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999)); *see also Linton v. Zorn*, 135 F.4th 19, 39-40 (2d Cir. 2025) (finding summary judgment inappropriate because whether jury could find officer's use of force reasonable would depend on its resolution of factual disputes); *Jok v. City of Burlington, Vermont*, 96 F.4th 291, 297-98 (2d Cir. 2024) (dismissing defendant's appeal of opinion denying summary judgment because the district court's decision on qualified immunity turned on disputed facts).

## C.   Whether Defendant Mosher Is Entitled to Summary Judgment on Plaintiff's Excessive Force Claim Brought Under 42 U.S.C. § 1983 (Count I).

Defendant Mosher argues that the court should grant summary judgment in his favor on Plaintiff's excessive force claim because (1) his use of force on Plaintiff was objectively reasonable, (2) he did not violate a clearly established right and thus is protected by qualified immunity, and (3) he is protected by qualified immunity under Vermont state law. Plaintiff opposes the motion, arguing a jury must first find the operative facts before qualified immunity may be applied.

42 U.S.C. § 1983 "is not itself a source of substantive rights" but provides "a method for vindicating federal rights elsewhere conferred[.]" *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). A claimant must establish the person who committed the violation was acting "under color of state law." *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004) (internal quotation marks omitted) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). He or she also "must p[rove] that each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). "'The factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because

22

the elements of different constitutional violations vary." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676) (alteration in original).

The Fourth Amendment governs "a claim for excessive force after [the plaintiff] has been arrested and detained, but 'prior to the time when [the person arrested] is arraigned or formally charged, and remains in the custody (sole or joint) of the arresting officer.'" *Cugini v. City of N.Y.*, 941 F.3d 604, 612 (2d Cir. 2019) (quoting *Powell v. Gardner*, 891 F.2d 1039, 1044 (2d Cir. 1989)). "To establish a claim of excessive force, a plaintiff must show that the force used by the officer was, in light of the facts and circumstances confronting him, 'objectively unreasonable' under Fourth Amendment standards." *Davis v. Rodriguez*, 364 F.3d 424, 431 (2d Cir. 2004) (internal quotation marks and citation omitted).[4] Reasonableness in the Fourth Amendment context is not "an easy-to-apply legal test" and requires courts to "slosh [their] way through [a] factbound morass[.]" *Scott v. Harris*, 550 U.S. 372, 383 (2007). This fact-specific inquiry "requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010).

Factors to consider include: "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Id.* "Though the Second Circuit has not yet ruled on the issue, many courts have viewed the 'immediate threat to the safety of the officers or others' as the most important . . . factor." *Ramos v. Town of E. Hartford*, 2019 WL 2785594, at *7 (D. Conn. July 2, 2019) (quoting *A.K.H. v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016)). "A plaintiff must also demonstrate that the officer was made reasonably aware that the force used was excessive." *Cugini*, 941 F.3d at 608. Reasonableness of the use of

---

[4] An officer's acts or omissions are subject to an objectively reasonable standard and must be evaluated "without regard to their underlying intent or motivation." *Meli v. City of Burlington, Vermont*, 585 F. Supp. 3d 615, 628 (D. Vt. 2022) (internal quotation marks omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 297 (1989)).

force "must [be] judge[d] . . . from the perspective of a reasonable officer on the scene[]" and embody "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006) (internal quotation marks omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)).

In this case, it is undisputed that Plaintiff was not charged with or convicted of a serious crime but was rather taken into protective custody because he was intoxicated. The crux of this case is thus whether, from the perspective of a reasonable officer at the scene, Plaintiff posed an imminent threat to Defendant Mosher's personal safety. It is undisputed that Plaintiff was in an elevated emotional state, and that Plaintiff was reported to be spitting and uncooperative prior to his arrival at NWSCF. It is also undisputed that he did not spit at Defendant Mosher and was handcuffed behind his back.

In the light most favorable to Plaintiff, the events that precede Defendant Mosher's use of force consist of Plaintiff flinching at Defendant Mosher's attempt to take hold of his arm, yelling, "Let me do it," and then saying "no you're not" in response to Defendant Mosher saying "we'll pull you out if you don't." (Doc. 170-6 at 1:28-34). Plaintiff's range of motion was limited. Within approximately sixteen seconds, Defendant Mosher had forcibly removed Plaintiff from the police cruiser, causing Plaintiff serious injuries.

Courts in the Second Circuit have held that when video evidence of an alleged civil rights violation is available, "in the ordinary case, the appropriate course of action is still to permit the jury an opportunity to 'resolve the competing versions of events, *in conjunction with the video*, through the ordinary fact-finding processes in which juries engage[.]'" *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 482 (N.D.N.Y. 2017) (emphasis in original) (quoting Howard M. Wasserman, Video Evidence & Summary Judgment: The Procedure of Scott v. Harris, 91 Judicature 180, 182-83 (2008)); *see also Mack v. Howard*, 2014 WL 2708468, at *3 (W.D.N.Y. June 16, 2014) (finding summary judgment inappropriate where the "case boils down to two credible interpretations of the

24

same video"). In addition, "a number of courts in this circuit . . . have recognized[ that] 'a claim of necessary force is much harder to maintain' after a suspect is already in handcuffs." *Adedeji v. Hoder*, 935 F. Supp. 2d 557, 568 (E.D.N.Y. 2013) (alteration adopted) (quoting *Pierre-Antoine v. City of New York*, 2006 WL 1292076, at \*4 (S.D.N.Y. May 9, 2006)); *Rudavsky v. City of S. Burlington*, 2021 WL 1894780, at \*10 (D. Vt. May 11, 2021) (denying summary judgment for defendants despite video evidence because "whether at the end of the takedown [defendant] is guiding rather than slamming, and the exact angle at which [plaintiff's] head is forced into the floor, is up for the factfinder to determine").

Defendant Mosher analogizes this case to *Brayshaw v. City of Burlington*, wherein this court granted summary judgment for the defendants on an excessive force claim and noted that "officers do not use excessive force where they make an objectively reasonable mistake of fact regarding the amount of force required or their ability to employ a takedown maneuver in a manner that minimizes harm to the suspect." 2015 WL 1523019, at \*11 (D. Vt. Apr. 3, 2015). *Brayshaw* is distinguishable because it involved a video showing a non-cooperative, intoxicated plaintiff who was forcibly removed from a food cart line by law enforcement and who was then "swinging his free arm in such a manner that he could potentially strike" the officer, rendering it "objectively reasonable for [the officer] to use some measure of force to defend himself against this potential assault." *Id.* at \*10. Moreover, in *Brayshaw*, the officer tried lesser forms of force before resorting to an arm bar takedown.

The cases Defendant Mosher cites in which courts found a correctional officer's use of force justified in response to spitting are also distinguishable. *See Yarborough v. Loftis*, 2017 WL 9288033 (E.D. Tex. Oct. 18, 2017), *report and recommendation adopted*, 2018 WL 387910, at \*4 (E.D. Tex. Jan. 12, 2018) (explaining that officer "reasonably believed that she was spit on and immediately applied force to prevent further disturbance or reoccurrence"); *Nowell v. Acadian Ambulance Serv.*, 147 F. Supp. 2d 495, 509 (W.D. La. Apr. 13, 2001) (finding deputy's use of force reasonable where the plaintiff "was under arrest for a serious crime" and "was by all accounts resisting and

25

belligerent as he was admittedly intoxicated, agitated and spitting at [the officer]");
*Norwood v. Bergh*, 2019 WL 136689, at *5 (E.D. Wis. Jan. 8, 2019) (noting, in case
denying summary judgment to defendants on excessive force claim, that "the defendants
were entitled to protect themselves and others" from inmate's spitting because "spit can
carry germs and viruses that cause serious, even fatal diseases"). In any event, "spitting
does not give rise to an excusable use of force *per se*." *Durr v. Slator*, 558 F. Supp. 3d 1,
17 (N.D.N.Y. 2021) (emphasis in original).

Because there is a genuine issue of material fact as to whether a reasonable officer
would have concluded that Plaintiff posed an immediate threat to Defendant Mosher's
safety and that the degree of force used was reasonable, a jury must make factual findings
before the court can determine whether qualified immunity applies.

### 1.    Whether the Right in Question is Clearly Established.

Defendant Mosher argues that even if a rational jury could find his use of force
excessive, this court could not further find that the right at issue was clearly established.
A police officer's conduct violates "clearly established law" only when it is clear that
"every reasonable official would have understood that what he is doing violates that
right." *Coollick v. Hughes*, 699 F.3d 211, 220 (2d Cir. 2012) (internal quotation marks
omitted). "Only Supreme Court and Second Circuit precedent existing at the time of the
alleged violation is relevant in deciding whether a right is clearly established." *Torcivia v.
Suffolk Cnty.*, 17 F.4th 342, 367 (2d Cir. 2021), *cert. denied*, 143 S. Ct. 438 (2022)
(mem.) (internal quotation marks omitted) (quoting *Moore v. Vega*, 371 F.3d 110, 114
(2d Cir. 2004)).

"In analyzing whether [the] right [against unreasonable seizures] has been
violated, courts must be careful not to define clearly established law at a high level of
generality, because the dispositive question for the purpose of qualified immunity is
whether the violative nature of *particular* conduct is clearly established[.]" *McKinney*, 49
F.4th at 739 (alteration adopted) (internal quotation marks and citation omitted)
(emphasis in original). "[S]pecificity is especially important in the Fourth Amendment
context, where the [Supreme] Court has recognized that it is sometimes difficult for an

officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (internal quotation marks, alteration, and citation omitted); *see also City & Cnty. of S.F. v. Sheehan*, 575 U.S. 600, 613 (2015) ("Qualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures.").

Although a case "directly on point" is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (internal quotation marks and citations omitted). Because objective reasonableness is a fact-specific inquiry, a police officer is "'entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue.'" *McKinney*, 49 F.4th at 739 (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152-53 (2018)).

Plaintiff argues that Defendant Mosher "violated [Plaintiff's] clearly established right not to be forced to a controlling surface when he is attempting to comply or not given an opportunity to comply." (Doc. 180 at 23.) Defendant Mosher contends that to overcome his qualified immunity defense, Plaintiff must "show that he had a clearly established right not to be forcefully removed from a car after failing to comply with multiple verbal requests, low level physical prompting, and presenting as pre-assaultive." (Doc. 170 at 18.) Neither position clearly reflects the undisputed facts. The question is instead whether it is clearly established that a police officer cannot use a significant degree of force on an individual who is not accused of a crime, who is handcuffed behind the back, and who is resisting through a lack of cooperation and non-violent verbal protest where lesser force has not been attempted.

"[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). In *Tracy v. Freshwater*, for example, the Second Circuit found summary judgment inappropriate where the parties disputed whether the plaintiff was already fully handcuffed when an officer pepper-sprayed him, noting that the use of pepper spray "constitutes a significant degree of force" and, as such, "should not be used lightly or gratuitously against an

27

arrestee who is complying with police commands or otherwise poses no immediate threat to the arresting officer." 623 F.3d at 98-99. The Second Circuit subsequently held that "following *Tracy*, it was clearly established that an officer's significant use of force against an arrestee who was no longer resisting and who posed no threat to the safety of officers or others — whether such force was by pepper spray, taser, or any other similar use of significant force — violates the Fourth Amendment." *Jones v. Treubig*, 963 F.3d 214, 226 (2d. Cir. 2020); *see also Linton*, 135 F.4th at 34 ("[W]e have consistently held that [*Tracy*] clearly established that the use of gratuitous force, whether by pepper spray, taser, or similar significant force, against a non-resistant *or handcuffed* arrestee violates that arrestee's Fourth Amendment rights.") (emphasis supplied).

In this case, there is a material dispute of fact as to whether Plaintiff posed a threat to the physical safety of Defendant Mosher or others at the time force was used. As one court observed, "once someone has been restrained with handcuffs, the need for force is near 'nonexistent.'" *Kalvitz v. City of Cleveland*, 763 F. App'x 490, 494 (6th Cir. 2019) (quoting *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988)); *see also Farnsworth v. City of Geneva*, 750 F. Supp. 3d 152, 165 (W.D.N.Y. 2024) (declining to grant summary judgment on qualified immunity defense where Plaintiff claimed he was pulled from a police car while handcuffed and not resisting, resulting in injury to his ankle requiring medical attention).

The Second Circuit has found a genuine issue of material fact whether an individual is "resisting" when he is only verbally defiant. *See Singh v. City of New York*, 2024 WL 319117, at \*1, \*5 (summary order) (2d Cir. 2024) (finding it disputed whether plaintiff resisted arrest where, while intoxicated and being voluntarily escorted to the hospital by officers, plaintiff stopped, turned around, and said to an officer that he was "going to have to handcuff [me]" and then, once the officer began retrieving the handcuffs, said "I'm just joking. You're not going to handcuff me" while turning around) (internal quotation marks omitted); *Frost v. New York City Police Dep't*, 980 F. 3d 231, 253, 255 (2d. Cir. 2020) (finding that "a reasonable jury could find that [plaintiff] was neither threatening nor resisting" officers even though plaintiff said, prior to the use of

force, "I should spit in your fuckin' face") (internal quotation marks omitted).

If a jury finds Plaintiff posed no threat to the physical safety of Defendant Mosher or others, and further finds that Defendant Mosher's use of force was excessive, clearly established Second Circuit precedent is sufficiently similar to this case to potentially render qualified immunity unavailable. The court thus DENIES summary judgment for Defendant Mosher on Plaintiff's excessive force claim.

### 2. Whether Defendant Mosher Is Entitled to Qualified Immunity Under State Law.

Defendant Mosher contends he is entitled to qualified immunity under Vermont law, which provides for, "[q]ualified immunity attaches to public officials who are (1) acting during the course of their employment and acting, or reasonably believing they are acting, within the scope of their authority; (2) acting in good faith; and (3) performing discretionary, as opposed to ministerial, acts." *Baptie v. Bruno*, 2013 VT 117, ¶ 11, 195 Vt. 308, 314, 88 A.3d 1212, 1216 (internal quotation marks omitted). "Thus, if the official's conduct does not violate clearly-established rights of which a reasonable person would have known, the official is protected by qualified immunity from tort liability." *Sprague v. Nally*, 2005 VT 85, ¶ 4, 178 Vt. 222, 226, 882 A.2d 1164, 1168 (quoting *Cook v. Nelson*, 712 A.2d 382, 384 (Vt. 1998)).

> [O]nce the issue [of qualified immunity is] raised, [the plaintiff] ha[s] the burden to rebut the qualified immunity defense "by establishing that the official's allegedly wrongful conduct violated clearly established law. We do not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs."

*Sprague,* 2005 VT 85, ¶ 4, 178 Vt. at 225, 882 A.2d at 1167 n. 3 (citation omitted).

In this case, there is a genuine issue of material fact as to whether Defendant Mosher was acting in good faith when he used force on plaintiff because "to determine whether a state employee is acting in 'good faith,' Vermont law relies on the same federal objective standard . . . and asks whether the [d]efendants' conduct violated 'clearly established rights . . . of which a reasonable person would have known.'" *Crowell v. Kirkpatrick*, 667 F.Supp.2d 391, 417 (D. Vt. 2009), *aff'd*, 400 Fed. App'x 592 (2d Cir. 2010) (third alteration in original) (quoting *Stevens v. Stearns*, 2003 VT 74, ¶ 15, 175 Vt.

428, 434, 833 A.2d 835, 840); *see also Winfield v. Trottier*, 2009 WL 2160588, at \*3-4 (D. Vt. July 15, 2009) (denying state troopers' motion to dismiss tort claims because the complaint adequately alleged "gross negligence and willful misconduct"). The court therefore DENIES Defendant Mosher's request for summary judgment based upon qualified immunity under Vermont law. *See Barrette v. Vill. of Swanton*, 2023 WL 3891034, at \*8 (D. Vt. June 6, 2023) (citing provision in 12 V.S.A. § 5602 providing that state sovereign immunity does not apply to gross negligence or willful misconduct).

### D. Whether Defendant Mosher Is Entitled to Summary Judgment on Plaintiff's Unlawful Detention or Seizure Claim Brought Under 42 U.S.C. § 1983 (Count II.)

Although Plaintiff brings separate claims for excessive force and unlawful detention or seizure against Defendant Mosher, both parties focus primarily on Plaintiff's excessive force claim. Defendant Mosher argues in a footnote that "[Plaintiff's] seizure claim is based on [Defendant] Mosher's alleged excessive force. There is nothing in his complaint to suggest that the seizure claim is separate from, or an alternative to, his claim[] for excessive force." (Doc. 170 at 16, n.83.) Plaintiff does not respond to this argument or otherwise mention a claim for unlawful detention or seizure separate from his excessive force claim. *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014) ("When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures.").

Because Plaintiff does not respond to Defendant Mosher's contention that his unlawful seizure claim is identical to his excessive force claim, he has abandoned that claim. *See Camarda v. Selover*, 673 F. App'x 26, 30 (2d Cir. 2016) (summary order) ("Where, as here, a counseled non-moving party submits 'a partial response arguing that summary judgment should be denied as to some claims while not mentioning others,' that response 'may be deemed an abandonment of the unmentioned claims.'") (quoting *Jackson v. Federal Express*, 766 F.3d 189, 195 (2d Cir. 2014)); *Connelly v. Ferguson*, 2022 WL 123800, at \*3 (D. Vt. Jan. 13, 2022) (finding plaintiff had abandoned state law tort causes of action because she did not substantively address them in opposition to

30

summary judgment); *Curry v. Keefe*, 2021 WL 1087444, at \*6 (D. Vt. Mar. 22, 2021)
(finding that claims had been abandoned where defendants "explicitly moved for
summary judgment on each of these claims" but plaintiff did not oppose defendants'
arguments in his briefing). The court therefore GRANTS Defendant Mosher's motion for
summary judgment on Count II of Plaintiff's Amended Complaint on the grounds that it
is duplicative of Count I.

### E. Whether Defendant Mosher Is Entitled to Summary Judgment on Plaintiff's Assault and Battery Claim (Count V).

Under Vermont law, battery "is an intentional act that results in harmful contact
with another." *Christman v. Davis*, 2005 VT 119, ¶ 6, 179 Vt. 99, 101, 889 A.2d 746, 749
(citing Restatement (Second) of Torts § 13 (1965)). "At common law, the civil tort of
assault is defined as any gesture or threat of violence exhibiting an [intention] to assault,
with the means of carrying that threat into effect . . . unless immediate contact is
impossible." *MacLeod v. Town of Brattleboro*, 2012 WL 5949787, at \*8 (D. Vt. Nov. 28,
2012) (internal quotation marks omitted) (alterations in original); *see also Bishop v.
Ranney*, 7 A. 820, 820-21 (Vt. 1887) ("[A]ny gesture or threat of violence exhibiting an
intention to assault, with the means of carrying that threat into effect, is an assault, unless
immediate contact is impossible.") (internal quotation marks omitted).

"This [c]ourt has held that 'when assault and battery is alleged against police
officers, the inquiry is whether the officer's conduct was reasonably necessary and
thereby privileged.'" *Meli v. City of Burlington, Vermont*, 585 F. Supp. 3d 615, 635 (D.
Vt. 2022) (internal quotation marks omitted) (alterations adopted) (quoting *Crowell*, 667
F. Supp. 2d at 417). "A police officer's privilege to use force, however, ends when the
force used is excessive, which is determined using the same standards used to analyze a
Fourth Amendment excessive force claim." *Connelly v. City of Albans, Vermont*, 2024
WL 1834472, at \*11 (D. Vt. Apr. 26, 2024) (internal quotation marks and citation
omitted).

Because there are disputed issues of material fact regarding whether Defendant
Mosher's use of force was excessive, the court DENIES summary judgment for

Defendant Mosher on Plaintiff's assault and battery claim. *See Meli*, 585 F. Supp. 3d at 635 (denying summary judgment for defendant on assault and battery claims because they, "like [plaintiff's] excessive force claim, turn on a question of reasonableness which considering material disputed facts should be left to the jury").

### F. Whether Defendant Mosher Is Entitled to Summary Judgment on Plaintiff's Intentional Infliction of Emotional Distress ("IIED") Claim (Count VII).

"To sustain a claim for IIED [under Vermont law] [the] plaintiff must show [the] defendants engaged in outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct." *Fromson v. State*, 2004 VT 29, ¶ 14, 176 Vt. 395, 399, 848 A.2d 344, 347 (internal quotation marks and citation omitted). "[The] [p]laintiff's burden on this claim is a 'heavy one' as he [or she] must show [the] defendants' conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decent and tolerable conduct in a civilized community and be regarded as atrocious and utterly intolerable." *Id.* (internal quotation marks omitted).

"The test is objective; the plaintiff must show that the harm resulting from the inflicted distress was so severe that no reasonable person could be expected to endure it." *Farnum v. Brattleboro Retreat, Inc.*, 671 A.2d 1249, 1256 (Vt. 1995). "[W]hether a jury could reasonably find that the conduct at issue meets this test[ ]" is a "threshold question" for "the court to determine[.]" *Dulude v. Fletcher Allen Health Care, Inc.*, 807 A.2d 390, 398 (Vt. 2002).

Plaintiff claims that Defendant Mosher's use of force was planned based in part on dispatch telling Defendant Recore that NWSCF would meet Plaintiff with a "welcoming party[,]" which according to Plaintiff "is well known as a euphemism that the corrections officers are preparing to use force." (Doc. 180 at 6-7) (internal quotation marks omitted). Plaintiff's sole evidentiary support for the alleged meaning of "welcoming party" is Mr. Cummings's testimony about the meaning of the term, which is inadmissible because Mr.

32

Cummings is not an expert witness and lacks personal knowledge of what the term meant at the time it was allegedly used by dispatch in this incident.

Plaintiff argues that Defendant Mosher's conduct was outrageous in part based on comments made by his colleagues or supervisors in internal documents; for example, Plaintiff cites an email where someone reviewed the use of force and described it as "very disturbing[.]" (Doc. 180 at 28) (quoting 180-16 at 2). Plaintiff cites *Burwell v. Peyton*, in which the court upheld an IIED claim on summary judgment because "a rational jury could conclude that the officers' use of force against Plaintiff was gratuitous and took place at a time when the officers either knew or reasonably should have known that Plaintiff was incapacitated." 131 F. Supp. 3d 268, 300 (D. Vt. 2015). *Burwell* is distinguishable because it involved a plaintiff who was pepper-sprayed and beaten with a baton while non-responsive due to a medical condition. *Id.* at 274, 281. In this case, Plaintiff does not claim he "was not capable of understanding [officers'] commands or complying with them." *Id.* at 295.

Because a rational jury could not find that Defendant Mosher's conduct was so outrageous in character and so extreme "as to go beyond all possible bounds of decency" the court GRANTS summary judgment for Defendant Mosher on Plaintiff's IIED claim. *Demag v. Am. Ins. Cos.*, 146 Vt. 608, 508 A.2d 697, 699 (Vt. 1986) (quoting Restatement (Second) of Torts § 46, Comment d (1965)); *see also Meli*, 585 F. Supp. 3d at 624, 636 (granting summary judgment for officer defendant on IIED claim where defendant "pushed [plaintiff] forcefully, causing him to fall backwards, hit his head, and lose consciousness"); *Jok v. City of Burlington, Vermont*, 2022 WL 444361, at *1, *9 (D. Vt. Feb. 14, 2022) (granting summary judgment for officer defendant on IIED claim where defendant's "arm takedown" caused plaintiff to "hit the ground and los[e] consciousness") (internal quotation marks omitted); *Brayshaw*, 2015 WL 1523019, at *2, *15 (granting summary judgment for officer defendant on IIED claim where officer's use of takedown maneuver had "caused [p]laintiff's head to strike the pavement").

## CONCLUSION

For the foregoing reasons, the court DENIES summary judgment for Defendant

Mosher on Plaintiff's excessive force, assault, and battery claims and GRANTS summary judgment for Defendant Mosher on Plaintiff's unlawful seizure and IIED claims.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 22nd day of May, 2025.

Christina Reiss, Chief Judge
United States District Court