UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2025 AUG 29 PM 3: 29

CLERK
BY_____
DEPUTY CLERK

DEVEN BARRETTE, )
)
Plaintiff, )
)
v. )   Case No. 2:22-cv-00129
)
VILLAGE OF SWANTON, )
KYLE GAGNE, ROBERT RECORE, )
LEONARD STELL, )
JORDAN MICHAEL MOSHER, and )
JOHN AND JANE DOES I-X, )
)
Defendants. )

**OPINION AND ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT
BY DEFENDANTS VILLAGE OF SWANTON, KYLE GAGNE, ROBERT
RECORE, AND LEONARD STELL**
(Docs. 207, 208, 210)

Plaintiff Deven Barrette ("Plaintiff") brings this action against Defendants the

Village of Swanton ("Swanton"); Kyle Gagne ("Defendant Gagne"); Jordan M. Mosher

("Defendant Mosher"); Robert Recore ("Defendant Recore"); and Leonard Stell

("Defendant Stell"); as well as John and Jane Does I-X (the "Doe Defendants").

Plaintiff's claims arise from his detention by Swanton Village Police Department

("SVPD") officers on the night of April 2, 2020 and subsequent treatment by those

officers and Northwest State Correctional Facility ("NWSCF") employees. The Amended

Complaint asserts eight claims: violation of his Fourth and Fourteenth Amendment rights

against excessive force under 42 U.S.C. § 1983 against Defendants Recore, Gagne, and

Mosher (Count I); violation of his Fourth and Fourteenth Amendment rights against

unlawful detention or seizure under 42 U.S.C. § 1983 against Defendants Recore, Gagne,

and Mosher (Count II); violation of his Fourth and Fourteenth Amendment rights against

unlawful imprisonment under 42 U.S.C. § 1983 against Defendants Recore, Gagne, and

Mosher (Count III); unconstitutional policies, customs, and practices under 42 U.S.C. § 1983 against Swanton (Count IV); assault and battery against Defendants Recore, Gagne, and Mosher (Count V); violation of the Vermont Constitution, Chapter 1, Article 11, against Swanton (Count VI); intentional infliction of emotional distress against Defendants Recore, Gagne, and Mosher (Count VII); and negligence against the Howard Center, Inc., doing business as Howard Center (the "Howard Center") and Doe Defendants (Count VIII). On March 7, 2024, the court granted Defendant Mosher's partial motion to dismiss Count III against him, (Doc. 147), and on March 19, 2024, the court granted Defendant Howard Center's motion to dismiss Count VIII against it, (Doc. 150). The court granted in part and denied in part Defendant Mosher's motion for summary judgment on May 22, 2025. (Doc. 238.)

On January 31, 2025, Defendants Gagne and Recore filed motions for summary judgment, (Docs. 207, 210), and Defendant Stell and Swanton filed a joint motion for summary judgment (Doc. 208). Plaintiff filed oppositions to each of the three motions on March 3, 2025. (Docs. 226-28.). Defendants Gagne, Recore, Stell, and Swanton (the "Remaining Defendants") filed replies on March 17, 2025, at which point the court took their motions under advisement. (Docs. 231-33.)

Plaintiff is represented by Colin R. Hagan, Esq., David J. Shlansky, Esq., and Frances F. Workman, Esq. Swanton and Defendants Gagne and Stell are represented by James F. Carroll, Esq. Defendant Recore is represented by Brian P. Monaghan, Esq. Defendant Mosher is represented by Andrew C. Boxer, Esq. and Oliver A. Abbott, Esq.

## I.    Undisputed Facts.

### A.    Plaintiff Is Taken Into Protective Custody.

Swanton is a Vermont municipality incorporated as a village. It owns, operates, controls, and manages SVPD under the direction of a chief of police. (Doc. 228-2 at 1-2.) On April 2, 2020, Defendants Gagne and Recore were both employed as SVPD patrol officers. *Id.* at 2-3. Defendant Stell was SVPD's chief of police for approximately twenty-five years and retired from his position on January 1, 2022. *Id.* at 4.

On the evening of April 2, 2020, Plaintiff and his girlfriend at the time, Casey

2

Landon, were living in Highgate, Vermont at the home of Plaintiff's friend, John Cournoyer. Plaintiff and Ms. Landon drove from their residence to the home of Amber Barbeau in Swanton, Vermont for a social visit. At Ms. Barbeau's home, Plaintiff drank Jägermeister liquor and Red Bull.[1] Because he had recently undergone an outpatient operative procedure to remove screws or pins from a left ankle fracture, he was wearing a cast on his lower left leg, was taking prescribed hydromorphone pain medication, and was using crutches. Plaintiff had been instructed to use crutches until he could bear weight on his left leg.

The distance between Mr. Cournoyer's house and Ms. Barbeau's residence was 7.2 miles. In his deposition, Plaintiff acknowledged that the only safe way to travel between the houses at night was by motor vehicle. On the night in question, Plaintiff was wearing dark clothing. After a disagreement with his girlfriend about whether to leave Ms. Barbeau's residence, Plaintiff went outside to his girlfriend's car, and Ms. Landon and Ms. Barbeau locked him outside of the house. Ms. Landon testified at her deposition that Plaintiff "was definitely not himself[.]" (Doc. 207-7 at 11.) When he discovered that her car was locked, Plaintiff tried calling and texting Ms. Landon but she would not answer, so he "started knocking louder and louder" on the door. (Doc. 207-3 at 25.) Plaintiff then hit Ms. Landon's locked vehicle with a crutch until the crutch broke. He left both crutches on the ground.

At approximately 9:35 p.m. that night, Ms. Barbeau and Ms. Landon called SVPD and spoke to Vermont State Police ("VSP") dispatch. Ms. Barbeau reported that she had two children and that her "friend's boyfriend is trying to get into [her] house and he's drunk and a little belligerent." (Doc. 207-17 at 00:07-11.) She told the dispatcher that her friend's boyfriend had "just beat his girlfriend's car with his crutch" and that he "took off

---

[1] Plaintiff and Ms. Landon purchased a 750 milliliter bottle of Jägermeister, which has an alcohol content by volume of 35%. Plaintiff took three "good drink[s]" meaning "a full mouthful" which he estimated was equal to two shots per mouthful and then had a "Jägerbomb" mixed with Red Bull. (Doc. 226-5 at 58.) According to Plaintiff, there was still two-inches to an inch-and-a-half of alcohol in the bottle when he left the Barbeau residence. *Id.* at 84. In contrast, Ms. Barbeau told Defendant Gagne that Plaintiff "drank the whole bottle." (Doc. 226-2 at 39.)

3

behind [her] garage" and was still there. (Doc. 207-18 at 00:06-14.) Ms. Landon further reported:

> We came together, and he just, I don't know, I, it's like a flipped switch and he just snapped. He lost it, he, we were literally just sitting here playing cards and he just snapped and, you know, there's, there's kids involved. So he went outside, and I told her to just lock the door, like [sigh].

*Id.* at 1:53-2:16.

VSP dispatch contacted Defendants Gagne and Recore, who were on duty that night, and stated that there was a "complainant on the line" at Ms. Barbeau's address "advising that a male she doesn't want there is there, intoxicated, and now is hiding behind the garage." (Doc. 207-19 at 00:07-12.) When asked who the male was, the dispatcher said, "Deven Barrette; apparently, he and his girlfriend are there visiting. He quote, unquote 'snapped and lost it,' and they've locked him outside the residence." (Doc. 207-20 at 00:05-15.)

Defendant Gagne arrived at Ms. Barbeau's home at approximately 9:39 p.m. The weather at the time was approximately 40 degrees and raining. Shortly after parking in front of Ms. Barbeau's home and exiting his police cruiser, Defendant Gagne encountered Plaintiff, who was walking away from the residence. Plaintiff recognized Defendant Gagne because they attended high school together.

Defendant Gagne asked Plaintiff if he got in a fight with his girlfriend as Plaintiff walked toward him. Plaintiff replied, slurring his speech, "Um no, she kicked me out. I'm just trying to get home." (Doc. 207-13 at 00:39-43.) Defendant Gagne asked Plaintiff where he lived, and Plaintiff responded, "ask her" as he began walking away. Defendant Gagne called out to him, saying: "It's Darren, right? Or Deven, right? Hey, I just want to make sure you got a ride. What's going on? You seem pretty intoxicated."[2] *Id.* at 00:47-52.

---

[2] Shortly after Defendant Gagne's arrival on the scene, Mr. Cournoyer arrived at Ms. Barbeau's residence because Ms. Landon had called him. Mr. Cournoyer spoke briefly with Ms. Landon in the driveway but did not speak with either Plaintiff or an SVPD officer before driving away. (Doc. 226-2 at 10.)

4

Plaintiff resumed walking away and crossed the street toward a gas station/convenience store (the "gas station") after waiting for a car to pass. Defendant Gagne followed Plaintiff across the street and noticed the cast on Plaintiff's leg. Doc. 207-13 at 00:53-1:15; Doc. 226-2 at 15. Plaintiff stated, "Dude, my house is straight," followed by an inaudible remark. Defendant Gagne responded, "Deven, come talk to me. I need to talk to you, though." (Doc. 207-13 at 1:17-20.) On at least three occasions, Defendant Gagne told Plaintiff he appeared intoxicated; on at least six occasions, he told him he was trying to help him get home; on at least eight occasions, he asked Plaintiff to talk to him; and at least twelve times, he asked Plaintiff to stop.

As Plaintiff and Defendant Gagne walked through the gas station parking lot, Defendant Gagne said, "Man, I'm just trying to get you help." *Id.* at 1:28-29. Plaintiff replied loudly, "Yeah, well, I'm fine." *Id.* at 1:29-31. The following exchange took place:

Defendant Gagne: "Well, you're intoxicated. I just want to get you home. Do you have somebody we can call to come get you?"

Plaintiff: "No, she's fine."

Defendant Gagne: "No, I want to make sure you get home. That's what I'm worried about."

Plaintiff: "I'm on my way home."

Defendant Gagne: "Where do you live?"

Plaintiff: "Don't worry about it."

Defendant Gagne: "Well, I am worried about it."

Plaintiff: "Don't."

*Id.* at 1:32-47.

Defendant Gagne continued following Plaintiff to a location behind the gas station. At the time, Plaintiff was walking with his hands in his pockets. Defendant Gagne asked, "Do you want to take your hands out of your pockets for me?" *Id.* at 1:48-49. Plaintiff first responded "no" but nonetheless took his hands out of his pockets and raised them to his side, keeping them there as he continued walking with a wide stance. *Id.* at 2:08.

Defendant repeatedly asked Plaintiff to stop and talk to him as he continued to

follow him. Plaintiff told Defendant Gagne to "kiss my ass" and said on multiple occasions, "Don't touch me." At one point, he said, "Don't touch me. I'm telling you, it's gonna get bad." *Id.* at 2:24-27. Plaintiff approached a wooden fence and stepped over it, knocking down one of its railings. Defendant Gagne followed him into the backyard of a residence. (Doc. 226-2 at 16.) While they were in the backyard, Defendant Gagne said, "Hey man, just stop and talk to me," and Plaintiff turned around and said loudly and emphatically, "Don't touch me." (Doc. 207-13 at 2:35-38.) Defendant Gagne asked to see Plaintiff's hands, and Plaintiff raised them in the air. Defendant Gagne told Plaintiff twice to turn around, and Plaintiff replied, "I'm fine. I haven't done anything." *Id.* at 2:40-43. Plaintiff continued walking away while Defendant Gagne repeatedly told him to stop.

Defendant Recore joined Defendant Gagne and Plaintiff. As Defendant Gagne continued to follow Plaintiff, who was walking with his hands spread out by his sides, Defendant Gagne said to Defendant Recore, "We have to go hands on." *Id.* at 2:49. The following exchange took place:

Defendant Gagne: "Deven, stop."

Plaintiff: "I'm going home."

Defendant Gagne: "No, so where do you live?"

Plaintiff: "Uh, 112 Borderview Drive."

Defendant Gagne: "Where is that?"

Plaintiff: "Uh, up by the border."

Defendant Gagne: "Alright, well, let's get you a ride. That's what I'm trying to do."

Plaintiff: "Don't touch me."

*Id.* at 2:53-3:08.

The video depicts Plaintiff standing and facing Defendant Gagne, illuminated by a flashlight. Defendant Gagne ordered him to stop and advised he was trying to get him a ride, and Plaintiff repeated, "I haven't done anything wrong," as he stepped backwards and turned around and continued walking away from the officers. *Id.* at 3:09-3:15. Defendant Gagne stated, "You're intoxicated. You're intoxicated, and I can't let you,"

6

and Defendant Recore interjected to add, "We have to make sure you're safe," to which Plaintiff responded, "I'm safe," and Defendant Recore replied, "We can't let you walk." *Id.* at 3:16-3:22.

Thereafter, Defendants Gagne and Recore each took hold of one of Plaintiff's arms and forcibly took him to the ground. (Doc. 226-2 at 22.) Defendant Gagne testified that Plaintiff "was onto his butt and then he was onto his back. We were then able to get control of his arms after a brief struggle. We were able to get him rolled over onto his stomach and get him into handcuffs." (Doc 207-4 at 29.) Plaintiff's recollection was similar: "I was grabbed. I'm not sure what came from where. I was not punched in the face . . . I don't believe anyone swung at me, no." (Doc. 210-1 at 8.) In an SVPD Response to Resistance Report completed after the event, Defendant Recore described the use of force as "[t]akedown to the ground, forearm on chest for bodyweight keeping subject from getting up, prone shoulder lock for cuffing[.]" (Doc. 228-13 at 4.) Because it was dark, the takedown is not clearly shown on Defendant Gagne's and Recore's body camera videos. Plaintiff can be heard saying, "Don't, don't" and "Don't do it" as Defendants Gagne and Recore took hold of him. (Doc. 207-13 at 3:26-31.) Plaintiff also said, "I haven't done anything," as Defendant Gagne replied, "Deven, I'm going to tase you. Stop. You're going to get tased." *Id.* at 3:38-43. Defendant Gagne took his taser out of its holster but did not use it.

Defendant Gagne advised Plaintiff that he was in protective custody and told him to "relax." In response, Plaintiff shouted, "Let off me. Let off me." (Doc. 207-13 at 3:44-50.) Plaintiff asked, "What have I done?" and Defendant Recore replied, "You're intoxicated. We have to make sure you're safe." *Id.* at 3:53-56. A few seconds later, Defendant Recore told Plaintiff to stop fighting and Plaintiff responded, "I'm not." *Id.* at 4:00-02.[3]

Thereafter, Defendant Gagne directed Plaintiff to roll over and put his hands

---

[3] Defendant Recore testified that his use of the term "fighting" encompassed "a broad spectrum of actions" aside from "going to blows, kicking, punching," including "giving resistance, tugging, pulling, not allowing, you know to — to stop and talk[.]" (Doc. 228-10 at 48.)

behind his back. Plaintiff responded that he was trying. The officers handcuffed Plaintiff

behind his back. Plaintiff asked to sit up, and one of the officers said, "If we let you sit

up, are you going to relax?" *Id.* at 4:35-50. Plaintiff responded "yeah," and the officers

allowed Plaintiff to sit up and asked if he had any weapons on him, to which he

responded "no." *Id.* at 4:38-43. The following exchange ensued:

> Defendant Gagne: "Why won't you just talk to me?"
>
> Plaintiff: "Get your foot off me. What do you want to talk about?"
>
> Defendant Gagne: "Why won't you — Dude, I'm just trying to get you home. You're intoxicated, and I can't let you walk."
>
> Defendant Recore: "You have to understand where we're coming from, okay. You've had too much alcohol. We don't want you to get hit by a car."
>
> Defendant Gagne: "Do you have any weapons on you?"
>
> Plaintiff: "Wait. You guys are asking me too many questions. I don't have anything."

*Id.* at 4:43-5:03. The officers assisted Plaintiff to his feet, and Plaintiff groaned and stated

in a tearful voice that he just had surgery. *Id.* at 5:07-10. The officers asked Plaintiff if he

wanted to sit down. When he replied in the affirmative, they assisted Plaintiff into a

seated position on the ground. The officers and Plaintiff continued to discuss Plaintiff's

condition and the reasons for protective custody as follows:

> Defendant Gagne: "Listen, man, I'm trying not to fight with you, I'm trying to get you a ride home. Do you understand that?"
>
> Plaintiff: "I'm trying to talk to you, and you're chasing me."
>
> Defendant Gagne: "I know. I know you are. You're being aggressive."
>
> Plaintiff: "Bullshit."
>
> Defendant Recore: "You kept walking away."
>
> Plaintiff: "He was chasing me. Fuck you."
>
> Defendant Gagne: "Deven. Deven. Stop. Do you want me to have rescue come check your foot out?"
>
> Plaintiff: "No."
>
> Defendant Gagne: "You sure?"
>
> Plaintiff: "It's fine."

Defendant Gagne: "Who can we call to get you a ride home?"

Plaintiff: "Uh, 309 —"

Defendant Gagne: "Just hang on a sec."

Plaintiff: "Guys, can we get out of the rain?"

Defendant Recore: "Yep, just give us a sec. We'll give you a place to sit."

Plaintiff: "You're a fucking piece of shit. Fuck you. You're lucky I'm cuffed."

Defendant Gagne: "Do you want to go to detox tonight, Deven, or do you want to go home? Shut your mouth and stop talking like that, do you understand me?"

Plaintiff: "Yes."

Defendant Gagne: "I was trying to be decent with you the whole time and you didn't want to stop and listen and then you wanted to fight with us."

Plaintiff: "No. I'm listening."

Defendant Gagne: "So, stop, I'm not going to deal with that. I'm not going to take it. Do you need rescue for your foot?"

Plaintiff: "My foot's fine. I just got to get out of the rain."

Defendant Recore: "What's the rest of that phone number?"

Plaintiff: "Get me out of the rain, and we'll talk."

*Id.* at 5:27-6:42.

Defendant Gagne then said to Defendant Recore, "Do you want to go get your cruiser?" and Defendant Recore replied in the affirmative and began walking towards the cruiser. *Id.* at 5:06-07. Plaintiff and Defendant Gagne continued talking:

Defendant Gagne: "You're going to fight with me again?"

Plaintiff: "No."

Defendant Gagne: "Okay."

Plaintiff: "Dude, hey, you know me."

Defendant Gagne: "I went to high school with you."

Plaintiff: "Get me out of these cuffs."

Defendant Gagne: "Well, we're going to work on that, but you just tried to fight with us, so."

Plaintiff: "Look at me. I was fighting with *them*. They were trying to chase

9

me."

Defendant Gagne: "Okay, man. Listen, Deven."

Plaintiff: "No. Get me out of these cuffs."

Defendant Gagne: "He's going to bring his cruiser over, and we're going to work on that. We're going to get you a ride home. That's all I was trying to do. You're intoxicated, Deven. I can tell. I can't let you walk home. If you get hit by a car, that's on me. Do you understand that?"

Plaintiff: "What are you?"

Defendant Gagne: "You've been drinking tonight. I can smell it on you."
*Id.* at 6:46-7:18.

Plaintiff continued to ask that his handcuffs be removed. Defendant Gagne responded that Defendant Recore was driving his cruiser to their location so they could give Plaintiff a ride home. Plaintiff called Defendant Gagne "small stuff," to which Defendant Gagne replied that he "ain't worried about [his] size." *Id.* at 7:23-27. Defendant Gagne explained that he was trying not to fight with Plaintiff. Plaintiff protested that he was not fighting and said he had to "take a piss." *Id.* at 7:45-47. Defendant Gagne asked Plaintiff who he was living with. Plaintiff, in a calm voice, replied that he lived with his "buddy John. It's like, uh, a father-son thing." *Id.* at 7:53-58. Defendant Gagne asked Plaintiff if he had had a lot to drink that night, and Plaintiff said, "No, dude. Like, that's the worst part." *Id.* at 8:16. Plaintiff again requested to use the restroom and complained about the cold. Defendant Gagne advised Plaintiff he would need to wait and assured him that the cruiser would be warm.

Defendant Gagne continued speaking to Plaintiff as they awaited Defendant Recore's return. When Plaintiff said he "just want[s] to go home," Defendant Gagne asked Plaintiff if there was another adult at his residence. Plaintiff responded that he "can give [the officer] a couple of different numbers." *Id.* at 8:58-9:05. Defendant Recore arrived, and he and Defendant Gagne helped Plaintiff to stand up. *Id.* at 9:13. As they walked toward the cruiser, Plaintiff indicated that he wanted his hands in front of him so that he didn't fall. Plaintiff said he wasn't fighting and wouldn't touch the officers. He spit on the ground en route.

10

As they approached the cruiser, Plaintiff complained in an agitated voice about his escort. Defendant Gagne said, "We're not twisting you. Hey, just walk." Defendant Recore added, "Don't spit in my face." Plaintiff calmly replied that he didn't spit in Defendant Recore's face. Defendant Recore explained that, "You're spitting because you're breathing heavy. I just don't want to get spit on me. That's all." *Id.* at 10:17-22.

The officers continued to interact with Plaintiff as they helped him walk to the cruiser. Plaintiff answered questions about his surgery and stated he was not trying to be disrespectful. At one point, Plaintiff told Defendants Gagne and Recore, "Wait, back up," and then spat on the ground. *Id.* at 10:52-57. Plaintiff then asked the officers if they were okay. Plaintiff reiterated he wasn't trying to be disrespectful, and Defendant Gagne replied, "I'm just going to fix these cuffs." Plaintiff said, "They're cutting me." *Id.* at 11:10. Plaintiff appeared to cooperate while an officer adjusted his handcuffs, although he continued to complain that they were cutting him. *Id.* at 11:30-40. Plaintiff had the following exchange with Defendant Gagne:

> Defendant Gagne: "Don't fight with us, Deven."
>
> Plaintiff: "I'm not. Am I fighting? Am I fighting?"
>
> Defendant Gagne: "Not right now. Stop yelling. Stop yelling."
>
> Plaintiff: "Oh, my god [inaudible.]"
>
> Defendant Gagne: "Deven, you're not in trouble, okay? But, when we go to grab a hold of you to make sure you don't walk away from us and get hit by a car and you start tensing up and wanting to fight with us —."
>
> Plaintiff: "I'm working with you, right?"
>
> Defendant Gagne: "You're working with us now. So let's go. We're working good. Let's continue. . . . we're going to have a seat in the car and then we're going to get you a ride, okay?"

*Id.* at 11:52-12:13.

As Defendants Gagne and Recore attempted to guide Plaintiff into the cruiser, they offered again to call an ambulance, which Plaintiff declined, although he claimed he couldn't breathe. Plaintiff became agitated as he entered the cruiser and shouted, "Stop. Let me do it." *Id.* at 13:14-16. Defendant Recore responded: "Okay, fine. Do it yourself then." *Id.* at 13:14-16.

### B.    Plaintiff's Companions Are Interviewed.

Defendant Recore stayed at the cruiser with Plaintiff while Defendant Gagne
returned to Ms. Barbeau's residence and spoke to Ms. Barbeau and Ms. Landon. During
their conversation, which is captured on Defendant Gagne's body camera, Ms. Landon,
who was crying, told Defendant Gagne that Plaintiff had "snapped" while they were
playing cards. (Doc. 207-14 at 00:58.) She denied that he had hit or assaulted anyone but
said "He started getting loud. He started, like, puffing his chest and, like, being really
aggressive, and there's babies in the house." *Id.* at 1:00-10. Defendant Gagne advised that
Plaintiff was in protective custody and asked if there was a sober adult who could pick
him up. *Id.* at 1:20. Ms. Landon said she had spoken to Mr. Cournoyer, the person she
and Plaintiff were staying with, but, when Defendant Gagne asked if Mr. Cournoyer
would take Plaintiff, Ms. Landon responded, "At this point, he's fed up with him." *Id.* at
1:50-53. Ms. Landon mentioned the 750 milliliter bottle of Jägermeister they were
drinking that night, and Ms. Barbeau said, "He drank the whole bottle." *Id.* at 2:14-18.
Ms. Landon mentioned telling Mr. Cournoyer that she wanted to go back and gather her
things from the residence she shared with Plaintiff. Defendant Gagne asked for Ms.
Landon's information and explained to Ms. Landon and Ms. Barbeau:

> [Plaintiff's] going to go to detox tonight, and the way he's acting, he's
> probably going to be detoxed at Northwest Correctional just because of the
> way he is. They're not going to take him at detox with him being
> aggressive. So he'll probably, he'll, not any charges, he'll just spend the
> night at the jail and then, when he's sober, they'll release him, um, but it's
> probably what's going to be best for him. At this point with him, he didn't,
> like, throw punches wanting to fight with us, but he wasn't cooperative,
> so . . .

*Id.* at 2:50-3:10. Ms. Landon told Defendant Gagne that Plaintiff had been hitting her car
with his crutches, although she did not want to press charges. She confirmed that Plaintiff
had surgery the day before. Defendant Gagne's conversation with Ms. Landon and Ms.
Barbeau lasted approximately five minutes. Defendant Gagne told dispatch, "Can you get
ahold of detox and just let them know it's going to be a refusal." (Doc. 228 at 7.)

12

### C.    Plaintiff Is Transported to Detox.

While Defendant Gagne was interviewing Ms. Landon and Ms. Barbeau, Defendant Recore continued speaking with Plaintiff at the open door of the police cruiser. Defendant Recore asked Plaintiff for a phone number he could call. Plaintiff provided him Ms. Landon's number, and Defendant Recore asked if she had been drinking that night, to which Plaintiff responded, "I don't know." (Doc. 207-15 at 13:05-21.) Defendant Recore advised, "Well, we got to find you some place to go, but they got to be sober," and, "We're trying to avoid bringing you to detox." *Id.* at 13:30-38. Plaintiff, who was handcuffed behind his back, asked if he could put his hands in front of him because he was not a danger. Defendant Recore described Plaintiff's behavior to him as alternating between cooperative and belligerent. Plaintiff reminded Defendant Recore that they went to school together, to which Defendant Recore explained that it was Defendant Gagne who went to school with Plaintiff. When Plaintiff asked if they were brothers, Defendant Recore answered that they were not and that they merely worked together.

Defendant Recore asked Plaintiff if he had been exposed to COVID-19 or had any symptoms. Plaintiff denied any exposure and, when requested, agreed to put six feet between himself and Defendant Recore, indicating that he respected Defendant Recore's family. Defendant Recore again asked for a phone number for someone who could pick up Plaintiff. In response, Plaintiff complained about his handcuffs. He then provided his own phone number to Defendant Recore.

For the next several minutes, Defendant Recore tried to get Plaintiff to swing his feet inside the police cruiser. At one point Plaintiff said, "Look at me. Are you American? We're trying, right?" *Id.* at 16:25-28. Plaintiff asked if he was in trouble and asked to be uncuffed and said he had to use the restroom. Defendant Recore advised Plaintiff to put his feet inside the vehicle so he could bring him to a place where Plaintiff could use a restroom.

As Plaintiff struggled to put his feet inside the cruiser, he asked Defendant Recore to move something inside the vehicle forward. When Defendant Recore explained that he

13

was unable to do that and stated he was willing to help Plaintiff move his foot, Plaintiff exclaimed, "Hey! Let me do it" as Defendant Recore attempted to assist him. *Id.* at 18:09-11. Defendant Recore replied, "Okay, then you do it. I'm done with you yelling at me. Move your foot. You're intoxicated and you don't realize it, but you're screaming in my ear." *Id.* at 18:12-20. Plaintiff denied yelling. Defendant Recore coached Plaintiff regarding how to get into the cruiser and assured Plaintiff that, if he was "more mellow," he was "possibly think[ing] about moving [the handcuffs] to the front." *Id.* at 19:13-16. Plaintiff replied, "I've been mellow," to which Defendant Recore responded, "No, you haven't." Plaintiff asked, "I haven't?" *Id.* at 19:16-20.

Plaintiff eventually agreed to let Defendant Recore help him, but became frustrated and raised his voice when Defendant Recore tried to do so. *Id.* at 19:43-50. Defendant Gagne, who had returned from his visit to Ms. Barbeau's house, helped Plaintiff instead. Plaintiff yelled "Fuck you" at Defendant Recore but calmed down when Defendant Gagne told him to stop. *Id.* at 20:07-10. Defendant Gagne attempted to get a breath sample from Plaintiff but Plaintiff refused. Defendant Gagne again advised, "You're not in trouble." Once inside the police cruiser, Plaintiff became agitated and said, "Kyle, don't, don't, Kyle." In response, Defendant Gagne repeatedly advised Plaintiff to "breathe" and "just breathe" as he shut the door to the cruiser. *Id.* at 21:30-42.

Defendants Gagne and Recore spoke outside the cruiser. Defendant Recore described Plaintiff's behavior in Defendant Gagne's absence as follows: "He's up and down. Bad . . . He's fine for a minute, and then he starts screaming in my ear, screaming in my face, telling him to relax, he's fine for a minute, then he's screaming again." *Id.* at 21:45-22:05. Defendant Gagne directed Defendant Recore to bring Plaintiff to detox, stating that his girlfriend did not want him at the place where she and Plaintiff were staying. *Id.* at 22:10-15. Defendant Recore responded, "They'll screen him through the outside of the car, I'm sure." *Id.* at 22:15-17.

As Defendant Recore transported Plaintiff to a detox facility, Plaintiff repeatedly tried to convince him to remove his handcuffs. Defendant Recore declined to do so but assured him he was not in trouble. After Plaintiff asked several times to use a restroom,

14

Defendant Recore advised that they needed to arrive at their destination first. Plaintiff periodically raised his voice during the ride and insulted Defendant Recore, but at other moments was either silent or speaking calmly. Plaintiff can occasionally be heard spitting in the back seat of the cruiser. At one point, Defendant Recore said to Plaintiff, "Hey man, you've got to stop spitting back there." *Id.* at 30:05-07.

After driving for approximately twelve minutes, Defendant Recore and Plaintiff arrived at the Howard Center. Defendant Recore stated they would wait for the nurse to get there to see if the nurse would allow Plaintiff to use the restroom. Plaintiff thanked him. *Id.* at 36:49-58. While they were waiting, Plaintiff repeatedly asked to use the restroom. Defendant Recore told Plaintiff to "relax" and "cooperate." A nurse arrived and spoke briefly with Defendant Recore before leaving to retrieve paperwork. Several minutes later, Defendant Gagne returned and had a brief exchange with Defendant Recore that is not entirely audible from Defendant Recore's body camera video. Defendant Recore told Plaintiff, "Well, we're not staying here." Plaintiff asked again to use the restroom and Defendant Recore replied that it was not possible. Defendant Gagne spoke to Howard Center screener Rita Dean with his body camera turned off. He testified that he did not recall the specifics of their conversation. (Doc. 226-2 at 49.)

Rita Dean of the Howard Center did not physically examine, meet, or speak with Plaintiff before refusing him. *Id.* at 50. On a form with the header "Incapacitation Screening and Disposition Report[,]" she checked violence concerns, uncooperative, and refused under "NON-ADMIT REASON CODES[.]" (Doc. 207-22 at 2.) Ms. Dean also signed the portion of the form titled "Protective Custody Certification" and checked the box for "NWCF[,]" although she did not fill out the following statement, which was printed on the form:

> *I certify that* the physical and/or mental functioning of [blank] is substantially impaired from the consumption of alcohol and/or other drugs; and that protective custody at a lock-up or correctional facility is necessary to ensure the safety of the client or others; and the other appropriate placements [checkbox] have been actively refused or [checkbox] are unavailable

*Id.* According to Ms. Dean, "if somebody is so uncooperative that you can't get close

enough to them to safely do a screening, that person is therefore necessarily a danger to themselves and/or to others" and "would definitely need to be locked up, because they aren't thinking correctly. They aren't thinking in a normal manner . . . They could hurt somebody." (Doc. 207-21 at 17.)

### D.    Plaintiff Is Transported to NWSCF.

Officer Recore drove Plaintiff to NWSCF, and they arrived at approximately 10:37 p.m. It was the SVPD's policy to take "males who have been picked up for incapacitation" to NWSCF. (Doc. 226-2 at 51.) En route to NWSCF, Defendant Recore received a radio transmission from dispatch stating that "Reservations have been made at Northwest, welcoming party will be available."[4] *Id.* at 57. Defendant Recore told NWSCF staff that Plaintiff had been kicking and spitting. At NWSCF, the booking officer was told by dispatch "that [Plaintiff] was 'an intoxicated male' who 'has been spitting' and 'in and out of being compliant/non-compliant' and was 'just refused [from] detox,' and 'he's been a little bit of a handful.'" *Barrette v. Vill. of Swanton*, 2025 WL 1476497, at *10 (D. Vt. May 22, 2025) (internal quotation marks and citation omitted). Neither Defendant Gagne nor Defendant Recore participated in removing Plaintiff from the cruiser once he arrived at NWSCF or personally caused Plaintiff's injuries when he was removed. On April 3, 2020, Plaintiff's blood alcohol content ("BAC") at the Northwestern Medical Center at 1:24 a.m. was 0.194, which is more than twice the legal limit for operating a motor vehicle in Vermont. (Doc. 226-2 at 5.)

During his tenure as SVPD Chief, Defendant Stell was not aware of any individuals other than Plaintiff who sustained injuries in the garage or sallyport of NWSCF after SVPD transported them there. (Doc. 228-2 at 32.) He also was not aware of any incapacitated person being injured after being picked up by SVPD. Doc. 210-13 at

---

[4] Although Plaintiff contends that the term "welcoming party" is a euphemism indicating that the officers receiving him at NWSCF were prepared to use force, his only basis for this contention is the testimony of his acquaintance Randy Cummings. As this court recently ruled, Mr. Cummings's testimony on this issue is inadmissible. *See Barrette v. Vill. of Swanton*, 2025 WL 1476497, at *7 (D. Vt. May 22, 2025).

41-42; *see* Doc. 228-2 at 13.

### E.    Defendant Gagne's and Recore's Use of Force.

Shannon West, Plaintiff's use-of-force expert, testified that the amount of force
Defendants Gagne and Recore used on Plaintiff was the "minimal force necessary" to
seize him, Doc. 207-23 at 8, although Mr. West opined that the officers should not have
seized Plaintiff. *Id.* at 13. Mr. West testified that the degree and means of force applied
by the officers was "consistent with police policies, training and procedures[,]" and more
specifically:

> I would say that their use of force, or the application of use of force and the
> things they did to seize him was perfectly within reason for officers and
> they acted professionally in using minimal force necessary . . . [and]
> certainly I couldn't see anything excessive in what they were doing.

(Doc. 226-2 at 25.) Mr. West further opined that Plaintiff's plan to walk "out into the
night" in his state of dress evidenced "a significant impairment in his decision making,
basic decision making[,]" (Doc. 210-24 at 7), and that Plaintiff was "'significantly' or
'substantially' intoxicated during the encounter[.]" (Doc. 228-2 at 34-35). He gave
Defendants Gagne and Recore high praise for their communication skills, describing
them as "professional; they communicated calmly. I gave them an A+ on their
communication skills, their de-escalation skills and the things that we're trying to teach
recruits. I wish all officers acted the way those two officers acted in their interactions."
(Doc. 226-2 at 36.) He stated that he "does not believe that either of these officers had,
ever had any malicious intent whatsoever." (Doc. 228-2 at 34.)

Defendant Stell became aware of the April 2, 2020 use of force on Plaintiff in July
of 2020 while reviewing Defendants Gagne's and Recore's body camera videos to
respond to records requests made by Plaintiff's counsel. (Doc. 228-2 at 4-5.) Lieutenant
David Kachajian, another officer at SVPD, was the supervisor responsible for reviewing
Response to Resistance reports. *Id.* at 7. On April 5, 2020, Lt. Kachajian reviewed the
Response to Resistance reports completed by Defendants Recore and Gagne regarding
their use of force on April 2, 2020, as well as the corresponding body camera videos, and

17

determined that the use of force was justified.[5] *Id.* at 8. While serving as SVPD Chief, Defendant Stell had discretion to determine whether an SVPD policy was needed. (Doc. 210-13 at 9.)

### F.     SVPD's Policies, Practices, and Training.

As of April 2, 2020, SVPD had a use-of-force policy in place but "had not adopted a formal written policy specific to incapacitated persons." (Doc. 228-2 at 9). SVPD's "Response to Resistance" policy was adopted on October 16, 2018 and includes guidance that "[a]ll responses to resistance must be objectively reasonable[,]" with "objectively reasonable" defined as "[t]he amount of force that would be used by other reasonable and well-trained officers when faced with the circumstances that the officer using the force is presented with." (Doc. 228-18 at 157.)

At the time of the incident, SVPD officers were instructed that the Howard Center was the "designated and approved substance abuse treatment program with detoxification capabilities for the purposes of screening and treatment" and that individuals "taken into protective custody and found to be incapacitated by a substance abuse counselor and refused for detoxification treatment at the Howard Center" should be taken to NWSCF. (Doc. 208-48 at 3.) On June 20, 2022, the SVPD adopted a policy on "Protective Custody of Incapacitated Persons." (Doc. 228-2 at 9.)

SVPD officers, as part of their standard training, undergo "annual use of force training, which includes use of firearms and annual firearms qualifications, training in seizures and detentions and the force options to be used in effectuating seizures and other custodial situations." Doc. 208-45 at 3; *see* Doc. 228-2 at 34. Defendant Gagne discussed protective custody of incapacitated persons with a field training officer as part of his

---

[5] Plaintiff asserts that Lt. Kachajian's finding that the use of force was justified is inadmissible because it goes to the ultimate issue. The court will not exclude this evidence at the summary judgment stage. *See* Federal Rule of Evidence 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue."); *see also Barrette*, 2025 WL 1476497, at *5-6 (admitting, for purpose of summary judgment, internal reviews of Defendant Mosher's use of force that described it as "concerning" and inconsistent with training); *Cooper Crouse-Hinds, LLC v. City of Syracuse, New York*, 568 F. Supp. 3d 205, 222 (N.D.N.Y. 2021).

18

training at SVPD in 2014. (Doc. 228-2 at 26.) He testified that he received training on
dealing with incapacitated persons at the Vermont Police Academy and reviewed the
statute on incapacitation in 2018 as part of his Level III training, although he did not
"recall any specifics" on whether "there was training specifically on determining whether
or not someone is incapacitated." Doc. 208-5 at 44; *see also* Doc 228-2 at 26.

Defendant Recore also underwent Level III training from the Vermont Police
Academy, although he did not remember whether he had received training on the
difference between "intoxication" and "incapacitation." (Doc. 228-10 at 19.) Between
2016 and through 2020, Defendants Gagne and Recore both met or exceeded the thirty
hours of in-service training required by the Vermont Criminal Justice Council, including
required training in the use of force. (Doc. 228-2 at 32-33.)

### G. The Incapacitation Statute.

Vermont law provides that "[w]hen a law enforcement officer encounters a person
who, in the judgment of the officer, is intoxicated . . . the officer may assist the person, if
he or she consents, to his or her home, to an approved substance abuse treatment
program, or to some other mutually agreeable location." 18 V.S.A. § 4810(a) (the
"Incapacitation Statute"). If the officer determines the person is "incapacitated" as
defined in the statute, "the person shall be taken into protective custody by the officer" at
"an approved substance abuse treatment program with detoxification capabilities or [at]
the emergency room of a licensed general hospital for treatment" or, if the following
conditions are met, "in a lockup or community correctional center":

(1) the person refuses to be transported to an appropriate facility for
treatment or, if once there, refuses treatment or leaves the facility before he
or she is considered by the responsible staff of that facility to be no longer
incapacitated; or

(2) no approved substance abuse treatment program with detoxification
capabilities and no staff physician or other medical professional at the
nearest licensed general hospital can be found who will accept the person
for treatment.

§ 4810(b)-(d).

The Incapacitation Statute defines "[p]rotective custody" as "a civil status in

which an incapacitated person is detained by a law enforcement officer for the purposes of: (A) ensuring the safety of the individual or the public, or both; and (B) assisting the individual to return to a functional condition." § 4802(11). It defines "[i]ncapacitated" as when:

> a person, as a result of his or her use of alcohol or other drugs, is in a state of intoxication or of mental confusion resulting from withdrawal such that the person:
>
> (A) appears to need medical care or supervision by approved substance abuse treatment personnel, as defined in this section, to ensure the person's safety; or
>
> (B) appears to present a direct active or passive threat to the safety of others.

§ 4802(7). The Incapacitation Statute also provides that law enforcement officers "who act under the authority of this section are acting in the course of their official duty and are not criminally or civilly liable therefor, unless for gross negligence or willful or wanton injury." § 4810(j).

## II.    Disputed Facts.

According to Defendants Gagne and Recore, the "only safe way to travel the 7.2 miles between" Plaintiff's address as of April 2, 2020 and Swanton village "would be by car, especially at night." (Doc. 226-2 at 3.) Plaintiff agreed with this statement at his deposition; he now, however, contends that this is incorrect because he has traveled this distance by foot or mountain bike before dawn. *Id.* The court does not consider this dispute material as no rational jury could find it was unreasonable to raise concerns regarding an intoxicated individual walking 7.2 miles at night in the dark and rain with an injured foot.

Defendant Gagne testified that, when he first arrived at Ms. Barbeau's residence and spoke with Plaintiff on the night of April 2, 2020, he observed "indicators of intoxication[,]" including "glossy eyes, the strong odor of an intoxicant[,] and [Plaintiff's] slurred speech[.]" (Doc. 207-4 at 25.) When asked whether Plaintiff, "[o]ther than having a cast on," was "stumbling around" or "walking all right[,]" Defendant Gagne testified that Plaintiff walked "with his feet kind of spread wider than what you

would expect a person to normally walk, with a slight limp, and then he did stumble over his feet in the parking lot of the gas station." *Id.* at 17.

Plaintiff disputes that Officer Gagne observed signs of his intoxication when he first arrived at the Barbeau house. He also contends that he did not stumble while walking except when he crossed the wooden fence, and states he was not "having difficulty walking but for the medical boot." (Doc. 226-1 at 2.) This dispute is not material because Defendants Gagne's and Recore's interactions with Plaintiff are captured by videotape which the court relies on rather than the parties' characterization of the events.[6]

Although Defendants Gagne and Recore state that it was "dark and rainy" when Defendant Gagne made contact with Plaintiff on April 2, 2020, Plaintiff disputes that it was dark and contends that streetlights and lights from the gas station across the street "provided enough lighting to be able to see well." (Doc. 226-2 at 14-15.) Plaintiff testified at his deposition that there was a "light misty rain[.]" (Doc. 226-5 at 61.) The court finds these divergent descriptions of the lighting and weather non-material as the videos accurately depict the lighting and weather conditions.

The parties dispute whether Defendant's statements to "Just stop and talk to me" before he and Defendant Recore performed an arm bar takedown were "commands[.]" (Doc. 226-2 at 20.) Plaintiff contests Defendant Gagne's testimony that he "ordered" Plaintiff to stop immediately prior to the takedown and contends that Defendant Gagne merely asked or advised Plaintiff to cooperate. As this exchange is depicted on the video, the court will rely on the video, which reflects the officers repeatedly telling Plaintiff to cooperate and to not fight with them.

Defendants Gagne and Recore contend that they used "command presence, verbal commands, and soft empty hand controls" to detain Plaintiff. (Doc. 226-2 at 24) (citing Defendant Gagne's deposition testimony). According to Plaintiff, he was "elbowed or kneed" during the takedown. *Id.* at 24. He cites his deposition testimony in which he

---

[6] *See Scott v. Harris*, 550 U.S. 372, 381 (2007) (holding that, where unaltered video footage contradicts a party's version of events on summary judgment, court should "view[ ] the facts in the light depicted by the videotape").

21

answered the question, "And you don't have a memory of either [Defendants Gagne or Recore] hitting you or striking you . . . do you?" with "in the mix of all three of us . . . I don't know what came from where; elbows and knees, what hit what. I know that I was on the ground and I was hurting." (Doc. 226-5 at 64.) Plaintiff testified that he was "thrown to the ground" and "had bruises everywhere" the next day. *Id.* at 64. The SVPD Response to Resistance Report submitted by Defendant Recore described the force used as "[t]akedown to the ground, forearm on chest for bodyweight keeping subject from getting up, prone shoulder lock for cuffing[.]" (Doc. 207-25 at 4.) The video does not clearly depict the takedown. Accordingly, for purposes of summary judgment, the court relies on Plaintiff's version of the takedown.

Defendant Gagne testified that, during his interaction with Plaintiff on April 2, 2020, he "didn't have any knowledge of anybody coming to get [Plaintiff] or any vehicle waiting for him." (Doc. 207-4 at 38.) According to Plaintiff, Defendant Gagne "should have seen" Mr. Cournoyer when he arrived at Ms. Barbeau's home. (Doc. 226-2 at 33.) Mr. Cournoyer testified that, around 9:30 or 10 p.m. on April 2, 2020, Ms. Landon called him to say that Plaintiff was drunk and needed a ride. When he arrived, Mr. Cournoyer parked in front of a police cruiser with a police officer sitting inside of it. He testified that Ms. Landon told him that "police already got [Plaintiff]," and he then left Ms. Barbeau's residence without speaking to police or asking where the police had taken Plaintiff. (Doc. 226-9 at 34.) When Defendant Gagne asked Ms. Landon whether Mr. Cournoyer would give him a ride home, Ms. Landon responded, "At this point, he's fed up with him." (Doc. 207-14 at 1:50-53.) Because Plaintiff does not contend Mr. Cournoyer advised law enforcement that he would provide Plaintiff with a ride, this dispute is not material.

According to Defendant Gagne, "[t]he Howard Center makes the determination whether they are going to accept somebody or refuse them. That's not my determination. It's ultimately their decision." (Doc. 207-4 at 19-20.) Based on Defendant Gagne's statement to Ms. Landon that Plaintiff was "probably going to be detoxed at Northwest Correctional. Just because of the way he is, they're not going to take him at detox with him being aggressive[,]"Doc. 207-14 at 2:53-3:08, and the fact that Defendant Gagne had

a conversation with Ms. Dean that was not captured on his body camera, Plaintiff
contends that Defendant Gagne had decided to take Plaintiff to NWSCF before the
Howard Center refused him. (Doc. 226-2 at 47.) As there is no admissible evidence to
support this speculation, and as a police officer is not required to predict what a third-
party screener may do, it does not create a genuine issue of material fact. *See Lee v.
Golaszewski*, 2025 WL 2083725, at *3 (S.D.N.Y. July 24, 2025) (noting that "non-
movant cannot defeat a summary judgment motion by relying on 'mere speculation or
conjecture as to the true nature of the facts.'") (quoting *Knight v. U.S. Fire Ins. Co.*, 804
F.2d 9, 12 (2d Cir. 1986)).

   Although Defendants Gagne and Recore describe Ms. Dean as a "Public Inebriant
screener certified by the State of Vermont[,]" Plaintiff contends there is "no evidence"
that Ms. Dean was certified by the State of Vermont and asserts that she "had received no
formal training in how to determine whether someone was inebriated or incapacitated."
(Doc. 226-2 at 48.) Ms. Dean's exact status and credentials are immaterial to the pending
motions because Plaintiff has not established that Defendants Gagne and Recore knew
she was allegedly unqualified to provide an evaluation.

   Affidavits by Defendants Gagne and Recore state that,

   [a]s of April 2, 2020, the Northwestern Medical Center would not accept
   persons for treatment of substance abuse who were brought to the
   emergency room by SVPD after having already been screened and refused
   by a designated substance abuse counselor at the Howard Center and found
   to be incapacitated unless the person was in need of exigent emergency
   medical care due to an acute, chronic, or traumatic health condition other
   than substance abuse.

Docs. 207-43 at 2, 207-44 at 2. Plaintiff asserts that these affidavits contradict Defendant
Gagne's testimony that he "would have taken [Plaintiff] for medical treatment" if "he
needed" it after the Howard Center refused Plaintiff. He points out that Defendants
Gagne and Recore had taken intoxicated individuals who are arrested or detained to the
emergency room on previous occasions. Based on Defendant Gagne's testimony that, if
Plaintiff "needed medical treatment, we would have taken him for medical treatment[,]"
Doc. 226-4 at 63, and Defendant Stell's testimony that there was no SVPD policy that

23

required Plaintiff to be taken to NWSCF rather than the hospital, Doc. 226-12 at 37, Plaintiff contends that Defendants Gagne and Recore "could have taken [Plaintiff] to a hospital to address [his] supposed incapacitation, but they did not do so." (Doc. 226-1 at 5.) More generally, Plaintiff disputes that he was found incapacitated by anyone at the Howard Center because Ms. Dean did not personally evaluate him there. (Doc. 226-2 at 61.) As it is undisputed that Plaintiff was not examined by the Howard Center before Ms. Dean refused his admittance and as the video depicts the officers repeatedly asking Plaintiff if he needed medical assistance and Plaintiff declining that assistance, this dispute is not material.

When asked at his deposition whether he "could have driven [Plaintiff] home[,]" Defendant Gagne answered that it was "an option[,]" although he noted that Defendant Recore would have had to drive Plaintiff because his own vehicle was not equipped to transport someone in the back seat. (Doc. 226-4 at 19.) This dispute is not material because Plaintiff could not identify a sober adult who would supervise him if he were taken home.

Plaintiff contends that SVPD's practice was to take people into "'protective custody' on the basis of their perceived personal safety, even absent a finding of incapacitation" and believes this happened to him. (Doc. 228-1 at 10.) Plaintiff cites Defendant Recore's testimony regarding protective custody that "it was drilled in as a routine to make sure that everybody is safe" but otherwise cites no other instances to support his claim of a policy or custom. A conclusory statement to this effect will not suffice.

Defendant Stell "was familiar in April of 2020 with the Vermont statutes relating to incapacitation and protective custody." (Doc. 228-2 at 11.) Plaintiff disputes this based on Defendant Stell's deposition testimony that in April of 2020 it had been "[y]ears" since he read "the Vermont statute that relates to incapacitation in protective custody[.]" (Doc. 228-12 at 11.) Defendant Stell also testified that he did not "recall having specific discussion with [his] officers on that particular statute" or about "citizens' constitutional rights in the United States and Vermont[,]" *id.* at 20-21, and that he did not know if any

24

of the officers' use-of-force training during his tenure as chief focused on the statutory criteria for taking an incapacitated person into protective custody, *id.* at 11. Defendant's personal knowledge of the operative law does not determine whether qualified immunity is available because the standard is an objective one.

Finally, disagreements regarding Plaintiff's degree of intoxication are not material in light of a video that depicts Plaintiff's statements and conduct, the reports of his companions that evening, the amount of alcohol he admits consuming, and his BAC hours later. Even in the light most favorable to Plaintiff, the video reveals he was highly intoxicated and was, at times, non-compliant and uncooperative, resistant, as well as verbally combative, threatening, and abusive.

## III.    Conclusions of Law and Analysis.

### A.    Standard of Review.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that "'might affect the outcome of the suit under the governing law.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248). On a motion for summary judgment, the court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (internal quotation marks omitted) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011)).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). When the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249.

25

To avoid summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

In adjudicating a motion for summary judgment, the district court's role "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Clark v. Hanley*, 89 F.4th 78, 95 (2d Cir. 2023) (internal quotation marks omitted) (quoting *Kee v. City of New York*, 12 F.4th 150, 166-67 (2d Cir. 2021)). If the evidence "presents a sufficient disagreement to require submission to a jury[,]" the court should deny summary judgment. *Anderson*, 477 U.S. at 251-52.

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (citation and internal quotation marks omitted). Not all disputed issues of fact, however, preclude summary judgment. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## B.    Qualified Immunity.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). "When a defendant moves for summary judgment based on qualified immunity, courts consider whether the facts shown make out a violation of a constitutional right, and whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct." *McKinney*, 49 F.4th at 738 (internal quotation marks and citation omitted) (alteration in original). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"Once the jury has resolved any disputed facts that are material to the qualified immunity issue, the ultimate determination of whether the officer's conduct was objectively reasonable is to be made by the court." *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007). However, where there are disputed issues of material fact, a determination of qualified immunity is often inappropriate at the summary judgment stage. *See Husain v. Springer*, 494 F.3d 108, 133 (2d Cir. 2007) (noting that "[s]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness") (alteration in original) (quoting *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999)); *see also Linton v. Zorn*, 135 F.4th 19, 39-40 (2d Cir. 2025) (finding summary judgment inappropriate because whether jury could find officer's use of force reasonable would depend on its resolution of factual disputes).

In some instances, even where facts are disputed, summary judgment remains available if, in the light most favorable to the non-movant, the contested facts reveal that law enforcement's conduct was supported by probable cause or arguable probable cause. *See Singh v. City of New York*, 2024 WL 319117, at *4 (2d Cir. Jan. 29, 2024) (summary order) (holding that grant of summary judgment for defendant on false arrest claim was warranted on qualified immunity ground because arguable probable cause existed based solely on uncontroverted evidence in the record); *see also Harig v. City of Buffalo*, 574 F. Supp. 3d 163, 193 (W.D.N.Y. 2021) (granting summary judgment for defendant on false arrest claim because plaintiff's "[a]rrest was supported by either probable cause or arguable probable cause"), *aff'd*, 2023 WL 3579367 (2d Cir. May 22, 2023).

C.    **Whether Defendants Gagne and Recore Are Entitled to Summary Judgment on Plaintiff's Unlawful Detention or Seizure Claim Brought Under 42 U.S.C. § 1983 (Count II).**

Defendant Gagne argues that he either had probable cause to take Plaintiff into protective custody on April 2, 2020 or had arguable probable cause to do so and that in either case he is entitled to qualified immunity. Defendant Recore makes this same argument and notes that his actions are shielded by qualified immunity because he did not

27

violate any clearly established right. Plaintiff counters that there were "no circumstances from which a reasonable officer could have concluded that" he was incapacitated or that there was otherwise "any basis to take him into protective custody." (Doc. 226 at 10.)

Plaintiff's claims for violations of his federal constitutional rights arise under 42 U.S.C. § 1983, which "is not itself a source of substantive rights" but provides "a method for vindicating federal rights elsewhere conferred[.]" *Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). A claimant must establish the person who committed the violation was acting "under color of state law." *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004) (internal quotation marks omitted) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). He or she also "must p[rove] that each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

A seizure within the meaning of the Fourth Amendment occurs when a "government actor[ ] ha[s], 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen[.]'" *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 19, n.16 (1968)) (omission in original). The Fourth Amendment's protections against unreasonable seizures apply when an officer takes an individual into custody, "whether the seizure is for purposes of law enforcement or due to an individual's mental illness" or intoxication. *Myers v. Patterson*, 819 F.3d 625, 632 (2d Cir. 2016); *see also Glass v. Mayas*, 984 F.2d 55, 58 (2d Cir. 1993) (finding that the plaintiff's involuntary admission to a hospital was an "infringement of his liberty . . . tantamount to the infringement of being arrested"); *cf. Soldal v. Cook Cnty., Ill*, 506 U.S. 56, 67 (1992) ("[T]he [Fourth] Amendment's protection applies in the civil context as well.").

"Probable cause is a complete defense to a constitutional claim of false arrest." *Singh*, 2024 WL 319117, at *3. Accordingly, if a law enforcement officer's decision to take someone into protective custody is supported by probable cause, no constitutional violation may be found. *See Myers*, 819 F.3d at 632 ("To handcuff and detain, even

28

briefly, a person for mental-health reasons, an officer must have 'probable cause to believe that the person presented a risk of harm to [him]self or others.'") (quoting *Kerman v. City of New York*, 261 F.3d 229, 237 (2d Cir. 2001)); *Barrette v. Vill. of Swanton*, 2023 WL 3891034, at *9 (D. Vt. June 6, 2023) (noting that "the same standard applies in the context of seizures for intoxication due to alcohol").

Although "[p]robable cause exists when a police officer has 'reasonably trustworthy information' that suggests the suspect committed a crime[,]" *Sgambati v. City of New York*, 2025 WL 1866910, at *2 (E.D.N.Y. July 7, 2025) (*quoting Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012)), "[e]ncounters are initiated by the police for a wide variety of purposes, some of which are wholly unrelated to a desire to prosecute for crime." *Terry v. Ohio*, 392 U.S. 1, 13 (1968). For example, "police officers . . . are often called to discharge noncriminal 'community caretaking functions,' such as responding to disabled vehicles or investigating accidents." *Caniglia v. Strom*, 593 U.S. 194, 196 (2021); *see United States v. Seagroves*, 2025 WL 2084157, at *5 (D. Vt. July 24, 2025) (finding that officer's seizure of vehicle whose occupants appeared to be overdosing was "objectively reasonable under the community caretaking exception"). "Under the Fourth Amendment, an officer's decision to handcuff and detain a person will not violate the Constitution provided the officer has probable cause to believe the person presented a risk of harm to himself or others." *Leno v. Stupik*, 2008 WL 5412849, at *3 (D. Vt. Dec. 29, 2008) (finding probable cause for seizure under Vermont's incapacitation statute). As a result, the court need not determine whether Plaintiff was merely "intoxicated" as opposed to "incapacitated" to determine whether Plaintiff was properly placed in protective custody. Even without strict compliance with 18 V.S.A. § 4802,[7] law enforcement was entitled to seize Plaintiff under the community caretaking

---

[7] A violation of state law "neither gives plaintiffs a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim." *Liberian Cmty. Ass'n of Connecticut v. Lamont*, 970 F.3d 174, 192 (2d Cir. 2020) (quoting *Doe v. Conn. Dep't of Child & Youth Servs.*, 911 F.2d 868, 869 (2d Cir. 1990)).

exception if he presented a danger to himself or others. The court's analysis must further be guided not only be probable cause, but by arguable probable cause.

"It has long been recognized that, where there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court." *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007). "[E]ven if a police officer lacked probable cause, the officer is still 'entitled to qualified immunity so long as "arguable probable cause" was present when the arrest was made.'" *Singh*, 2024 WL 319117, at *3 (quoting *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016)). This "analytically distinct test" is "more favorable to the officers than the one for probable cause." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004).

Arguable probable cause exists when "(a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Figueroa*, 825 F.3d at 100 (quoting *Zalaski v. City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013)) (internal quotation marks omitted). "Put another way, an arresting officer will find protection under the defense of qualified immunity unless 'no reasonably competent officer' could have concluded, based on the facts known at the time of arrest, that probable cause existed." *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

### 1.    Failure to Provide Plaintiff with a Ride Home.

Plaintiff asserts that, "[d]espite professing an intent to find [him] a ride home," Defendants Gagne and Recore "made only notional effort to do so." (Doc. 226 at 13.) He observes that Defendant Gagne testified that it was "an option" for Defendants Gagne or Recore to drive Plaintiff home, Doc. 226-4 at 19, and contends, based on Mr. Cournoyer's testimony, that Defendant Gagne should have seen Mr. Cournoyer parked in front of Ms. Barbeau's house when Defendant Gagne returned there to speak to Ms.

30

Landon and Ms. Barbeau.[8]

It is undisputed that Defendant Gagne neither saw Mr. Cournoyer, nor did Mr. Cournoyer approach law enforcement to offer Plaintiff a ride. The record is replete with the officers' efforts to find Plaintiff a ride and with Plaintiff's inability, presumably because of his intoxication, to identify someone who could provide him with one and with his failure to identify a sober adult at his home. The record is also replete with Plaintiff's insistence that he did not need a ride and could walk home. Reasonable officers could differ as to whether it was safe to drive Plaintiff home and leave him alone in his highly intoxicated state. Arguable probable cause therefore existed to take Plaintiff into protective custody. In such circumstances, no constitutional violation may be found based on the officers' failure to provide Plaintiff with a ride home.

### 2. Initial Seizure of Plaintiff.

Plaintiff points out that body camera video shows that he was able to walk without falling or stumbling and that he complied with Defendant Gagne's command to remove his hands from his pockets. Unlike in *Leno*, where this court found probable cause for taking a plaintiff into protective custody because he "appeared highly intoxicated, was urinating in public near a police station, would not identify himself or tell [the officer] where he lived, and showed resistance to [the officer] during their conversation[,]" Plaintiff notes he was not driving while intoxicated, was not urinating in public, and was not described as "very violent" or "very threatening." 2008 WL 5412849, at *2-3.

In the light most favorable to Plaintiff, it remains beyond dispute that Plaintiff was highly intoxicated, non-compliant at times, slurred his speech, yelled, shouted, wailed, and screamed, was significantly confused at times and combative at others. Plaintiff's

---

[8] Courts have held that "qualified immunity protects against this kind of 20/20 hindsight." *Palmer*, 2009 WL 378646, at *5 (granting summary judgment on qualified immunity grounds because "the judgment call the officers made at the time, though perhaps mistaken, was one competent officers reasonably could make in the same circumstances"); *Gonzalez v. Hahl*, 850 F. App'x 127, 129 (2d Cir. 2021) (summary order) (explaining that "when police officers 'reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless entitled to qualified immunity'") (quoting *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002)).

31

labile mood rapidly cycled between tearful and aggressive. Plaintiff threatened law enforcement that it would "get bad" if they touched him and that it was "lucky" for them that he was "cuffed." In his intoxicated condition, he posed a danger to himself due to his plan to walk home in the dark, cold, and rain with an injured foot. He posed a danger to others because, as his companions that evening had advised, he "snapped," prompting them to lock him out of the house and call the police because they were concerned about Plaintiff's behavior around children. Even Plaintiff's own expert concedes Plaintiff was substantially intoxicated and his judgment was impaired.

The potential danger posed by Plaintiff's impaired judgment was compounded by other circumstances that an officer in Defendants Gagne's and Recore's positions would have observed prior to taking Plaintiff into custody. Although Plaintiff claims he was walking to "a well-lit gas station . . . except that [Defendant] Gagne unnecessarily pursued him[,]" Plaintiff walked into the backyard of a private residence, a trespass that would have prompted a reasonable officer to conclude that Plaintiff was not fully cognizant of his surroundings. He confused Defendant Gagne, someone he knew, with Defendant Recore, whom he did not know, and asked if they were brothers. He provided his own phone number when he was asked to identify someone who could give him a ride. "An officer's decision to handcuff and detain a person will not violate the Constitution so long as the officer had probable cause to believe that the person presented a risk of harm to himself or others." *Kerman v. City of New York*, 261 F.3d 229, 237 (2d Cir. 2001). Here, that standard was satisfied.

Plaintiff's reliance on *Alfano v. Lynch* is unavailing. There, the First Circuit found the district court's entry of summary judgment for the officer defendant based on qualified immunity inappropriate where the plaintiff was detained while waiting in line at a concert when "[t]he record, viewed favorably to [the plaintiff], contain[ed] no facts indicating that [the plaintiff] was likely to harm himself, injure another person, or damage property." 847 F.3d 71, 79-80 (1st Cir. 2017). The facts in this case are easily distinguishable and are supported by a video that amply demonstrates Plaintiff's risk to his self and others. According to Plaintiff's own expert, Defendants Gagne and Recore

used the minimal force necessary to take Plaintiff into protective custody. Reasonable officers could differ in their opinions as to whether Plaintiff was merely intoxicated or incapacitated and whether Plaintiff was a risk to himself or others if not taken into protective custody. There was thus at least arguable probable cause for the decision to take Plaintiff into protective custody and qualified immunity applies to Defendants Gagne's and Recore's initial seizure of Plaintiff.[9]

### 3.    Decision to Bring Plaintiff to NWSCF.

Plaintiff asserts that Defendants Gagne and Recore's decision to take him to NWSCF rather than the hospital after the Howard Center refused him was a further violation of his Fourth Amendment rights. He argues that Defendants Gagne and Recore only "went through the motions of taking [Plaintiff] to the Howard Center" because no one at the Howard Center evaluated Plaintiff in person, and Ms. Dean refused him based "exclusively on what [Defendant] Gagne and [Defendant] Recore told her, and what [Defendant] Gagne told her is entirely unknown because he had turned off his body-worn camera." (Doc. 226 at 14.) Plaintiff also disputes that Ms. Dean was "a substance abuse crisis team, a designated substance abuse counselor, a clinical staff person of an approved substance abuse treatment program with detoxification capabilities, or a professional

---

[9] In *Palmer v. New Britain General Hospital*, the court found that officers lacked probable cause to place the plaintiff in protective custody where, although intoxicated, the plaintiff "was fully conscious, aware of his whereabouts, able to react to people and events and capable of communicating" and the officers failed to ask plaintiff if he would like a ride home before telling him his only options were to go the a hospital or to jail. 2009 WL 378646, at *4 (D. Conn. Feb. 13, 2009). Nonetheless, it granted summary judgment to the officers on qualified immunity grounds because the plaintiff's refusal to get out of his parked car after an officer ordered him to and his unexplained sobbing after eventually leaving the car "provided reason to suspect that he was incapable of making a rational decision regarding his need for treatment" and "[g]iven [the plaintiff's] condition and behavior, competent officers could reasonably assume that he would try to drive if left alone with access to his car[.]" *Id.* at *5; *see also Leno*, 2008 WL 5412849, at *3 (finding that plaintiff "appear[ing] highly intoxicated," refusing to tell officer where he lived, and showing "resistance to [the officer] during their conversation" supported probable cause to find that plaintiff was incapacitated); *c.f. Midgett v. C.A.R.E.S.*, 2023 WL 9235311, at *12 (D. Col. Sept. 28, 2023) (finding there was arguable probable cause for emergency commitment of plaintiff at behavioral health facility because she was "agitated," "irritable," and "angry" at intake, arrived via transport by law enforcement, and registered a high BAC).

33

medical staff person at a licensed general hospital emergency room" within the meaning of 18 V.S.A. § 4810(b). According to Plaintiff, the failure to have him evaluated by the Howard Center before he was transported to NWSCF violated Vermont's incapacitation statute, which states:

> No person shall be lodged in a lockup or community correctional center under subsection (d) of this section without first being evaluated and found to be indeed incapacitated by a substance abuse crisis team, a designated substance abuse counselor, a clinical staff person of an approved substance abuse treatment program with detoxification capabilities, or a professional medical staff person at a licensed general hospital emergency room.

18 V.S.A. § 4810(e). A reasonable jury could find that § 4810(e) was not strictly followed by either law enforcement or Ms. Dean.[10]

Because "the ultimate touchstone of the Fourth Amendment is 'reasonableness[,]'" *Riley v. California*, 573 U.S. 373, 381 (2014) (some internal quotation marks omitted), the question is not whether there was strict compliance with Vermont law but whether the conduct of Defendants Gagne and Recore was reasonable under the circumstances. Plaintiff has proffered no evidence that Defendants Gagne and Recore had the authority to compel the Howard Center to conduct an evaluation of him. Their decision to take Plaintiff to NWSCF was an option available under the statute once an evaluation took place. Reasonable law enforcement officers could differ as to whether Defendants Gagne and Recore's attempt to secure an evaluation prior to proceeding to a correctional facility was adequate. "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 555 U.S. at 231 (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004)).

---

[10] There is no evidence, however, that Defendants Gagne and Recore fabricated facts related to Plaintiff's condition that prompted the Howard Center's refusal. Moreover, "[t]he mere violation of state laws and procedures . . . does not give rise to a constitutional claim under Section 1983." *Moments v. Warden (John Doe) RMSC Rikers Island*, 2025 WL 1696755, at *5 (S.D.N.Y. June 16, 2025)

As Officers Gagne and Recore assured both Plaintiff and his companions, they anticipated Plaintiff would sleep off his intoxication at NWSCF until he could safely be released. A police officer is not required to anticipate the acts or omissions of a third-party tortfeasor even if they rise to the level of criminal activity unless they are reasonably foreseeable. *See Napper v. Hankison*, 617 F. Supp. 3d 703, 730 (W.D. Ky. 2022) (finding that third party's action of firing gun was a "superseding cause" that precluded finding liability against certain officer-defendants who returned fire but whose shots were not those alleged to have entered the plaintiff's apartment); *see also Martin v. City of New York*, 793 F. Supp. 2d 583, 587 (E.D.N.Y. 2011) (finding that officer who arrested plaintiff was not liable for plaintiff's injuries while in custody because the "decision of the arraignment judge to set a $10,000 bail that [the plaintiff] was unable to post and his remand to Rikers Island, broke the causal chain to his assault injuries").

Because a competent officer in Defendant Gagne's and Defendant Recore's positions could have reasonably concluded that it was permissible to take Plaintiff to NWSCF after an incapacitation evaluation was attempted, the Fourth Amendment's guarantee of reasonableness was satisfied. For the reasons stated above, the court GRANTS Defendants Gagne and Recore's motions for summary judgment on Count II.

### D. Whether Defendants Gagne and Recore Are Entitled to Summary Judgment on Plaintiff's Unlawful Imprisonment Claim Brought Under 42 U.S.C. § 1983 (Count III.)

"A false imprisonment claim under § 1983 tracks the state-law elements of the claim." *Grega v. Pettengill*, 123 F. Supp. 3d 517, 548 (D. Vt. 2015) (citing *Russo v. City of Bridgeport*, 479 F.3d 196, 204 (2d Cir. 2007)); *Russo*, 479 F.3d at 204 ("[W]e look to . . . state law principles to determine the validity of [the plaintiff's] federal civil rights claim based on false imprisonment."). Under Vermont law,

> a person commits the crime of false imprisonment, or unlawful restraint in the second degree, "if the person . . . knowingly restrains another person." 13 V.S.A. § 2406; *see also State v. Alexander*, 173 Vt. 376, 795 A.2d 1248, 1253 (2002) (describing unlawful restraint in the second degree as the "Vermont equivalent" of false imprisonment). "Probable cause is a complete defense to a constitutional claim of false arrest and false

35

imprisonment" under both Vermont and federal law. *Betts[ v. Shearman]*, 751 F.3d [78,] 82 [(2d Cir. 2014)]; *Crowell v. Kirkpatrick*, 667 F. Supp. 2d 391, 417 (D. Vt. 2009).

*Grega*, 123 F. Supp. 3d at 548 (omission in original).

At the motion to dismiss stage, this court granted Defendant Mosher's motion to dismiss Count III against him because it failed to set forth allegations separate from, or alternative to, Plaintiff's claim against Defendant Mosher for unlawful seizure. *See Barrette*, 2023 WL 3891034, at *12 ("His claim for false imprisonment in violation of the Fourth Amendment is thus duplicative of his unlawful seizure claim and must be dismissed."). Defendants Gagne and Recore argue that Count III against them should be dismissed for the same reason. Although Plaintiff states that he "does not concede that Count III is not a live claim," he does not separately address the claim in opposing summary judgment and acknowledges "that it may, if Count II remains at trial, be duplicative[.]" (Doc. 126 at 20 n.2.) Because Counts III and II are duplicative, the court GRANTS Defendants Gagne and Recore's motions for summary judgment on Count III. *See Barrette*, 2025 WL 1476497, at *18 (granting summary judgment for defendant because plaintiff did not response to defendant's "contention that his unlawful seizure claim is identical to his excessive force claim").

Even in the absence of duplicative claims, Plaintiff has abandoned this claim by failing to address its essential elements at summary judgment. *Celotex*, 477 U.S. at 323 ("The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."); *see also Curry v. Keefe*, 2021 WL 1087444, at *6 (D. Vt. Mar. 22, 2021) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one claim and the party opposing summary judgment fails to address the argument in any way.") (internal quotation marks omitted) (quoting *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003)).

E.   **Whether Defendants Gagne and Recore Are Entitled to Summary Judgment on Plaintiff's Excessive Force Claim Brought Under 42 U.S.C. § 1983 (Count I.)**

Defendants Gagne and Recore argue that their use of force was objectively reasonable and entitled to qualified immunity. Plaintiff counters that summary judgment is inappropriate because there is a disputed issue of material fact regarding whether Plaintiff was resisting. Plaintiff further asserts that Defendants Gagne and Recore provided "false information" about him to the officers at NWSCF, making them more likely to use force on Plaintiff when he arrived at that correctional facility. (Doc. 227 at 26.)

The Fourth Amendment governs "a claim for excessive force after [the plaintiff] has been arrested and detained, but 'prior to the time when [the person arrested] is arraigned or formally charged, and remains in the custody (sole or joint) of the arresting officer.'" *Cugini v. City of N.Y.*, 941 F.3d 604, 612 (2d Cir. 2019) (quoting *Powell v. Gardner*, 891 F.2d 1039, 1044 (2d Cir. 1989)). "To establish a claim of excessive force, a plaintiff must show that the force used by the officer was, in light of the facts and circumstances confronting him, 'objectively unreasonable' under Fourth Amendment standards." *Davis v. Rodriguez*, 364 F.3d 424, 431 (2d Cir. 2004) (internal quotation marks and citation omitted). Reasonableness in the Fourth Amendment context is not "an easy-to-apply legal test" and requires courts to "slosh [their] way through [a] factbound morass[.]" *Scott v. Harris*, 550 U.S. 372, 383 (2007). This fact-specific inquiry "requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010).

Factors to consider include: "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Id.* "Though the Second Circuit has not yet ruled on the issue, many courts have viewed the 'immediate threat to the safety of the officers or others' as the

37

most important . . . factor." *Ramos v. Town of E. Hartford*, 2019 WL 2785594, at \*7 (D. Conn. July 2, 2019) (quoting *A.K.H. v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016)).

"A plaintiff must also demonstrate that the officer was made reasonably aware that the force used was excessive." *Cugini*, 941 F.3d at 608. Reasonableness of the use of force "must [be] judge[d] . . . from the perspective of a reasonable officer on the scene[ ]" and embody "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006) (internal quotation marks omitted) (quoting *Graham*, 490 U.S. at 396-97).

"For excessive force claims, the court applies the 'same' standard of 'objective reasonableness' as it applies to the qualified immunity claim." *Hall v. Ashe*, 2025 WL 2306201, at \*4 (D. Vt. Aug. 11, 2025) (quoting *Collado v. City of N.Y.*, 396 F. Supp. 3d 265, 274 n.11 (S.D.N.Y. 2019); *see also O'Bert ex rel. Est. of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) ("[I]n Fourth Amendment unreasonable force cases, unlike in other cases, the qualified immunity inquiry is the same as the inquiry made on the merits[.]") (internal quotation marks and citation omitted).

### 1. Whether There Is a Material Dispute of Fact About Whether Defendants Gagne and Recore's Use of Force Was Reasonable.

It is undisputed that Plaintiff was not suspected of a serious crime but rather was taken into protective custody. Defendant Gagne argues that, in these circumstances, the court should apply the modified *Graham* analysis adopted by the Sixth Circuit:

Where a situation does not fit within the *Graham* test because the person in question has not committed a crime, is not resisting arrest, and is not directly threatening the officer, the court should ask:

(1) Was the person experiencing a medical emergency that rendered him incapable of making a rational decision under circumstances that posed an immediate threat of serious harm to himself or others?

(2) Was some degree of force reasonably necessary to ameliorate the immediate threat?

38

(3) Was the force used more than reasonably necessary under the
circumstances (i.e., was it excessive)?

*Est. of Hill by Hill v. Miracle*, 853 F.3d 306, 314 (6th Cir. 2017). This test has not been
adopted by the Second Circuit. The court nonetheless considers the questions posed
instructive. Defendants "are liable as long as the force used exceeded the force needed for
the factual circumstances and the fact that Plaintiff may not have sustained serious long-
lasting harm is not dispositive." *Graham v. City of New York*, 928 F. Supp. 2d 610, 618
(E.D.N.Y. 2013) (collecting cases).

### a.    Excessive Force Based Upon Arm Bar Takedown.

The court has found Plaintiff posed an immediate threat to himself because, if left
alone to continue walking home by himself at night in cold and inclement weather, in his
state of substantial intoxication, dark clothing, and in light of his injured foot and his
abandonment of his crutches, he risked suffering harm not only from falling or getting hit
by a passing vehicle and exposure to the elements but also through his impaired
judgment, which caused him to trespass on the property of others who might take action
against him. He was a threat to others by virtue of his labile mood and his threats to law
enforcement that it would be "bad" if they touched him and that they were lucky that he
was cuffed. His companions' reaction to his behavior further underscored the potential
for violence against others.

Mr. West, Plaintiff's use-of-force expert, testified that the use of force by
Defendants Gagne and Recore was "minimal[.]" (Doc. 226-2 at 25.) Plaintiff does not
dispute this characterization.

Because the arm bar takedown is not fully captured on the video, the court adopts
Plaintiff's version of events. According to Plaintiff, he was grabbed and made contact
with the bodies of the officers but he was not punched, struck, or tased. "Several courts
have described an arm bar takedown as a 'minimal' or 'limited' use of force that may be
used to subdue disorderly persons." *Brayshaw v. City of Burlington*, 2015 WL 1523019,
at *11 (D. Vt. Apr. 3, 2015); *see also McKnight v. Vasile*, 2017 WL 1176051, at *25
(W.D.N.Y. Mar. 30, 2017) (finding officer's use of "straight arm bar" technique

39

reasonable even though plaintiff was not suspected of a serious crime because the plaintiff was "actively resisting being taken into custody"). The arm bar takedown in this case occurred quickly and with no more force than necessary.

Plaintiff's own expert agrees that Defendants Gagne and Recore's use of force was "perfectly within reason" and he "couldn't see anything excessive in what they were doing." (Doc. 226-2 at 25.) Accordingly, even if the officers were mistaken as to whether Plaintiff was incapacitated versus intoxicated, their use of force remained reasonable because reasonable officers could differ as to the extent of force required. *See Aponte v. Kanbur*, 2021 WL 3854069, at \*4 (2d Cir. Aug. 30, 2021) (summary order) ("We have made clear that the unlawfulness of an arrest does not make the force used to effectuate that arrest per se unreasonable and excessive under the Fourth Amendment."). Plaintiff has failed to establish that the arm bar takedown was an excessive use of force and no constitutional violation may be found on this basis.

### b.    Excessive Force Based Upon Tight Handcuffing.

Although Plaintiff notes that a claim for excessive force may be based on excessively tight handcuffing, there is no evidence that "an officer reasonably should have known during [Plaintiff's] handcuffing that his use of force was excessive." *Ketcham v. City of Mount Vernon*, 2025 WL 1499190, at \*2 (2d Cir. May 27, 2025) (quoting *Cugini v. City of New York*, 941 F.3d 604, 613 (2d Cir. 2019)). The video shows two instances in which Plaintiff complains to Defendants Gagne and Recore that the handcuffs were cutting or hurting him. In response to both complaints, the officers adjusted the handcuffs, after which Plaintiff no longer complained that his wrists hurt.[11] *See* Doc. 207-13 at 11:10-30; Doc. 207-15 at 14:53-15:33. Plaintiff has thus failed to sustain his burden that his handcuffing was an excessive use of force. *See Rolkiewicz v.*

---

[11] Although Plaintiff has not produced evidence of wrist injury, "a district court should not grant summary judgment on this basis alone." *Ketcham v. City of Mount Vernon*, 992 F.3d 144, 151 (2d Cir. 2021) ("[W]e have never held that a court may grant summary judgment to officers on an excessive force claim merely because the injuries were minor even where the force was unreasonable.").

*City of New York*, 442 F. Supp. 3d 627, 641 (S.D.N.Y. 2020) (granting summary judgment for defendants on claim for excessive force from handcuffing because the plaintiff "fail[ed] to provide any evidence, even solid testimonial evidence that he sustained injuries as a result of handcuffing"); *cf. Farnsworth v. City of Geneva*, 750 F. Supp. 3d 152, 162 (W.D.N.Y. 2024) (holding that defendant was entitled to qualified immunity on claim of excessive force because "there was no Second Circuit precedent indicating that there is a constitutional violation if the suspect remains in pain, but does not verbalize that pain, after an officer readjusts the handcuffs in response to the suspect's complaints").

### c.   Excessive Force Based Upon Allegedly False Information to NWSCF.

To the extent that Plaintiff argues Defendant Recore violated his clearly established rights by providing false information to the NWSCF officers that Plaintiff was "spitting and kicking[,]" the Second Circuit precedent he cites is inapplicable because it does not pertain to use of force. (Doc. 227 at 21.) "Courts within the Second Circuit have been reluctant to entertain excessive-force claims without any physical contact. Mere threats or verbal harassment, without any appreciable injury, generally are not actionable under [S]ection 1983[.]" *See Harper v. Town of Newburgh*, 2020 WL 1140858, at *11 (S.D.N.Y. Mar. 6, 2020) (internal quotation marks and citation omitted).

Because there was, at a minimum, arguable probable cause to take Plaintiff into protective custody and because the amount of force used was not excessive, no constitutional violation may be found based on Defendant Recore's provision of information to NWSCF. *See Rosado v. Mastrantonio*, 2019 WL 6841809, at *4 (W.D.N.Y. Dec. 16, 2019) (granting summary judgment to defendants on excessive force claim because there was no reasonable basis for jury to conclude that defendants either used force against the plaintiff or had sufficient opportunity to intervene in other officers' alleged use of force).

For the reasons stated above, the court GRANTS the motions by Defendants Gagne and Recore for summary judgment on Count I. *See McKenzie v. City of New York*,

2021 WL 3375613, at *6 (S.D.N.Y. Feb. 26, 2021), *report and recommendation adopted*, 2021 WL 2894164 (S.D.N.Y. July 2, 2021) (finding that officer punching plaintiff multiple times was objectively reasonable in "the absence of any testimony from [the plaintiff] that the punches were in any way unnecessary to stop his flight").

## F.    Whether Defendants Gagne and Recore Are Entitled to Summary Judgment on Plaintiff's Assault and Battery Claim (Count V).

Under Vermont law, battery "is an intentional act that results in harmful contact with another." *Christman v. Davis*, 2005 VT 119, ¶ 6, 179 Vt. 99, 101, 889 A.2d 746, 749 (citing Restatement (Second) of Torts § 13 (1965)). "At common law, the civil tort of assault is defined as any gesture or threat of violence exhibiting an [intention] to assault, with the means of carrying that threat into effect . . . unless immediate contact is impossible." *MacLeod v. Town of Brattleboro*, 2012 WL 5949787, at *8 (D. Vt. Nov. 28, 2012) (internal quotation marks omitted) (alterations in original); *see also Bishop v. Ranney*, 7 A. 820, 820-21 (Vt. 1887) ("[A]ny gesture or threat of violence exhibiting an intention to assault, with the means of carrying that threat into effect, is an assault, unless immediate contact is impossible.") (internal quotation marks omitted).

"This [c]ourt has held that 'when assault and battery is alleged against police officers, the inquiry is whether the officer's conduct was reasonably necessary and thereby privileged.'" *Meli v. City of Burlington*, 585 F. Supp. 3d 615, 635 (internal quotation marks omitted) (alterations adopted) (quoting *Crowell*, 667 F. Supp. 2d at 417). "A police officer's privilege to use force, however, ends when the force used is excessive, which is determined using the same standards used to analyze a Fourth Amendment excessive force claim." *Connelly v. City of Albans, Vermont*, 2024 WL 1834472, at *11 (D. Vt. Apr. 26, 2024) (internal quotation marks and citation omitted).

Defendants Gagne and Recore argue that they are entitled to qualified immunity under Vermont law, which provides that "[q]ualified immunity attaches to public officials who are (1) acting during the course of their employment and acting, or reasonably believing they are acting, within the scope of their authority; (2) acting in good faith; and (3) performing discretionary, as opposed to ministerial, acts." *Baptie v. Bruno*, 2013 VT

117, ¶ 11, 195 Vt. 308, 314, 88 A.3d 1212, 1216 (internal quotation marks omitted). "Thus, if the official's conduct does not violate clearly-established rights of which a reasonable person would have known, the official is protected by qualified immunity from tort liability." *Sprague v. Nally*, 2005 VT 85, ¶ 4, 178 Vt. 222, 226, 882 A.2d 1164, 1168 (quoting *Cook v. Nelson*, 712 A.2d 382, 384 (Vt. 1998)); *see Amy's Enters. v. Sorrell*, 174 Vt. 623, 817 A.2d 612, 617 (Vt. 2002) (explaining that good faith exists "[i]f the official's conduct does not violate clearly-established rights of which a reasonable person would have known"). Under Vermont law, the burden is on a plaintiff to rebut a qualified immunity defense.

> [O]nce the issue [of qualified immunity is] raised, [the plaintiff] ha[s] the burden to rebut the qualified immunity defense "by establishing that the official's allegedly wrongful conduct violated clearly established law. We do not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs."

*Sprague*, 2005 VT 85, ¶ 4, 178 Vt. at 225, 882 A.2d at 1167 n.3 (citation omitted).

Here, Plaintiff does not dispute that Defendants Gagne and Recore were either acting during the course of their employment or reasonably believed they were acting within the scope of their authority. Because they did not violate Plaintiff's clearly established rights, Defendants Gagne and Recore are entitled to qualified immunity on Plaintiff's assault and battery claims for the same reasons they are protected by qualified immunity on Plaintiff's excessive force and unreasonable seizure claims. The court thus GRANTS Defendants Gagne and Recore's motions for summary judgment on Count V.

## G.    Whether Defendants Gagne and Recore Are Entitled to Summary Judgment on Plaintiff's IIED Claim (Count VII).

"To sustain a claim for IIED [under Vermont law] [the] plaintiff must show [the] defendants engaged in outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct." *Fromson v. State*, 2004 VT 29, ¶ 14, 176 Vt. 395, 399, 848 A.2d 344, 347 (internal quotation marks and citation omitted). "[The] [p]laintiff's burden on this claim is a 'heavy one' as he [or she] must show [the] defendants' conduct was so outrageous in character and so

extreme in degree as to go beyond all possible bounds of decent and tolerable conduct in a civilized community and be regarded as atrocious and utterly intolerable." *Id.* (internal quotation marks omitted).

"The test is objective; the plaintiff must show that the harm resulting from the inflicted distress was so severe that no reasonable person could be expected to endure it." *Farnum v. Brattleboro Retreat, Inc.*, 671 A.2d 1249, 1256 (Vt. 1995). "[W]hether a jury could reasonably find that the conduct at issue meets this test[ ]" is a "threshold question" for "the court to determine[.]" *Dulude v. Fletcher Allen Health Care, Inc.*, 807 A.2d 390, 398 (Vt. 2002).

Plaintiff argues that Defendant Gagne's conduct was extreme and outrageous because he "chased [Plaintiff] unnecessarily; tackled him to take him into custody without probable cause[,]" failed to have Plaintiff properly evaluated at the Howard Center, and sent him to NWSCF rather than a hospital knowing that a "welcoming party" was assembled to receive Plaintiff. (Doc. 226 at 26.) To the extent that Plaintiff argues that Defendant Gagne sent Plaintiff to NWSCF knowing that Plaintiff would likely be injured there, Plaintiff has cited no admissible evidence which would allow a jury to make that finding. *See Barrette*, 2025 WL 1476497, at *19 (holding that Mr. Cummings' testimony on the meaning of "welcoming party" is inadmissible).

Plaintiff compares his case to *Long v. L'Esperance*, 701 A.2d 1048, 1052 (Vt. 1997), in which the Vermont Supreme Court found that a jury could find for the plaintiff on his IIED claim where the plaintiff alleged that the defendant officer placed him under arrest and shackled him to a wall for forty-five minutes for no reason except that the plaintiff, when "speaking in a conversational tone," used an expletive when responding to a question asked by the officer at a DUI checkpoint. In *Long*, the court found that, accepting the plaintiff's testimony as true, a reasonable officer in the defendant's position would have understood that arresting the plaintiff violated his established right to free speech and his right not to be arrested without probable cause. *Id.* at 1054. This case is distinguishable because Defendants Gagne and Recore had arguable probable cause to take Plaintiff into protective custody and Plaintiff was not exercising his First

44

Amendment rights at the time. Defendants Gagne and Recore neither verbally nor physically threatened Plaintiff. They used "minimal" force only when verbal efforts to gain Plaintiff's compliance proved ineffective. In the words of Plaintiff's expert, they were "professional" and maintained an "A+ on their communication skills[and] their de[-]escalation skills." (Doc. 226-2 at 36.) Plaintiff's expert also saw no "malicious intent whatsoever." (Doc. 228-2 at 34.)

*Burwell v. Peyton*, 131 F. Supp. 3d 268 (D. Vt. Nov. 9, 2015), the other case relied on by Plaintiff, is equally distinguishable. In *Burwell*, the court found that a jury could find for the plaintiff on his IIED claim where it was "uncontested that the officers pepper-sprayed and beat [the p]laintiff with a baton in his own residence while [the p]laintiff was experiencing a hypoglycemic event triggered by a medical condition." *Burwell v. Peyton*, 131 F. at 274 (D. Vt. 2015), *on reconsideration in part*, No. 5:12-CV-166, 2015 WL 6874250 (D. Vt. Nov. 9, 2015), *and aff'd sub nom. Burwell v. Moody*, 670 F. App'x 734 (2d Cir. 2016). Even in the light most favorable to Plaintiff, no rational jury could find that Defendants Gagne's and Recore's conduct was comparable and was "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decent and tolerable conduct in a civilized community and be regarded as atrocious and utterly intolerable." *Fromson*, 2004 VT 29, ¶ 14, 176 Vt. at 399, 848 A.2d at 347 (internal quotation marks and citation omitted).

The court thus GRANTS Defendant Gagne's and Defendant Recore's motions for summary judgment on Plaintiff's IIED claims.

### H. Whether Defendants Stell and Swanton Are Entitled to Summary Judgment on Plaintiff's Unconstitutional Policies, Customs, and Practices Claim Brought Under 42 U.S.C. § 1983 (Count IV).

Plaintiff argues that his constitutional rights were violated as a result of the SVPD's "official policy of handcuffing . . . and incarcerating individuals without probable cause of incapacitation[,]" "policy or custom of abandoning the duty of care to incapacitated people in their custody upon entrance of the NWSCF or other correctional facility garage," and failure to train "officers about how to identify incapacitation under

18 V.S.A. § 4810, when someone could be taken into protective custody on the basis of incapacitation, or the use of force on an incapacitated person." (Doc. 228 at 14-15.) Defendants Stell and Swanton assert that Defendant Stell was neither personally involved in the alleged constitutional violations nor liable as a policymaker and that Plaintiff has failed to identify a disputed issue of material fact regarding whether the municipality's failure to adopt policies or practices or whether its alleged failure to train caused Plaintiff's injuries and rose to the level of deliberate indifference.[12]

Under *Monell*, a municipality may be liable under § 1983 "if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (citing *Monell v. Dep't of Social Services*, 436 U.S. 658, 690-91 (1978)). A plaintiff need not "bring official-capacity actions against local government officials, for under *Monell*, . . . local government units can be sued directly for damages and injunctive or declaratory relief." *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985) (citation omitted).

"The elements of a *Monell* claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Friend v. Gasparino*, 61 F.4th 77, 93 (2d Cir. 2023) (internal quotation marks omitted) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).

[A] local government may not be sued under § 1983 for an injury inflicted

---

[12] Defendants Stell and Swanton also argue that Plaintiff cannot sustain a *Monell* claim because there was no underlying constitutional violation. Where "the individual defendants violated plaintiff's rights but nonetheless enjoy qualified immunity," a plaintiff can pursue a *Monell* claim. *Bonilla v. Jaronczyk*, 354 Fed. App'x. 579, 582 (2d Cir. 2009) (citing *Curley v. Village of Suffern*, 268 F.3d 65, 71 (2d Cir. 2001)). Because the court grants summary judgment for Defendants Gagne and Recore on both lack of a constitutional violation and on qualified immunity grounds, for appellate purposes only, it proceeds to analyze whether summary judgment is available on Plaintiff's *Monell* claim.

solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Monell*, 436 U.S. at 694; *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) ("The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.") (plurality opinion) (emphasis in original) (footnote omitted). Stated differently, a municipality is "responsible only for [its] own illegal acts[,]" and is "not vicariously liable under § 1983 for [its] employees' actions." *Outlaw v. City of Hartford*, 884 F.3d 351, 372 (2d Cir. 2018) (citations, emphasis, and internal quotation marks omitted); *see also Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997) ("We have consistently refused to hold municipalities liable under a theory of respondeat superior.") (citations omitted).

"[T]here is no special rule for supervisory liability[,]" and "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). "Generally, a supervisor may be held liable as a 'direct participant' in a constitutional violation only where he or she 'authorizes, orders, or helps others to do the unlawful acts, even if he or she does not commit the acts personally.'" *Connelly v. City of St. Albans*, 2024 WL 1976658, at *19 (D. Vt. May 3, 2024) (quoting *Terebesi v. Torreso*, 764 F.3d 217, 234 (2d Cir. 2014)).

A municipality's "failure to train or supervise city employees may constitute an official policy or custom [only] if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." *Wray v. City of N.Y.*, 490 F.3d 189, 196 (2d Cir. 2007) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). "The Second Circuit has identified three requirements that must be met before a municipality's failure to train or supervise constitutes deliberate indifference to the constitutional rights of citizens[:] (1) a policymaker knows to a moral certainty that [his or] her employees

47

will confront a given situation[,] (2) the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation[,] and (3) the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Connelly*, 2024 WL 1976658, at *15 (internal quotation marks omitted) (quoting *Walker v. City of N.Y.*, 974 F.2d 293, 297-98 (2d Cir. 1992)).

> A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

*Connick*, 563 U.S. at 62 (internal citations omitted) (quoting *Brown*, 520 U.S. at 407). A *Monell* claim "is at its most tenuous" when it is based on a failure to train. *Id.* at 61.

"[I]n a narrow range of circumstances," however, "a pattern of similar violations might not be necessary to show deliberate indifference." *Id.* at 63 (internal quotation marks omitted). A municipality may be found to be deliberately indifferent based on a single constitutional violation only when "the unconstitutional consequences of failing to train [are] so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* at 64; *see also Canton*, 489 U.S. at 390 n.10 (stating that "the need to train officers in the constitutional limitations on the use of deadly force[ ] . . . can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights.") (internal quotation marks and citation omitted).

### 1.    *Monell* Claim Against Defendant Stell.

"*Monell* does not apply to . . . individuals who are sued in their individual capacity." *Acquah for J.B. v. City of Syracuse*, 2020 WL 1510405, at *2 (N.D.N.Y. Mar. 30, 2020). "Moreover, where[] a plaintiff names both a municipality and municipal officers in their official capacities, such claims 'are really claims against the municipality

and, thus, are redundant when the municipality is also named as a defendant.'" *Shook v. NYS Cent. Reg. of Child Abuse & Maltreatment*, 2025 WL 1718044, at \*7 n.13 (N.D.N.Y. June 20, 2025) (quoting *Golston v. Cortese*, 2022 WL 2657290, at \*5 (N.D.N.Y. Apr. 1, 2022), *report and recommendation adopted*, 2022 WL 2071773 (N.D.N.Y. June 9, 2022)). Because Defendant Stell cannot be sued in his individual capacity and suit against him in his official capacity is redundant in light of Plaintiff's claims against Swanton, the court GRANTS summary judgment for Defendant Stell on Plaintiff's *Monell* claim.

Even if summary judgment were not available on this basis, there is no evidence that Defendant Stell was personally involved in the April 2, 2020 incident or authorized, ordered, or assisted others in their involvement. *See Connelly*, 2024 WL 1976658, at \*19-20 (granting summary judgment for defendant for "lack of personal involvement" where there was no evidence the defendant "was personally involved in" the alleged § 1983 violation or "that [the defendant] authorized, ordered, or helped others to commit it"). "The focus is on what the *supervisor* did or caused to be done, 'the resulting injury attributable to his conduct, and the *mens rea* required of him to be held liable[.]'" *Tangreti*, 983 F.3d at 618 (emphasis in original) (quoting *Porro v. Barnes*, 624 F.3d 1322, 1327-28 (10th Cir. 2010)). Although Defendant Stell was the policymaker, Plaintiff has failed to establish a lack of training caused his injury. Summary judgment therefore would be appropriate even if Swanton were not named as a Defendant.

### 2. *Monell* Claim Based on Policy or Custom of Handcuffing and Incarcerating Individuals Without Probable Cause of Incapacitation.

To support his claim that it was SVPD's practice to take people into protective custody on the basis of a perceived risk to their personal safety, even absent a finding of incapacity, Plaintiff cites Defendant Recore's deposition testimony stating that the purpose of protective custody is "to make sure that everybody is safe[,]" Doc. 228-10 at 51. Plaintiff asserts that "[Defendant] Stell was aware that his officers were taking incapacitated people to jail without being properly evaluated[,]" Doc. 228-1 at 8, based

on Defendant Stell's testimony that it was the typical practice for officers to first bring incapacitated persons to "the detox facility," and then, if they were refused, "to the Vermont Department of Corrections" because "[t]hose were the only two facilities that we had available to us." (Doc. 228-12 at 26.) Other than his own case, Plaintiff cites no instances of SVPD taking individuals into protective custody without probable cause, nor does he allege that it was the SVPD's express policy to do so. He likewise proffers no evidence of individuals other than himself who were refused evaluation at a detox facility and then taken to a correctional facility.

Even if the latter may be established by Defendant Stell's testimony, "[i]n order to establish *Monell* liability based upon a 'persistent and widespread' practice by a subordinate municipal employee (or employees) other than a policymaker, the employee's unconstitutional conduct must be 'so manifest as to imply the constructive acquiescence of senior policy-making officials.'" *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297-98 (2d Cir. 2020) (quoting *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870-71 (2d Cir. 1992)).

Evidence that Defendants Gagne and Recore took Plaintiff into protective custody without a detox facility making a finding of incapacity coupled with Defendant Recore's testimony that the purpose of protective custody was "to make sure that everybody is safe" does not create a genuine issue of material fact as to whether Defendant Stell acquiesced to a widespread practice of placing people into protective custody without assessing whether they were incapacitated. "A single instance of allegedly unconstitutional conduct is generally insufficient to impose *Monell* liability." *Schmelzinger v. City of Buffalo*, 2024 WL 1023840, at *7 (W.D.N.Y. Mar. 8, 2024); *see McDonald v. City of Troy*, 542 F. Supp. 3d 161, 175 (N.D.N.Y. 2021) (finding that "eight settled lawsuits over eight years" regarding excessive force, while "not the best record for a small city[,]" did not show that the police department's "problems with excessive force are so pervasive and widespread as to have the tacit approval of [the municipality]"). Summary judgment based on a decision made by a policymaker or a policy, practice, or custom of improper evaluations or lack of training to identify "incapacitation" is

therefore GRANTED. This conclusion is underscored by the absence of evidence that the lack of a policy or training caused Plaintiff's injuries.

### 3.    *Monell* Claim Based on Policy or Custom of Abandoning Duty of Care to Incapacitated People in SVPD's Custody at Entrance of NWSCF.

Plaintiff claims that the "SVPD policy that custody of an incapacitated person in an SVPD cruiser transfers to the [DOC] the moment the SVPD cruiser crossed the garage at a [DOC] facility" caused his injury because Defendant Recore "abandoned the duty of care" toward Plaintiff as soon as he entered the NWSCF garage at which Plaintiff alleges excessive force was used on him by DOC employees. (Doc. 228 at 15.) To support the existence of this policy, Plaintiff cites Defendant Recore's testimony that "it is procedure that as soon as you roll through the doors [of the DOC facility] . . . the custody is transferred from police to [the DOC]." (Doc. 228-10 at 35.) Plaintiff does not, however, provide any evidence that Defendant Recore could have retained custody of him had he chosen to do so once Plaintiff was transported to NWSCF.

To succeed in his *Monell* claim, Plaintiff must show that this policy "actually caused or was the moving force behind the alleged violations." *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007). "It is not enough that a policy or policymaker's decision made a violation of the plaintiff's constitutional rights 'more likely[.]'" *Connelly*, 2024 WL 1976658, at *17 (alteration in original) (*quoting Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997)). "To establish deliberate indifference a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights." *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012). "The operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a 'conscious choice' rather than mere negligence." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 128 (2d Cir. 2004) (citation omitted).

Generally, there is no liability for the acts and omissions of a third party absent a special relationship. Although it is true that Plaintiff would not have been injured but for

51

Defendant Recore's decision to drop him off at NWSCF, but-for causation does not automatically create liability. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 833 n.9 (1985) ("Ordinary principles of causation used throughout the law of torts recognize that 'but for' causation, while probably a necessary condition for liability, is never a sufficient condition of liability.").

Plaintiff suggests that Defendant Recore "incited" the DOC to use force against him by "misleadingly telling them that [he] was spitting and kicking" and failing to inform the DOC of Plaintiff's medical boot, but Plaintiff does not allege that these actions were taken pursuant to any municipal policy or practice. The record includes no evidence that Swanton or Defendant Stell were aware or should have been aware that transferring custody to DOC would result in Plaintiff being subjected to excessive force. It is undisputed that during his tenure as SVPD Chief, Defendant Stell was not aware of any other individuals receiving injuries in the garage or sallyport of NWSCF after SVPD transported them there. Doc. 228-2 at 32; *see Connick*, 563 U.S. at 62 ("A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train.") (internal quotation marks and citation omitted). Plaintiff has thus failed to proffer admissible evidence that Swanton's policy of transferring custody to the DOC caused his alleged injury. *See Connelly*, 2024 WL 1976658, at *17 (denying plaintiff's motion for summary judgment on *Monell* claim because "[a]lthough [p]laintiff argues that some [of the municipality's] officers have used excessive force in the past, she does not cite evidence that these events were caused by the Response to Resistance Policy"). The court GRANTS summary judgment for Swanton on this basis.

### 4.    *Monell* Claim Based on Failure to Supervise or Failure to Train.

Plaintiff argues that, even without showing a "pattern of violations[,]" Swanton's lack of written policy regarding on how to identify if a person is incapacitated, when to take someone into protective custody because they are incapacitated, or the use of force against an incapacitated person constitutes deliberate indifference "because the need for training was patently obvious." (Doc. 228 at 16.) Plaintiff claims that "Vermont's

incapacitation statute reflects a policy to treat incapacitated people as needing treatment, not incarceration" and that Defendant Stell, based on his experience as an EMT and police officer, "understood the frequency with which law enforcement comes into contact with intoxicated and incapacitated individuals." *Id.*[13]

As of April 2, 2020, the SVPD had a written policy on the use of force but no written policy directed specifically toward law enforcement interactions with incapacitated individuals. Accordingly, Plaintiff has arguably identified a "specific deficiency in the city's training program[.]" *Brunette v. City of Burlington, Vermont*, 2018 WL 4146598, at *28 (D. Vt. Aug. 30, 2018) (quoting *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007)).

Plaintiff, however, does not proffer admissible evidence of a pattern of constitutional violations in this case. To be found "deliberately indifferent based on a single constitutional violation . . . the municipality must put their employees in a situation with an 'utter lack of an ability to cope with constitutional situations[.]'" *Rosenberg v. Town of Niskayuna*, 2019 WL 4195173, at *6 (N.D.N.Y. Sept. 4, 2019) (quoting *Connick*, 563 U.S. at 67).

The undisputed evidence shows that training at the Vermont Police Academy included instruction on the Incapacitation Statute; SVPD operated according to a written policy that defined the reasonable use of force; and SVPD officers underwent annual

---

[13] Plaintiff also notes that Burlington, Vermont had an incapacitation policy at the time of the incident. According to the testimony of current SVPD chief Matthew Sullivan, Swanton subsequently adopted this policy. *See* Doc. 228-17 at 11 ("It was after we were served with the Complaint and then I reviewed our policies and realized we didn't have one and so I implemented that policy."). The fact that Swanton adopted an incapacitation policy after Plaintiff's alleged injury is a subsequent remedial measure which is inadmissible to establish liability. *See* Fed. R. Evid. 407; *see also Connelly*, 2024 WL 1976658, at *2 (holding that evidence of policy changes after plaintiff's injury was inadmissible as showing "subsequent remedial measures"); *Picard v. JABA Assocs. LP*, 49 F.4th 170, 181 (2d Cir. 2022) ("Only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment, and a district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence.") (alteration adopted) (internal quotation marks and citation omitted).

53

"training in seizures and detentions and the force options to be used in effectuating seizures and other custodial situations." (Doc. 208-45 at 3.) It was therefore not "patently obvious" that the lack of a written policy or other additional training by SVPD on how to determine if a person was incapacitated would cause officers to violate individuals' constitutional rights. There is also no evidence that the lack of a policy had a causal relationship to what allegedly happened at NWSCF. *See Cox v. City of Rochester*, 2025 WL 50340, at *8 (W.D.N.Y. Jan. 8, 2025) (holding that objections to content and duration of training are "not enough to show that municipality's failure to train amounts to deliberate indifference"); *Brunette*, 2018 WL 4146598, at *28 (noting that "evidence arising solely from the incident in question cannot provide the basis for a claim of failure to train"); *O'Brien v. Barrows*, 2013 WL 486655, at *10 (D. Vt. Feb. 7, 2013) ("To hold the Town liable for inadequate training, without any notice of a deficiency in its police department's training regime, risks converting *Monell* liability into respondeat superior liability.").

Because Plaintiff has not proffered admissible evidence showing that he was injured due to a lack of municipal custom or policy or that Swanton's failure to train amounted to deliberate indifference, the court GRANTS summary judgment for Swanton on Count V.

## I.  Whether Defendants Stell and Swanton Are Entitled to Summary Judgment on Plaintiff's Vermont Constitution, Chapter 1, Article 11 Claim (Count VI).

Defendants Stell and Swanton seek summary judgment on Plaintiff's claim arising under Article 11 of the Vermont Constitution, which protects against unreasonable searches and seizures and "provides broader protection to individual rights than does the Fourth Amendment." *State v. Bryant*, 2008 VT 39, ¶ 14 n.2, 183 Vt. 355, 364, 950 A.2d 467, 473. The Vermont Supreme Court has recognized "an implied private right of action for damages . . . available directly under Article 11[]" based upon "a showing that a law enforcement officer acting within the scope of the officer's duties either acted with bad faith or knew or should have known that those actions violated clearly established law."

54

*Zullo v. State*, 2019 VT 1, ¶ 3, 209 Vt. 298, 306, 205 A.3d 466, 472.

To succeed in a claim for damages under Article 11, a plaintiff "must show that: (1) the officer violated Article 11; (2) there is no meaningful alternative remedy in the context of that particular case; and (3) the officer either knew or should have known that the officer was violating clearly established law or the officer acted in bad faith." *Id.* 2019 VT 1, ¶ 55, 209 Vt. at 333, 205 A.3d at 491. In applying the third element, the Vermont Supreme Court uses the federal definition of "clearly established." *See id.* ("A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.") (internal quotation marks omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). "[B]ad faith, which may exist even when the officer's conduct could be viewed as objectively reasonable, is characterized by ill will or wrongful motive, including discriminatory animus." *Id.* "[A]lthough subjective motivation may often have to be resolved by the factfinder, a plaintiff cannot withstand summary judgment without producing colorable facts upon which a reasonable jury could find bad faith." *Id.* 2019 VT 1, ¶ 57, 209 Vt. at 334, 205 A.3d at 492.

Because Defendants Gagne and Recore had arguable probable cause to seize Plaintiff and because their actions did not violate clearly established federal law, Plaintiff must provide evidence that warrants "broader protections than the Fourth Amendment[.]" *Id.* 2019 VT 1, ¶ 40, 209 Vt. at 325, 205 A.3d at 485 (collecting cases). Plaintiff contends that Vermont's incapacitation statute clearly established his "right not to be incarcerated for being intoxicated[.]" (Doc. 228 at 21.) The applicable statute does not provide this guarantee. Instead, it sets forth a mandatory protocol for screening an individual for incapacitation before the person may be taken to a correctional facility. Defendants Gagne and Recore attempted to follow this protocol by taking Plaintiff to the Howard Center for screening. To the extent Defendants Gagne and Recore arguably deviated from the protocol by failing to inquire whether the nearest hospital would accept Plaintiff for

treatment, imperfect compliance with a statute is not evidence of objective bad faith.[14] Plaintiff has proffered no evidence that Defendants Gagne and Recore acted with "gross negligence" or caused "willful or wanton injury[,]" which the Incapacitation Statute requires for civil liability. 18 V.S.A. § 4810(j). As Plaintiff's own expert opined, Officers Gagne and Recore were professional in their engagement with Plaintiff and acted without malice. No rational juror viewing the videotape of their encounter with Plaintiff could conclude that they acted in bad faith.

Because Plaintiff has not established that Defendant Gagne's or Recore's actions violated clearly established law under Article 11 or the United States Constitution, summary judgment must be granted. *See Kent v. Katz*, 146 F. Supp. 2d 450, 464 (D. Vt. 2001) (granting summary judgment for defendant on plaintiff's Vermont state constitutional claims because plaintiff had not shown that the rights in question were "clearly established").

For the foregoing reasons, the court GRANTS summary judgment for Defendants Stell and Swanton on Count VI.

## CONCLUSION

The court therefore GRANTS summary judgment for Defendants Gagne, Recore, Swanton, and Stell.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 29th day of August, 2025.

Christina Reiss, Chief Judge
United States District Court

---

[14] The Second Circuit's observation in *Boyd v. City of New York*, 336 F.3d 72, 77-78 (2d Cir. 2003) that "[a] lack of probable cause generally creates an inference of malice[,]" does not apply where, as here, the court has found at least arguable probable cause as a matter of law.